IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 4:17cr76 |
| v. | ) | |
| | ) | |
| ELMER EMMANUEL EYCHANER, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS
<u>COUNT TWO WITH MEMORANDUM IN SUPPORT</u>**

Defendant, Elmer Emmanuel Eychaner, by counsel and pursuant to Rule 12 of the Federal

Rules of Criminal Procedure, moves this Honorable Court to dismiss Count Two of the indictment.

In support of this motion, Mr. Eychaner states as follows:

<u>**STATEMENT OF ISSUES**</u>

This motion to dismiss Count Two presents the following questions:

1. Is § 1466A unconstitutionally vague when, as here, a person is charged with *attempting* to receive obscene cartoons without identifying for the jury any particular cartoon as obscene?

2. Does § 1466—which imposes draconian criminal penalties for attempted receipt of obscene cartoons—unconstitutionally chill protected speech in violation of the First Amendment?

3. Can a law that criminalizes the receipt of sexually explicit cartoons on a home computer—thereby touching upon the most private human conduct (sexual behavior) in the most private of places (the home)—survive strict scrutiny? Or does it infringe on fundamental liberties protected by substantive due process?

4. By failing to identify any specific item received in violation of the statute, does Count Two fail to state an offense, fail to fairly inform Mr. Eychaner of the charge against which he must defend, or fail to allow Mr. Eychaner to plead the judgment in this case as a defense to further prosecution?

5.  Does Count Two violate the rule against duplicity by charging Mr. Eychaner with two distinct offenses: both attempt to receive cartoon obscenity and the completed offense?

## BACKGROUND

Mr. Eychaner is charged with one count of Access with Intent to View Minors Engaged in Sexually Explicit Conduct in violation of 18 U.S.C § 2252(a)(4)(B), one count of Attempted Receipt of Obscene Visual Representations of the Sexual Abuse of Children in violation of 18 U.S.C § 1466A(a)(1), one count of Destruction of a Tangible Object to Impede a Federal Investigation in violation of 18 U.S.C. § 1519, one count of Obstruction of Justice-Attempted Evidence Tampering in violation of 18 U.S.C. § 1512(c)(1), and one count of Penalties for Registered Sex Offender in violation of 18 U.S.C. § 2260A.  ECF. No. 1.

On September 5, 2017, Mr. Eychaner entered a plea of not guilty.  ECF No. 10.  A motion to compel Production of Evidence was filed by the defense on November 9, 2017, and a response in opposition was filed by the United States on November 24, 2017.  ECF Nos. 14, 17.  That motion is still pending before the Court.  The defense has filed two unopposed motions to extend the motions cut-off date so that the defense expert may review the discovery before the filing of motions.[1]  ECF Nos. 12 and 15.  Both of those motions were granted.  A jury trial is currently set for January 9, 2018.  ECF No. 10.

## LEGAL STANDARDS

Rule 12(b)(1) states "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  The Supreme Court has

---

[1] In the interests of time, the defense is filing these motions despite the expert having not yet reviewed the evidence.  Should the expert alert defense counsel to additional issues that should be addressed pretrial, the defense will request the ability to file additional motions late.

explained that a defense may be raised and adjudicated in a pre-trial motion "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969).

Mr. Eychaner raises purely legal questions about whether Count Two should be dismissed in its entirety because it is unconstitutional facially or as applied to Mr. Eychaner. Rule 12(b)(3)(B) allows a motion for dismissal to be filed before trial if there is "a defect in the indictment or information." The Supreme Court has held that no prosecution can stand under a law that is unconstitutional. *United States v. Stanley*, 109 U.S. 3, 8-9 (1883). Therefore, if the indictment "alleges a violation of an unconstitutional statute," it is defective and may be dismissed following a motion under Rule 12(b)(3)(B). *United States v. Brown*, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010) (citing *Stanley*, 109 U.S. 8-9). Mr. Eychaner also moves to dismiss Count Two for duplicity because the indictment improperly joins two offenses in the same count. That motion, too, is properly raised before trial pursuant to Rule 12(b)(3)(B)(i).

## **ARGUMENT**

Count Two of the indictment should be dismissed for five reasons. ***First***, as applied to non-existent or unspecified materials, the crime of attempted receipt of obscenity under § 1466A is unconstitutionally vague. ***Second***, § 1466—which imposes severe criminal penalties for attempted receipt of obscene cartoons—unconstitutionally chills protected speech in violation of the First Amendment. ***Third***, a law that forbids a person from downloading sexually explicit cartoons onto his home computer touches upon the most private human conduct, sexual behavior, and in the most private of places, the home. Because no compelling government interest supports this restriction on a fundamental liberty interest, § 1466A violates substantive due process under the Supreme Court's decision in *Lawrence v. Texas*. ***Fourth***, by failing to identify any specific

3

item or material received in violation of the statute, Count Two fails to state an offense, fails to fairly inform Mr. Eychaner of the charge against which he must defend, and fails to allow Mr. Eychaner to plead the judgment in this case as a defense to further prosecution. **Finally**, Count Two must be dismissed for duplicity because it charges Mr. Eychaner with two distinct offenses: attempt to receive cartoon obscenity and the completed offense.

## I. As Applied to Non-Existent or Unspecified Materials, the Crime of Attempted Receipt of Obscenity Under § 1466A Is Unconstitutionally Vague.

The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." The Supreme Court's vagueness doctrine holds that the government "violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Com. of Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

Section 1466A is unconstitutionally vague as applied to Mr. Eychaner in this case. 18 U.S.C. § 1466A. He is charged with attempting to receive "visual depictions that depict minors engaging in sexually explicit conduct and are obscene, to wit: obscene anime cartoons." ECF No. 1, at 2. The indictment does not identify any particular cartoon as that which Mr. Eychaner allegedly attempted to receive. Nor does the indictment say whether the allegedly "obscene anime cartoons" in question actually exist. At trial on an attempt theory, the government presumably will not have to demonstrate that Mr. Eychaner ever actually received an obscene anime cartoon. Nor will the jury have to find that Mr. Eychaner ever even saw an obscene anime cartoon or that the

obscene cartoon that he allegedly attempted to receive ever actually existed.  Because—under the government's charged attempt theory—the jury will be asked to answer the impossibly indeterminate question whether an unspecified or perhaps non-existent item is obscene, § 1466A is unconstitutionally vague.

In *Miller v. California*, the Supreme Court recognized inherent difficulties in determining whether or not a particular item is obscene.  413 U.S. 15 (1973).  But—at least when determining the status of a specific item—the Court acknowledged the permissibility of such vagueness under the Constitution:

> The mere fact juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged. As this Court observed in *Roth v. United States*, 354 U.S., at 492 n.30, [ ] 'it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system.

*Miller*, 413 U.S. at 26 n.9.  The *Miller* Court continued, "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."  *Id.* at n.10. But in *Miller* and subsequent cases, criminal obscenity statutes surviving vagueness challenges have required the government to identify the particular item that is claimed to be obscene.  Thus, although different juries may reach different conclusions as to the same material—as *Miller* assumes—any given jury is asked to decide the obscenity question as to some particular material.

The indictment against Mr. Eychaner, however, does not allege that any particular item is obscene.  And—at least insofar as the indictment charges *attempted* receipt of an obscene item that never actually existed—perhaps it cannot.  Indeed, attempt liability can exist under this statute when a defendant—with the specific intent to download an obscene cartoon depicting a child engaged in sexually explicit conduct—takes a substantial step toward completion of the offense.

*See generally Braxton v. United States*, 500 U.S. 344, 351 fn\* (1991) (observing that attempt liability requires specific intent to commit completed offense even if completed offense is not a specific intent crime).  It is unclear, therefore, whether any obscene material must actually exist under the statute.  What fact, exactly, is a jury supposed to find in a case where the statute requires the jury to determine whether the item a defendant attempted to receive is obscene when that item is never identified or perhaps never even existed?  And how is the jury supposed to go about finding that fact?  The problem here is not merely that this fact will be hard for the jury to decide or that some cases will exist in which that question is difficult to determine; rather, the problem with § 1466A attempt is the inherent indeterminacy of precisely how the jury is supposed to approach the obscenity element when the allegedly obscene material is unspecified or non-existent.

The problem here is not dissimilar from that the Supreme Court addressed in *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015).  In *Johnson*, the residual clause of the Armed Career Criminal Act ("ACCA") required judges to determine whether a defendant's prior offense of conviction presented a "serious potential risk" of physical injury to another.  *Id.*  As with *Miller*'s obscenity standard, there was a non-trivial degree of vagueness inherent in applying that "serious potential risk" standard to a set of real world facts.  Yet, as the Supreme Court observed in *Johnson*, "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction."  *Id.* at 2558.  Because ACCA required judges to first imagine the "ordinary case" and then apply the "serious potential risk" standard to that abstraction, ACCA took an otherwise acceptable risk standard and used it in a statutory scheme that was—as a whole—unconstitutionally vague.  *Id.*  The same is true here.

Although some inherent vagueness exists whenever a jury applies *Miller*'s obscenity test to some identified item, that process does not run afoul of Due Process.  The same cannot be said,

however, when a jury is asked to apply *Miller*'s obscenity test to an unspecified or non-existent item.  As in ACCA, a jury would first be asked to imagine the unspecified or non-existent item that the defendant allegedly attempted to receive.  (How would it ever do so?)  And then the jury would have to decide whether this item—constructed somehow by the jury—is obscene under *Miller*.  It would violate Due Process for a man's liberty to turn on how a jury answers such an indeterminate question.  This is especially so when the statute implicates First Amendment interests.  *See Scull*, 359 U.S. at 353.

What is more, the ability to initiate obscenity-based prosecutions when no actual obscenity was involved in the inchoate offense opens the door to selective and discriminatory enforcement.  *See City of Chicago v. Morales*, 527 U.S. 41, 62 (1999); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).  The statute here proscribes an *attempt* to receive expressive material and therefore threatens the imposition of criminal sanctions without a defendant ever having actually received obscene materials.  This essential aspect of attempt liability will allow police and prosecutors to enforce content-based restrictions on the exchange of expressive material without reference to any specific material in existence.  No outside actor—no judge, jury, or member of the press or public—could independently assess the material in question to determine whether it actually qualifies as protected speech under the First Amendment.  Punishing the attempted receipt of non-existent material—especially without some specific guideline for how enforcement decisions should be made in such circumstances—invites selective and arbitrary enforcement.  One person who Googles "Lolita" may be treated differently from another, and the law gives police and prosecutors largely unbound discretion in such circumstances.  This is particularly problematic in the context of this statute because the "standards of permissible statutory vagueness are strict in the area of free expression."  *NAACP v. Button*, 371 U.S. 415, 432 (1963).

For all these reasons, § 1466A should be stricken down as unconstitutionally vague.

## II.   A Statute that Imposes Severe Criminal Penalties For *Attempted* Receipt of Obscene Cartoons Violates the First Amendment By Chilling Protected Speech.

Like the statute the Supreme Court struck down in *Ashcroft v. Free Speech Coalition*, § 1466A "prohibit[s] child pornography that does not depict an actual child." 535 U.S. 234, 240 (2002).   To avoid the problem identified in *Free Speech Coalition*, Congress required—in § 1466A—that any images not depicting an actual child be obscene.   By requiring the government to prove in a § 1466A prosecution that the cartoon at issue is obscene, the statute avoids a direct prohibition of protected speech.   *See Miller*, 413 U.S. at 23-24 (defining obscenity and finding it not protected speech under First Amendment); *see also Roth v. United States*, 354 U.S. 476, 484-85 (1957).

A statute that does not proscribe protected speech, however, can still violate the First Amendment if it unconstitutionally chills protected speech.   *See generally Free Speech Coal.*, 535 U.S. at 255 ("The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited *or chilled* in the process.") (emphasis added).   Section 1466A is unconstitutional because, in explicitly banning unprotected obscenity, it substantially chills protected speech.

A.   Even a law that directly targets only obscenity can unconstitutionally chill protected speech.

In the seminal law review article on the chilling effect doctrine, Professor Shauer provides a tentative definition for the phenomenon:

> *A chilling effect occurs when individuals seeking to engage in activity protected by the first amendment are deterred from so doing by governmental regulation not specifically directed at that protected activity.*   Thus, if a statute which is directed at hard-core pornography has the actual effect of deterring an individual from publishing the Decameron or Lady Chatterley's Lover, that effect is properly deemed a chilling effect.

Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the Chilling Effect*, 58 B. U. L. Rev. 685 (1978) (hereinafter "Schauer") (italics in original).[2]

The Supreme Court has applied this framework and stricken down criminal laws that targeted only obscenity because the practical effect of the law's restriction on unprotected obscenity would be to chill protected speech. In *Smith v. California*, 361 U.S. 147, 153 (1959), the Court struck down a statute that targeted only obscenity. Under that statute, booksellers were in violation of the obscenity law regardless of whether they knew that the item they possessed was obscene. The Court wrote that "if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose, he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature." *Id.* Thus, the statute only directly regulated obscenity. But it did so in a way that chilled protected speech. Therefore, the Supreme Court held, the obscenity statute violated the First Amendment. *Id.*

The Court's rationale is *Smith v. California* is similar to the approach this Court should apply here. To be sure, obscenity may be regulated. But, as the Supreme Court has said, "[R]egulation of obscenity must 'conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line.'" *Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 210 (1964) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). In this case, attempt liability under § 1466A crosses that line and unconstitutionally chills protected speech. At least as applied to Mr. Eychaner, the statute violates the First Amendment.

---

[2]*Available at* http://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=2010&context=facpubs (last accessed Dec. 12, 2017).

B. <u>The degree of First Amendment chill is measured by multiplying the probability of erroneous conviction or investigation by the harm produced by such error.</u>

A law that chills protected speech only in the slightest or most incidental way can survive First Amendment scrutiny whereas laws that substantially chill protected speech cannot. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). This means there must be some framework by which to measure the degree of "chill" imposed by a statute. The degree of chill may be likened to the product of the probability of the erroneous imposition of a legal sanction (i.e., a sanction for conduct protected by the First Amendment), times the harm produced by such an error. Schauer, at 695.

Applying that general framework here reveals a substantial probability that § 1466A will erroneously punish conduct protected by the First Amendment. Especially if this Court finds that § 1466A can criminalize the attempted receipt of traditionally expressive material—i.e., cartoons—without identifying any specific cartoon as obscene, the chill on protected First Amendment activity would be substantial. The indictment here does not identify any specific item as having been sought out by the defendant, yet the jury will be asked to decide whether this non-existent item—which may only have allegedly existed in Mr. Eychaner's mind—is obscene. Such a law comes very close to criminalizing mere thought. And as a practical matter, it will dissuade people from seeking out expressive material that—although perhaps unseemly—qualifies as protected speech under *Free Speech Coalition* and *New York v. Ferber*, 458 U.S. 747 (1982). Even if those items a person actually receives qualify as protected speech, he may still be criminally prosecuted under the theory that he *attempted* to receive some unidentified or non-existent item that constituted either child pornography under *Ferber* or obscenity under *Miller*.

As Professor Schauer observes, vagueness increases the possibility of error in the adjudicatory process and lessens the opportunity for correcting such error on appeal. Schauer, at

696 n.53.  The Supreme Court has recognized that the combination of vagueness problems and a criminal sanction can lead to unconstitutional chill under the First Amendment.  *See Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (holding that the law's "vagueness … raises special First Amendment concerns because of its obvious chilling effect on free speech" especially because it carried "criminal sanctions").  Accordingly, even if the vagueness issues described in Part I, *supra*, do not invalidate § 1466A under the Fifth Amendment, they increase the probability of error and therefore increase the degree of chill in this First Amendment analysis.

Finally on the probability of error, the inherently prejudicial and offensive nature of the allegations might lead a jury to more readily convict in this context than if other areas where the line between protected speech and obscenity is less offensive.  Section 1466A requires that a cartoon both 1) depict children engaging in sexually explicit conduct, and 2) be obscene.  Although jurors take seriously their obligation to apply the law, any juror evaluating the obscenity question will undoubtedly suffer some implicit bias against a person perceived to be sexually deviant based on his attempt to receive a cartoon image of a sexualized child, regardless of whether the cartoon also had some serious literary or artistic value.  This increases the probability of error.

The erroneous sanctioning of protected speech is one factor in measuring the degree of chill.  As mentioned above, the other factor is the magnitude of the harm resulting from such sanction.  "The most obvious measure of his harm is the harshness of the penalty."  Schauer, at 696.  Here, the harshness of the penalties on Count Two are extreme.  Mr. Eychaner faces a mandatory minimum prison term of 15 years if convicted on Count Two.  Count Two also serves as the only available predicate offense for a mandatory consecutive sentence of 10 years under Count Five.  So, as applied to Mr. Eychaner, the difference between attempting to receive a non-

obscene cartoon and attempting to receive an obscene cartoon is the difference between lawfully engaging in constitutionally protected speech and spending at least 25 years in federal prison.

Another factor affecting the magnitude of the harm is the extreme social stigmatism associated with sex offenses.  *See* Schauer, at 697 (discussing "stigma and disabilities which accompany a criminal conviction" as part of harm in chill analysis).  According to the drafters of the Model Penal Code, "the treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state.  For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements."  Model Penal Code: Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law Inst., Discussion Draft No. 2, 2015).

In a recent case involving possession of child pornography in the Eastern District of New York, the court emphasized that "[t]he heavy burdens of sex offender registration requirements are well-known."  *United States v. E.L.*, 188 F. Supp. 3d 152, 173 (E.D.N.Y. 2016).  A convicted sex offender "will have to live with the serious collateral consequences of his conviction: he will perpetually bear the scarlet letter that comes with being a convicted felon and registered sex offender."  *Id.*

More specifically, convicted sex offenders must comply with strict supervision requirements, such as submission to searches, computer monitoring, and even polygraph testing, that extend into nearly every facet of life.  *See id.*  Beyond the concrete day-to-day consequences, courts have also recognized that "[r]econnecting with family and loved ones may be particularly hard for sex offenders, because of the stigma associated with the offense as well as the strict restrictions imposed upon release."  *United States v. R.V.*, 157 F. Supp. 3d 207, 248 (E.D.N.Y.

2016).  In sum, a conviction under § 1466A imposes substantial harm *in addition* to the lengthy term of imprisonment.

A non-trivial probability of error multiplied by an extraordinarily high degree of harm results in a substantial degree of chill.

Finally, it is worth noting that although a conviction under § 1466A is clearly the ultimate harm at stake, being arrested for or searched in connection with a crime involving child-related obscenity imposes significant harm even on a defendant who is ultimately acquitted.  These government actions—with their attendant social stigmatization, professional ruin, and family upheaval—may be triggered by mere probable cause.  Because the legal standard is lower (probable cause versus beyond-a-reasonable-doubt) the likelihood of being arrested for or searched in connection with a § 1466A investigation is far greater than being erroneously convicted.  And the harm is still great.  Thus, the chill on protected speech created by § 1466A is significant even when—for some case-specific reason—the prospect of the defendant ultimately being convicted is not as high.

C.  <u>The facts here demonstrate how prosecutions for attempted receipt of obscenity can chill protected speech</u>

The prospect that protected speech will be chilled by this prosecution is not speculative. Although the indictment is vague, the government has already prosecuted Mr. Eychaner for a supervised release violation based on the same conduct.  *See United States v. Eychaner*, No. 2:07cr183 (Jan. 31, 2017).  The petition on supervised release in that matter and the discovery produced in this case shows that the government will attempt to prove Mr. Eychaner's attempted receipt of obscene cartoons, at least in part, based on his alleged use of search terms including "images of cg [computer generated] Lolita sex"; "Lolicon 3D images"; "show images of lolita model"; and "show images of lolita."  ECF No. 42, at 5 in *Eychaner*, No. 2:07cr183.

The defense believes that the government will attempt to use Mr. Eychaner's alleged use of those internet search terms to demonstrate that he intended to receive some unidentified or unspecified obscene cartoon.  If so, any rational person would balk at entering "show images of lolita" into Google's image search box.   Yet that search nets a top result consisting of core expressive speech: information about a 1997 feature film based on Vladimir Nabokov's classic novel.  That chilling effect—deterring people from engaging in core First Amendment activity— renders the statute unconstitutional, at least as applied to these facts.

### III.   A Statute Prohibiting the Private Exchange of Obscene Cartoons Between Consenting Adults Violates Fundamental Liberty Interests Protected Under the Fifth and Fourteenth Amendments.

In *Lawrence v. Texas*, the Supreme Court recognized the right of consenting adults to engage in private acts of sexual expression.  539 U.S. 558, 578 (2003).  *Lawrence* struck down a state law that—justified by promoting the interest of morality—sought to prohibit conduct "touching upon the most private human conduct, sexual behavior, and in the most private of places, the home."   *Id.* at 567.   Here, Congress sought to do the same thing through § 1466A, which prohibited Mr. Eychaner from receiving—in his home—obscene cartoon images not involving actual children.  This statute touches on the same liberty interest at stake in *Lawrence* and can be justified only by a similar morality-based rationale.   Accordingly, for the same reasons the Supreme Court struck down the statute in *Lawrence*, this Court should strike down § 1466A as unconstitutional and dismiss Count Two.

In the face of First Amendment challenges, the Supreme Court and the Fourth Circuit have upheld statutes that limit the exchange of obscene materials.  *See, e.g., United States v. Reidel*, 402 U.S. 351, 355 (1971); *United States v. Whorley*, 550 F.3d 326, 332 (4th Cir. 2008).  Defendants in those cases argued that because the First Amendment protects the *possession* of obscenity in one's home, *Stanley v. Georgia*, 394 U.S. 557 (1969), the First Amendment also protects a concomitant

right to receive such obscenity.  That argument has been rejected.  And although the defense raises it here to preserve the question for appeal, the defense also acknowledges that this particular argument is likely foreclosed by binding precedent in *Whorley*.

But a question addressed in *Whorley* is whether receiving, from another consenting adult in your home, obscene items that do not depict actual children is an act of sexual expression protected by substantive due process.

The Supreme Court's decision in *Lawrence* confirmed that "the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person."  539 U.S. at 565.  In that case, Lawrence challenged a law that proscribed certain private sexual contact between consenting adults of the same sex.  Describing the liberty interest at stake, the Court wrote that the law "touch[ed] upon the most private human conduct, sexual behavior, and in the most private of places, the home."  *Id.* at 567.  The Court held that, as a general rule, courts and the state should stay out of regulating in that arena "absent injury to a person or abuse of an institution the law protects."  *Id.*

There is no moral equivalency between homosexuality and pedophilia.  The defense is not suggesting that there is.  But in defining the liberty interest being regulated, there is no principled distinction between the conduct at issue in *Lawrence* and the conduct at issue here.   Both homosexual sodomy and downloading sexually explicit cartoons into a home computer "touch[ ] upon the most private human conduct, sexual behavior, and in the most private of places, the home."  *Id.*  The *Lawrence* Court observed that, "The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused."  *Id.* at 578.  The same is true here.

Section 1466A does not proscribe only pornography depicting actual children.  If it did, the government would certainly have a compelling interest to proscribe such conduct, notwithstanding any plausible liberty interest raised by a defendant.  *See Ferber*, 458 U.S. at 758 (holding that statute proscribing pornography involving actual minors protects children who would be harmed through the production process).  The question is whether the government has a compelling state interest here, when the statute does not involve depictions of actual children.

To defend the constitutionality § 1466A, the government may assert that its prohibition of sexualized cartoon images is sufficiently related to the serious and legitimate regulatory interests that exist over either real child pornography or hands-on offenses against children such that the government can prohibit conduct in this area too.  But the Supreme Court rejected a more compelling version of that same argument in *Free Speech Coalition*.  535 U.S. at 250.

In *Free Speech Coalition*, the government argued that it could prohibit depictions of what appeared to be actual children engaging in sexual activity even if the images were computer generated or created with adult actors.  The Supreme Court disagreed:

> In contrast to the speech in *Ferber*, speech that itself is the record of sexual abuse, the CPPA prohibits speech that records no crime and creates no victims by its production.  Virtual child pornography is not "intrinsically related" to the sexual abuse of children, as were the materials in *Ferber*.  458 U.S. at 759.  While the Government asserts that the images can lead to actual instances of child abuse, the causal link is contingent and indirect.  The harm does not necessarily follow from the speech, but depends upon some unquantified potential for subsequent criminal acts.

*Free Speech Coal.*, 535 U.S. at 250 (internal citations omitted).  Again, the same is true here.

The government may also assert that § 1466A legitimately promotes decency and morality.  But as the Fourth Circuit held when analyzing laws that implicate a fundamental liberty interest, the "interest of promoting moral principles is [ ] infirm in light of *Lawrence*: 'the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a

sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could

save a law prohibiting miscegenation from constitutional attack.'"  *Bostic v. Schaefer*, 760 F.3d

352, 380 (4th Cir. 2014) (quoting *Lawrence*, 539 U.S. at 577-78 and *Bowers v. Hardwick*, 478

U.S. 186, 216 (1986) (Stevens, J., dissenting)).  Indeed, as the *Lawrence* Court wrote:

> [F]or centuries there have been powerful voices to condemn
> homosexual conduct as immoral.  The condemnation has been
> shaped by religious beliefs, conceptions of right and acceptable
> behavior, and respect for the traditional family.  For many persons
> these are not trivial concerns but profound and deep convictions
> accepted as ethical and moral principles to which they aspire and
> which thus determine the course of their lives.  These considerations
> do not answer the question before us, however.  The issue is whether
> the majority may use the power of the State to enforce these views
> on the whole society through operation of the criminal law.  "Our
> obligation is to define the liberty of all, not to mandate our own
> moral code."  *Planned Parenthood of Southeastern Pa. v. Casey*,
> 505 U.S. 833, 850 [ ] (1992).

539 U.S. at 571.

It is not lost on counsel for Mr. Eychaner that any analogy between homosexual contact

between consenting adults and the receipt of obscene cartoons depicting child-like characters

engaged in sexually explicit conduct is nearly guaranteed to offend.  The defense does not make

this analogy lightly or with the aim of offending.  But the defense submits that any distinction

between these two forms of privately expressed sexual conduct is based on different normative

assessments of the conduct's morality.  Neither involves actual children.  Neither involves public

activity.  Both involve conduct that has been historically attacked as immoral.  The point here is

not to draw a moral equivalency where one does not exist.  (The absence of moral equivalency is

what makes the analogy so likely to offend.)  Rather, the point is to observe that—however strong

the moral case against a particular activity—morality-based legislation cannot curtail fundamental

liberty interests.  Some greater government interest is needed for such a law to survive strict

scrutiny.

Section 1466A prohibits conduct that falls squarely within the fundamental liberty interest identified by the Supreme Court in *Lawrence*: "the most private human conduct, sexual behavior, and in the most private of places, the home."  539 U.S. at 567.  The defense acknowledges that many who deem any act of sexual expression involving a cartoon depiction of a non-existent child to be wrong "reach that conclusion based on decent and honorable religious or philosophical premises."  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015).  Again, the defense clearly acknowledges the moral case to be made.  But as the Court in *Lawrence* held, even majority-held morality considerations do not answer the question before the Court.  "The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law."  *Lawrence*, 539 U.S. at 571.  Because § 1466A prohibits private conduct that falls within a core liberty interest protected by substantive due process, the majority may not use the power of the federal government to enforce its views on Mr. Eychancer through operation of the criminal law.  Section 1466A is unconstitutional and Count Two must be dismissed.

**IV.   The Indictment's Failure to List Any Specific Work as Violative of the Statute Must Result in Dismissal.**

   A.  By Failing to Allege That Mr. Eychaner Received or Attempted To Receive Any *Specific* Obscene Cartoon, Count Two Fails to State a Claim.

Section 1466A makes it a crime for any person to "knowingly … receive[ ] … a visual depiction of any kind, including a … cartoon … that … depicts a minor engaging in sexually explicit conduct; and [ ] is obscene."  18 U.S.C. § 1466A.  Count Two of the indictment charges that Mr. Eychaner "knowingly received and attempted to receive visual depictions that depict minors engaging in sexually explicit conduct and are obscene, to wit: obscene anime cartoons."  ECF No. 1, at 2.  The indictment fails to identify the "visual depiction" or "cartoon" that is the subject of this prosecution.  Because the indictment does not identify any specific conduct as

violating the statute, it fails to state an offense.  *Cf. United States v. Furukawa*, No. 06cr145, 2006 WL 3330726, at *2 (D. Minn. Nov. 16, 2006) (finding that the indictment stated the offense of transportation of child pornography because the "indictment informs defendant of each element of the offense for which he is charged *and identifies with specificity eighteen image files that are the basis of that offense*) (emphasis added).  Accordingly, dismissal is appropriate pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v).

B. <u>Assuming the Indictment States a Claim Under § 1466A, It Fails To Fairly Inform Mr. Eychaner of the Charge Against Which He Must Defend and May Not Allow Him To Plead a Judgment Here as a Bar To Future Prosecutions for the Same Offense.</u>

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  The two parts of the first requirement—A) must contain the elements, and B) must fairly inform the defendant of the charge against which he must defend—stand independently from each other.  Although infrequently, sometimes an indictment "satisfies one of those requirements but does not simultaneously satisfy the other."  *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988).  For purposes of this argument, the defense assumes *arguendo* that the indictment charges the essential elements.  Even so, the indictment should be dismissed because it fails to fairly inform the defendant of the charge against which he must defend.

The Supreme Court's decision in *Russell v. United States* is probably most directly on point here.  369 U.S. 749 (1962).  Mr. Russell had been convicted under a statute which provided that, "Every person who having been summoned as a witness by … any committee of either House of Congress … who … refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor."  *Id.* at 752, n.2 (quoting 2 U.S.C. § 192).  The indictment

tracked the language of the statute, stating that the questions to which answers were refused "were pertinent to the question then under inquiry" by the subcommittee. *Id.* The indictment failed, however, to identify the subject under subcommittee inquiry. *Id.* The Supreme Court held that to provide fair notice to the defendant and to ensure that any conviction would arise from the theory of guilt presented to the grand jury, the indictment in *Russell* had to do more than merely restate the language of the statute. *Id.* at 764. The *Russell* Court wrote,

> [T]he very core of criminality under [2 U.S.C. § 192] is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is central to every prosecution under the statute. Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.

*Id.*

As in *Russell*, the defense assumes here that the indictment charges each element of the offense. But like the indictment in *Russell*—which failed to provide the defendant with notice of the subject under inquiry—the indictment here fails to apprise Mr. Eychaner of the image or item that he allegedly received or attempted to receive. In *Russell*, pertinency was the core of criminality under § 192 and could not be determined except by reference to the subject under subcommittee inquiry; here, obscenity is the core of criminality under § 1466A and cannot be determined except by reference to the specific item or material received.

In the indictment, the government has not identified any specific cartoon as that which Mr. Eychaner received or attempted to receive. How is Mr. Eychaner to prepare a defense when neither he nor his lawyers know the basis for the crime alleged? The government must prove that any cartoon received by Mr. Eychaner is obscene. But what image does the government claim to be obscene? Without knowing the answer to that question, it will be impossible for Mr. Eychaner to contest or rebut the government's evidence on the obscenity element.

Moreover, "an important function of the indictment is to ensure that, 'in case any other proceedings are taken against [the defendant] for a similar offence, … the record [will] sho[w] with accuracy to what extent he may plead a former acquittal or conviction." *Sanabria v. United States*, 437 U.S. 54, 66 (1978) (quoting *Cochran v. United States*, 157 U.S. 286, 290 (1895)) (modifications in *Sanabria*).  Here, because the indictment does not allege that Mr. Eychaner attempted to receive any specific cartoon, Mr. Eychaner may have difficulty pleading his acquittal on Count Two as a bar to subsequent prosecutions or charges based on his alleged receipt of some other obscene cartoon.  *Compare with United States v. McCarty*, 862 F.2d 143, 145 (7th Cir. 1988) (observing, in § 922(g) case where indictment "specifically identified the handgun McCarty possessed by make, caliber, and serial number," that "the detail in the indictment, particularly the specificity with which it described the handgun, protected McCarty against double jeopardy"). Due Process requires more specificity than that contained in Count Two.  Accordingly, Count Two should be dismissed.

## V.   Count Two Must Be Dismissed For Duplicity Because It Charges More Than One Offense.

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  Here, Count Two should be dismissed because it joins two distinct and separate offenses in a single count: the completed offense, and the attempt of the underlying offense.  These offenses have different *mens rea*, and attempt is not a true lesser-included of the completed charged offense.  As such, Count Two is duplicitous.  And because there is a risk of jury confusion and the possibility that Mr. Eychaner could be convicted on hybrid of these distinct offenses, he is prejudiced thereby.  Count Two should therefore be dismissed.

A.   Count Two charges attempt and the underlying completed offense.

Section 1466A(a)(1) provides, in relevant part, that, "Any person who . . . knowingly . . . receives . . . a visual depiction of any kind that depicts a minor engaging in sexually explicit conduct; and is obscene . . . or attempts or conspires to do so, shall be subject to the penalties provided in section 2252A(b)(1)[.]"

Count Two of the indictment here charges that Mr. Eychaner "*knowingly received and attempted to receive* visual depictions that depict minors engaging in sexually explicit conduct and are obscene, to wit: obscene anime cartoons."[3] ECF No. 1 (emphasis added).  Accordingly, Count Two charges Mr. Eychaner with both the inchoate attempt offense and the underlying completed offense of receiving obscene visual representations of a minor engaging in sexually explicit conduct.

B.   The charged attempted offense is not a true "lesser included" offense of the completed because it requires a greater *mens rea* than the completed offense.

An "attempt" offense requires proof that the person "intended to commit the completed offense" and took a "substantial step" towards committing that offense.  *See United States v. Dozier*, 848 F.3d 180, 186 (4th Cir. 2017); *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003); *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996).  An attempt crime requires proof of the defendant's *specific intent* to commit the underlying crime.  *United States v. Russo*, No. 3:09CR191, 2009 WL 3839299, at *5 (E.D. Va. Nov. 16, 2009), *aff'd*, 408 F. App'x 753 (4th Cir. 2011).

---

[3] Notably, the indictment charges Mr. Eychaner with receiving *and* attempting to receive.  The specific use of the term "and" as opposed to "or" removes any possibility that the government is trying to set forth alternative theories and instead further supports the argument that Count Two is duplicative.

To be convicted of *attempt* under § 1466A(a)(1), the government must prove that Mr. Eychaner had the *specific intent* to receive an obscene visual depiction of a minor engaging in sexually explicit conduct.  *See Russo*, 2009 WL 3839299, at *5 (observing that "it is possible to knowingly receive child pornography without attempting to have done so, because an attempt crime requires 'specific intent' to commit the underlying crime, as opposed to the lesser mens rea, 'knowingly,' that 18 U.S.C. § 2252A requires") (emphasis in original); *id.* at *4 ("The Government's evidence proved commission of the *completed* crime beyond a reasonable doubt.  It is not evident, therefore, why the Government saddled itself with *the additional burden of proving 'attempt'*.") (emphasis added).  *See generally Braxton v. United States*, 500 U.S. 344, 351 fn* (1991) ("Since [18 U.S.C. § 1114] does not specify the elements of 'attempt to kill,' they are those required for an 'attempt' at common law . . . which include a specific intent to commit the unlawful act. 'Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill.'") (internal citations omitted) (citing 4 C. Torcia, Wharton's Criminal Law § 743, p. 572 (14th ed. 1981); R. Perkins & R. Boyce, Criminal Law 637 (3d ed. 1982); W. LaFave & A. Scott, Criminal Law 428-29 (1972)).

To be convicted for the *completed* offense, however, the government need only prove that Mr. Eychaner "knowingly" received the visual depictions.  *See United States v. Dean*, 635 F.3d 1200 (11th Cir. 2011).  Because the *mens rea* requirement for attempt is greater than the requisite *mens rea* for the completed offense, the attempt crime here is not a true "lesser included" of the completed offense.  Rather, Count Two charges Mr. Eychaner with two distinct offenses.

C.  The duplicity in Count Two prejudices Mr. Eychaner because it could result in Mr. Eychaner being erroneously convicted if the jury finds the *mens rea* for the completed offense and the *actus reus* for attempt.

The distinction between acting "purposely" and "knowingly" is meaningful.  The specific intent *mens rea* requirement to prove attempt is a much higher standard than the general intent

*mens rea* necessary to prove the completed offense.  General intent crimes are far easier to prove—at least on the *mens rea* element.  So, as a practical matter, it will be easier in this case for the government to prove that Mr. Eychaner acted "knowingly" than that he acted "purposely."

When it comes to the *actus reus* element, however, it will be easier for the government to prove that Mr. Eychaner took a "substantial step" toward receiving the proscribed material than it will be to show that he actually received it.

By charging both attempt and completed offense in one count, the government created a serious risk that the jury could convict Mr. Eychaner on Count Two based on the *mens rea* for the completed offense ("knowingly") but the *actus reus* of the attempt offense (taking a substantial step toward receiving the prohibited material).

Because Count Two violates the rule against duplicity in a way that could prejudice Mr. Eychaner, it should be dismissed.

## CONCLUSION

For the reasons stated herein, the defense respectfully asks the Court to dismiss Count Two.

Respectfully submitted,

ELMER EMMANUEL EYCHANER

By:_____/s/_____
    Of counsel

    Amanda C. Conner
    VSB # 88317
    Attorney for Elmer Emmanuel Eychaner
    Assistant Federal Public Defender
    Office of the Federal Public Defender
    150 Boush Street, Suite 403
    Norfolk, Virginia 23510
    (757) 457-0816
    (757) 457-0880 (telefax)
    amanda_conner@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 13th day of December, 2017,  I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF)

to:

Lisa Rae McKeel
United States Attorney's Office
721 Lakefront Commons
Suite 300
Newport News, VA 23606
(757) 591-4000
Email: Lisa.McKeel@usdoj.gov

Megan Cowles
United States Attorney Office - Newport News
Fountain Plaza Three
721 Lake Front Commons
Suite 300
Newport News, VA 23606
Email: megan.cowles@usdoj.gov


_____/s/_____

Amanda C. Conner
VSB # 88317
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0816
(757) 457-0880 (telefax)
amanda_conner@fd.org