```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                       NEWPORT NEWS DIVISION


 3


 4   UNITED STATES OF AMERICA,      )
                                    )
 5             Plaintiff,           )
                                    )
 6   v.                             )    Criminal Action No.:
                                    )         4:17cr76
 7   ELMER EMMANUEL EYCHANER, III,  )
                                    )
 8             Defendant.           )


 9


10               EXCERPT OF JURY TRIAL PROCEEDINGS


11                         Volume 1
                         Pages 1-54
12                  Newport News, Virginia
                       May 15, 2018
13


14


15   BEFORE:    THE HONORABLE MARK S. DAVIS
                United States District Judge, and a Jury
16


17


18   Appearances:


19        OFFICE OF THE UNITED STATES ATTORNEY
                  By: MEGAN COWLES
20                    LISA RAE McKEEL
                      Counsel for the United States
21

22        OFFICE OF THE FEDERAL PUBLIC DEFENDER
                  By: AMANDA CONNER
23                    ANDREW GRINDROD
                      Counsel for Defendant


24        The Defendant appearing in person.


25
```

I N D E X

Government Opening                                    34
Defense Opening                                       40

1                    P R O C E E D I N G S

2

3           (Proceedings commenced at 9:56 a.m. as follows:)

4

5           COURTROOM DEPUTY CLERK:  In Case No. 4:17cr76, the

6   United States of America v. Elmer Emmanuel Eychaner, III.

7           Ms. Cowles, is the government ready to proceed?

8           MS. COWLES:  The government's ready to proceed.  Good

9   morning, Your Honor.

10          THE COURT:  Good morning, Ms. Cowles.

11          COURTROOM DEPUTY CLERK:  Mr. Grindrod, is the

12   defendant ready to proceed?

13          MR. GRINDROD:  Yes, we are ready.  Good morning.  I'm

14   sorry I'm in the wrong seat.  We're going to switch here

15   momentarily.

16          THE COURT:  All right.  Good morning to you, to all of

17   you.

18          All right.  So the Court is aware of all the filings

19   through this morning, and my one question for you all now is is

20   there any -- have you resolved anything new about which you have

21   not already told us in your filings?  If you have resolved

22   something new, will you tell me that, Ms. Cowles?

23          MS. COWLES:  Your Honor, I don't believe that we have

24   resolved anything new, and I believe it's the 404(b), two issues

25   under 404(b), and then the images under 403 that are at issue.

1    THE COURT:  Do you agree, Mr. Grindrod?

2    MR. GRINDROD:  Yes, Your Honor.

3    THE COURT:  All right.  Thank you.  So let me go ahead

4  and address those issues first.

5    So having reviewed the renewed motion to exclude Rule

6  404(b) evidence, it's apparent to me that there may have been

7  some confusion about the scope of my ruling and the analysis

8  last week regarding the admission of the Rule 404(b) evidence

9  with respect to Count 2.  So in order to be crystal clear, and

10  for any, for the sake of any doubt, I want to restate my ruling

11  regarding the two types of evidence that may be admitted under

12  Rule 404(b) with regard to Count 2 to which defendant has

13  renewed his objection.

14    So first, with respect to the Category 1 evidence;

15  that is, the evidence of a prior federal conviction, the

16  judgment order, and the related information for possession of

17  material containing child pornography from 2007, the

18  government's proffered non-propensity reasons for admitting the

19  evidence is to prove, as I understand it, first, the absence of

20  mistake or accident; second, knowledge, and third, intent.  In

21  response, the defendant has conceded that he would not be

22  arguing mistake or that he lacked knowledge with regard to the

23  meaning of the search terms he used, but did not otherwise

24  concede lack of intent.  In analyzing the evidence, the Court

25  applies the four-part test articulated in United States v.

1  <u>Queen</u>, which, as we reviewed last week, was reaffirmed in 2017

2  in <u>U.S. v. Hall</u>.  Applying the first of those factors of this

3  test; that is, that the evidence must be relevant to an issue

4  such as an element of an offense and must not be offered to

5  establish the general character of the defendant, the

6  government's first category of evidence qualifies for

7  non-propensity purposes in that it shows lack of mistake,

8  knowledge and intent.  The Court notes especially how the

9  example of the Court in <u>U.S. v. Whorley</u>, Fourth Circuit, 2008

10 opinion, informs its decision with regard to this evidence.  In

11 <u>Worley</u>, the defendant, who was also charged under 18 U.S.C.

12 1466A(a)(1), objected to the admission of his prior conviction

13 for receiving child pornography as well as the terms of his

14 probation that prohibited him from possessing pornography.  On

15 appeal, the defendant argued that the probative value of

16 admitting this evidence was limited because neither his

17 knowledge nor intent were in issue.  The fourth Circuit

18 disagreed, as it noted that "While the defendant conceded he had

19 knowingly entered the website containing the charged images, he

20 had not conceded that he knowingly received the charged images

21 themselves or that he knew that the individuals in the images

22 charged were minors."

23        Likewise, in the instant case, defendant appears

24 willing to concede some parts of knowledge and receiving or

25 attempting to receive the obscene cartoon images, but has not

1  yet conceded intent or knowledge needed to prove Count 2.

2  Therefore, because the defendant has not conceded that he had

3  specific intent to receive the obscene cartoon images in

4  question, or that he knew that his search would produce such

5  images, the Court concludes that the admission of the Category 1

6  evidence is relevant to prove the non-propensity purposes

7  related to knowledge and intent.

8       The Court also notes a recent Sixth Circuit case in

9  which the Court noted that "Evidence of prior bad acts may be

10  admissible under Rule 404(b) to show intent when the defendant

11  is charged with a crime containing a specific intent element.

12  The prosecutor may use 404(b) evidence to prove that the

13  defendant acted with specific intent even if the defendant does

14  not raise a lack of intent defense," the Sixth Circuit said last

15  year in U.S. v. Lavictor.

16       Here, the defendant is charged with the specific

17  intent crime of attempted receipt of obscene visual

18  representations of sexual abuse of children, and therefore the

19  government 404(b) evidence would potentially be admissible for a

20  lack for a non-propensity purpose even if defendant did not

21  raise a lack of intent defense.

22       As a part of the first factor, the Court must consider

23  how closely related the charged conduct is to a prior bad act

24  and temporal proximity and factual similarity.

25       As to temporal proximity, the Court notes the prior

1  offense did occur nearly 10 years earlier.  Nonetheless, the

2  Court concludes that this is actually close in time to the

3  instant offense, as defendant's intervening prison term accounts

4  for the vast majority of time since his last offense.  The

5  defendant allegedly committed the instant offense after only

6  five months of being released from his prior term of

7  incarceration.  In the Court's view, this shows that there is,

8  in reality, virtually no break in defendant's course of conduct

9  of seeking illicit materials involving children, as he returned

10  to this pattern within months of his release from prison.

11          As to the factual similarity between the prior offense

12  for possession of child pornography and the instant offense for

13  attempted receipt of obscene visual represents of the sexual

14  abuse of children, the Court notes that primary similarity, the

15  primary similarity between the two offenses is that both

16  involved the pursuit of sexual materials involving minors,

17  representations of minors.  While it is true that the prior

18  offense primarily involved images of actual children, the

19  defendant used means to acquire those images in the prior case

20  that are different from the Bing.com search he allegedly used in

21  this case.  The prior offense demonstrates defendant's

22  continuing, however, abnormal interest in essentials of sexual

23  acts involving minors.  The Court also notes that in Whorley,

24  the Fourth Circuit found that evidence of a prior conviction for

25  possession of child pornography was sufficiently similar to a

violation under 1466A(a)(1) to permit the introduction of the

evidence regarding a prior conviction.  Also, to the extent that

the government's witness establishes that defendant previously

possessed similar kinds of anime images and also that defendant

previously employed sophisticated means both to obtain and hide

the evidence of his possession of images of child pornography

and other obscene cartoon images, the prior offense will have

many key similarities to the instant offense.  Thus, in light of

the similarity here both in terms of the inherent similarity of

convictions for possession of child pornography and violations

of 1466A(a)(1), and also the similarity here presented by the

facts of the prior case insofar as defendant previously

possessed similar anime images, the Court finds that the first

factor of the Queen test is met.

As to the second factor; that is, that the act must be

necessary in the sense that it is probative of an essential

claim or an element of the offense, the Court notes again this

is essential in that it goes to the knowledge and defendant's

specific intent to acquire illicit sexual materials involving

minors and representations of minors.

As to the third factor that the evidence must be

reliable, the judgment itself from the prior case shows that the

defendant has been shown to have committed the prior offense

beyond a reasonable doubt.  As to the specific evidence from the

prior case, the case agent involved in that case, that prior

1   case, will be able ostensibly to relate the relevant facts from

2   that case, and the Court also notes that defendant's statement

3   of facts from his plea agreement will also be able to

4   corroborate the case agent's testimony.  Therefore, the Court

5   concludes that the third factor is met.

6           As to the fourth element; that is, the evidence's

7   probative value must not be substantially outweighed by

8   confusion or unfair prejudice in the sense that it tends to

9   subordinate reason to emotion in the fact-finding process, the

10  Court does note that of course there is some prejudice to the

11  defendant from having his prior conviction come in.  The

12  probative value of this evidence, however, is extremely high in

13  terms of showing the defendant's intent and knowledge for

14  purposes of Count 2.

15          As to unfair prejudice, this is not a case where the

16  defendant's prior conviction is for something more heinous than

17  the charged offense, such as a prior offense such as a prior

18  offense with actual contact with child, and as such, there's

19  much less of a risk that the jury will infer that because

20  defendant did terrible things in the past, for example, that he

21  is likely to have committed the instant offense.  Defendant's

22  prior offense is for roughly the same conduct he's charged with

23  here in that it also involves the pursuit of illicit materials

24  involving children and representations of children.  In order to

25  limit the possible prejudicial effect of the admitting the prior

1 conviction, the Court cautions the government to not linger on

2 the most lurid details regarding the actual videos or images

3 that were possessed in the prior case.

4       In sum, the Court has weighed the prejudicial effect

5 of the Category 1 evidence against the substantial probative

6 value of such evidence and concludes that the probative value is

7 not substantially outweighed by the risk of unfair prejudice.

8       As to the second issue that the defendant raises in

9 his renewed motion to exclude the 404(b) evidence; that is, that

10 the defendant allegedly searched for images of minors while on

11 supervision in August of 2016, the government has noted that

12 this class of evidence goes to the issues of absence of mistake

13 and lack of accident, knowledge, intent, and preparation or

14 planning.  The Court agrees that this evidence would be

15 admissible for all of these non-propensity purposes.  While the

16 defendant specifically asserts that it is unclear how this goes

17 to planning and preparation, this evidence has at least some

18 probative value for showing that defendant was seeking ways to

19 get around the restrictions imposed by his monitoring software.

20       As to the factual similarity between the charged

21 offense and this prior bad act, the prior act similarly involved

22 an attempt to obtain materials that defendant was forbidden to

23 access while on supervision.  It also involved what appears to

24 be a probing of the probation office's monitoring software to

25 see what would be detected.

1     The Court also notes that while it is true that

2 defendant was seeking images of actual minors in August, 2016

3 instead of obscene cartoon images, the same motivation appears

4 to underlie both searches, as defendant appears to be deeply

5 drawn to viewing materials regarding children.

6     Thus, the Court concludes that this class of evidence

7 is factually similar to Count 2.

8     As to the temporal proximity, this class of evidence

9 arose roughly three months before the events in question for

10 Count 2 occurred, which is sufficiently close in time for its

11 consideration to not be unfair.  Therefore, the Court concludes

12 that the first Queen factor is met regarding this evidence.

13     Next, because the Court agrees that the government's

14 non-propensity purposes mean that the evidence is admissible,

15 and go to key elements of the offense or otherwise rebut

16 possible defenses, the Court finds that the second Queen factor

17 is met.

18     As to the third Queen factor, the evidence here will

19 take the form of evidence acquired from RemoteCOM and witness

20 testimony from defendant's probation officer or officers.  The

21 Court believes that both of these sources are reliable sources

22 for this evidence, and therefore there is little doubt that the

23 third factor is met.

24     As to the fourth Queen factor, the Court notes that

25 the probative value of this evidence is substantial for proving

1  the absence of mistake, knowledge, intent, and planning or

2  preparation.

3         As to prejudice, the actual bad act involved in this

4  class of evidence is likely to have only a very limited

5  prejudicial effect.  As the Court understands the facts,

6  defendant's search apparently turned up images of clothed

7  children who were not alleged to have been in any kind of sexual

8  pose.  The jury's emotions are unlikely to be overwhelmed by

9  learning about this kind of search.  While this act is a bad act

10 to the extent it violated defendant's terms of supervised

11 release, it's unlikely that learning of this violation will

12 cause the jury to decide that the defendant must be guilty of a

13 much more serious offense simply because he previously violated

14 a condition of his supervised release.

15        Therefore, the Court has considered the probative

16 value of this type of evidence for purposes of Count 2, and

17 finds that the probative value is not substantially outweighed

18 by the risk of unfair prejudice.  Therefore, defendant's renewed

19 motion to exclude the Rule 404(b) evidence is denied.

20        The Court turns next to the defendant's motion *in*

21 *limine* to exclude evidence pursuant to Rule 403.  Defendant

22 raises two objections to this motion.  First, defendant asserts

23 there are numerous images of rape among the images selected.

24 Second, he asserts that without a special verdict form, the

25 duplicitous charging of 24 distinct offenses within Count 2

1  unduly risks jury confusion and a non-unanimous verdict.

2  Defendant also notes that the absence of a special verdict form

3  will make meaningful appellate review all but impossible.  In

4  the government's opposition brief, the government did not

5  explain why it is opposing the use of a special verdict form.

6  The Court is extremely inclined to view the use of a special

7  verdict form as a necessity given the considerations that the

8  defendant has raised, but I want to hear any argument the

9  government may have of their view on this issue before I make

10 any kind of ruling.

11         Happy to hear from you, Ms. Cowles or Ms. McKeel, if

12 you wish to offer anything further.  You don't have to.

13         MS. COWLES:  Your Honor, if I could have one moment?

14         Your Honor, if the Court is inclined to have a special

15 verdict form in this case, the government would agree to that.

16         THE COURT:  All right.  So having considered all of

17 the arguments on this issue, I do conclude that use of a verdict

18 form that requires the jury to state unequivocally their

19 unanimous verdict regarding each of the 24 images that will be

20 published to them have been established.  The Court believes

21 that the special verdict form should have an attempted receipt

22 portion for Count 2 which will specifically list the 24 images,

23 as well as the completed offense for receipt of the images which

24 should also list each of the 24 images.  And so I'll let you all

25 work together to reflect what I want.  If you see any particular

1  issue with that, you can talk about it and then tell me later.

2  I wanted to get such this out of way as possible, but I'm

3  mindful we do have the jury downstairs.

4       So just so we're clear, I'm contemplating two sets of

5  24, actual and then the attempt.  So that there's no doubt.  And

6  of course the jury can select one or all 24 on either of those,

7  and the instruction will have to make that clear on the special

8  verdict form about what they can do.

9       So I want it to be -- Mr. Grindrod, you want it to be

10 very specific, I want it to be very specific also, so I want you

11 all to cooperate to make that be specific.

12       As to the defendant's objection that the images

13 selected involve the rape of children, the Court notes at the

14 outset that the defendant appears perhaps to misinterpret the

15 Court's previous comments.  The Court's prior ruling was

16 informed primarily by the Third Circuit's decision in United

17 States v. Cunningham, 694 F.3d 372, in 2012, in which the court

18 notes there that "While all depictions of an adult engaging in

19 sexual acts with a young child are bound to be repulsive, the

20 impact on the jury will depend upon the nature and severity of

21 the acts depicted," citing the Seventh Circuit Loughry case.

22 "Cunningham and other cases like this draw a distinction between

23 sexual acts in which a child was clearly an unwilling

24 participant in the sexual act and those in which the child is a

25 willing participant.  This is not to say that acts showing a

1  willing child participant are not statutory rape, but it is to

2  say that among the cesspool of evidence in these types of cases,

3  evidence of sexual acts that are clearly done against the will

4  of the child at the moment are qualitatively worse than those

5  that are not.  Cunningham and other cases like it do not say

6  that all evidence of adults engaging in sexual acts with

7  children are unfairly prejudicial.  The Court's prior comments

8  on this issue before were meant to suggest that the government

9  should not seek to highlight images that suggest the kinds of

10 elements that courts have found to be too prejudicial to submit

11 to the jury, such as images depicting bondage, violence or

12 sadism.  In the context of obscene cartoon images, the Court

13 believes that images that highlight the apparent pain of the

14 child or that show bondage are more likely to risk inflaming the

15 passions of the jury.  The Court does not, however, believe that

16 all images involving sexual relations between an adult and a

17 child constitute the kind of egregious rape content that the

18 Court in Cunningham was especially concerned with.  As

19 previously noted, the Court has a responsibility to review any

20 evidence objected to under Rule 403 before admitting such

21 evidence, as the Court said in Cunningham.  They said "The

22 court's refusal here to view the video excerpts of child

23 pornography to assist their prejudicial impact and instead over

24 objection rely on verbal descriptions was arbitrary and

25 unreasonable."  And so the Court will take time to review the

1    evidence before making a ruling on the issue.

2            Where are they, Ms. Cowles?

3            MS. COWLES:  Your Honor, I believe it's in the red

4    notebook before you.

5            THE COURT:  So these.  Okay.

6            (Pause in the record.)

7            THE COURT:  Do you all have this before you?  I'm

8    looking at 14A-14.  Is that -- what's the word I'm looking for?

9            Well, there's cartoon-ish images and then there are

10   images which are made to look like real children more.  What --

11   I forget...

12           MS. COWLES:  CGI, Your Honor.  Computer-generated.

13           THE COURT:  Computer-generated.  Thank you.  Are these

14   three at the top there computer-generated?  Is that what those

15   are?

16           MR. GRINDROD:  It --

17           THE COURT:  Well, really I think it's for the

18   government who should be answering this first.

19           MS. COWLES:  Yes, Your Honor, they appear to be

20   computer-generated.

21           THE COURT:  That's the government's position here at

22   trial today that those are computer-generated images?

23           MS. COWLES:  Yes, sir.

24           THE COURT:  Okay.

25           Mr. Grindrod, did you want to say anything?

1              MR. GRINDROD:  Your Honor, if they're

2    computer-generated images, the indictment charges cartoons, so

3    our position is that those -- whether this is more appropriate

4    in a Rule 29 stage or now -- but those shouldn't qualify as

5    charged counts if they're not cartoons, and showing them to the

6    jury is likely to inflame when they have really no probative

7    value.  Government just conceded they're not what they charged

8    here.

9              THE COURT:  Do you want to respond to that?

10             (Government's counsel conferred.)

11             MS. COWLES:  Your Honor, I believe it would fall under

12   the charged conduct, but this also shows -- what I think is

13   significant about this page is it shows that he went off of

14   Bing.com, and it's -- actually the site is premiumhentai.site,

15   and I believe we'll have testimony about hentai.  But it shows

16   an attempt to access.  It also shows lolicon as one of terms.

17   Says "The newest lolicon 3D images", then to the right it's

18   "Only best shotacon" in another image there.  So we believe this

19   would be proper for the jury to consider, Your Honor.

20             MR. GRINDROD:  If I may briefly respond to that, Your

21   Honor?

22             THE COURT:  Briefly.

23             MR. GRINDROD:  So if the Court just flips back one

24   page, all of those features the government identified as

25   probative appear on 14a-13, which is premiumhentai.site,

1  references to lolicon, shotacon, and there the image appears to

2  be an actual cartoon.  So I don't think the government needs to

3  put in the CG evidence, which is not charged, to establish the

4  points it just made here.

5       MS. COWLES:  And Your Honor, if I could respond to

6  that?

7       THE COURT:  Sure.

8       MS. COWLES:  Your Honor, I believe that would go to

9  his intent, and that would show that this didn't happen by

10  mistake.  He didn't just stumble upon this site to see that he

11  was on multiple pages of premiumhentai shows that it wasn't an

12  accident that this happened.

13       MR. GRINDROD:  One sentence if I could, Your Honor?

14  The next page after that is also premiumhentai, also has a

15  cartoon.  So does the page after that, 15 and 16.  So again, if

16  it's to show multiple pages, that's also satisfied by other

17  evidence that the government's offering.

18       THE COURT:  Let's see now, Mr. Grindrod.  Your

19  argument is Count 2 charges obscene anime cartoons and that CGI

20  is not an anime cartoon.  Do you have any case law for that

21  proposition?

22       MR. GRINDROD:  I don't, Your Honor.  The definition

23  section that -- I don't have the statute number in front of me,

24  but there's a statute that defines what's indistinguishable from

25  child pornography.  2256, Your Honor.  And there's a reference

in there that that is not to apply to cartoons or drawings and the like.  So I think that that shows Congress's intent in this broader statutory scheme that, when you're talking about graphic CGI that can be made to look indistinguishable from an actual minor, that's different from cartoons, and in at least one context, Congress made that difference explicit.

THE COURT:  Well, you know, I don't have larger images before me, but at first blush it looks like these are computer-generated as opposed to something that's indistinguishable from a minor.  And so I'm not so sure what that observation has for the import of your argument.  But you all are welcome to do more research on that.  I'm not going to rule on that issue now right now.  The main thing is from a 403, from a 403 standpoint, I think the government has appropriately limited, and I don't have any problem with these being what's presented to the jury.

Now there are 17 here, but the total is 24.

MS. COWLES:  24 Your Honor, yes, sir.

THE COURT:  So how are you going to, on the verdict form, separately delineate them?  How are we going to know what we're talking about?

(Government's counsel conferred.)

MS. COWLES:  Your Honor, is that something that we could consider and come back to?  And I'd certainly --

THE COURT:  You can put a number above or beside each

1  one, so you have them 14A-1, 2, 3 and then A-2, 4, and so on.  I

2  don't care.  But we've got to -- Mr. Grindrod made a good

3  argument last week about the appellate issues and unanimity and

4  the risks here, and I really want to be careful that we address

5  that so that if this issue goes up to the Court of Appeals, it's

6  as clean and clear for them as possible.  So think about that

7  more.

8         MS. COWLES:  Yes, sir.

9         THE COURT:  Okay.

10        (Court and courtroom deputy conferred.)

11        THE COURT:  So after reviewing the images, I want to

12  also be clear this is what the government intends to submit to

13  the jury, as I understand it, and that's all the images that the

14  government wishes to present; is that right?

15        MS. COWLES:  That's all the images the government

16  wishes to present in its case in chief, Your Honor.

17        THE COURT:  Okay.  So in the context of these cases,

18  for example, in child pornography, courts have limited the total

19  number of images that may be published to the jury to a level

20  that does not render the evidence cumulative and does not

21  otherwise risk provoking an overly emotional response from the

22  jury.  Here, the government seeks to submit these 24 images,

23  which is well within the range that courts have permitted in

24  these types of cases, like the Ninth Circuit's Ganoe case, the

25  Dodds case from the Eleventh Circuit, the Becht case from the

1  Eighth Circuit, and the <u>Storm</u> case from District of Oregon, the

2  <u>Shesulker</u> case that I cited last week also from the Seventh

3  Circuit, and the <u>Hinkle</u> case from the First Circuit.

4        As to whether the particular image selected by the

5  government risks unfair prejudice, the Court notes again that it

6  has reviewed the materials in question in determining whether

7  the images cause unfair prejudice, and mindful that while all

8  depictions of an adult engaging in sexual acts with a young

9  child are bound to be repulsive, the impact on the jury will

10 depend upon the nature and severity of the acts depicted, as the

11 Seventh Circuit said in <u>Loughry</u>.

12       I note that the emotional impact of this evidence

13 involved in Count 2 is limited, first because the evidence

14 concerns still images as opposed to video, and the images

15 concern cartoons, or at most, CGI as opposed to actual children.

16 These considerations inform the Court's 403 analysis regarding

17 the images.

18       Here, while the nature of the images is disturbing,

19 they contain images of children and adults engaged in sexual

20 acts, I don't see them reflecting facial images of pain and

21 bondage and undue excitement to the emotions of the jury; that

22 is, significant bondage, violent rape or sadism.  And those are

23 the things other courts have found warranted exclusion because

24 of a risk of unfair prejudice.  The Court's determined the

25 number of images involved and their contents are not of a

1  cumulative nature, and I find the publication of images to the

2  jury would not unfairly prejudice the defendant.

3          So in order to -- I want you all to know that to

4  mitigate any potential unfair prejudice from the publication of

5  these images to the jury, I will inform potential jurors at voir

6  dire of the disturbing images they might see in this case and

7  ask them if they can be fair.

8          All right.  Now I think that I need to take care of a

9  few other things, unfortunately.

10          Ms. Cowles, have any plea offers been made by the

11  United States in this case?  If so, would you review them for me

12  one by one?

13          MS. COWLES:  Yes, sir.  There were a total of three

14  prior plea offers made in this case, Your Honor.  The first plea

15  offer was extended on December 8th, 2017, and the government

16  offered a plea of guilty to Count 2 and Count 3 of the

17  indictment with no cap.

18          And then --

19          THE COURT:  No cap on the actual sentence imposed?

20          MS. COWLES:  Yes, sir.  No cap was offered.  And we

21  had asked that defense counsel let us know by December 15th,

22  because trial at that point was pending in January.  Counsel

23  asked if they could get an extension on the plea offer if a

24  continuance in the case was granted, and the government agreed

25  that if a continuance was granted, that we would keep the offer

1  open.  So that offer was left open.  And then on March 16th,

2  2016, I specifically resubmitted that offer to counsel and

3  stated that it would expire on March 23rd, 2018, and that offer

4  was rejected.

5          Then after the hearing last week on Thursday,

6  May 10th, the government offered a guilty plea again to Counts 2

7  and Count 3, with a 30-year non-binding recommendation, and that

8  night defense counsel countered with an offer to plead to

9  Counts 2 and Count 3 with a 15-year binding cap.

10          THE COURT:  So the same thing except a 15-year binding

11  cap?

12          MS. COWLES:  Yes, sir.

13          THE COURT:  Okay.

14          MS. COWLES:  And then on Friday, May 11th, the

15  government sent to defense counsel plea documents reflecting

16  that 30-year binding cap -- or non-binding cap to Counts 2 and

17  Count 3.  Then later --

18          THE COURT:  So you mean you rejected their counter,

19  and then you sent plea documents reflecting your third offer?

20          MS. COWLES:  Reflecting that actually still reflected

21  the second offer, Your Honor:  Plead to Count 2 and Count 3 with

22  a 30-year non-binding recommendation.

23          THE COURT:  You described that as the third offer?

24          MS. COWLES:  So then later that morning there was a

25  third offer made.

1          THE COURT:  Okay.

2          MS. COWLES:  And that offer was to plead to Count 2

3    and Count 3 with a 25-year non-binding sentencing recommendation

4    and that was rejected.  Both the second and the third offers

5    were rejected, Your Honor.

6          THE COURT:  And that was also May 11th?

7          MS. COWLES:  Yes, sir.

8          THE COURT:  Okay.  So however you slice that, I slice

9    that as maybe four offers, but since you made the same offer

10   again March 16th as you made December 8th -- but we'll, let's

11   find out first from Ms. Conner or Mr. Grindrod, is that an

12   accurate recitation of the offers that were made in this case?

13         MS. CONNER:  Your Honor, for the most part.  In the

14   March -- I don't have the exact dates in front of me, but during

15   the March offer, without any cap, the government did tell us

16   that we also countered at that time with a 15-year binding

17   sentence for Mr. Eychaner.  That was rejected.

18         THE COURT:  With a guilty plea to Counts 2 and 3?

19         MS. CONNER:  That's correct.

20         THE COURT:  So you countered twice, you're saying?

21         MS. CONNER:  Yes, Your Honor.

22         THE COURT:  Okay.  The same counter each time?

23         MS. CONNER:  That's right.

24         And then the March 23rd, the government's offer

25   expired.  We asked for more time to consider that because we had

1 a number of motions pending, as the Court knows.  And we -- the

2 government refused to leave that offer open.

3          The next time we had negotiation was last Thursday,

4 and that was an accurate recitation.  We didn't, we did not

5 reject the first offer, we countered, understanding that would

6 be a rejection, but otherwise it was the same as the government

7 said.

8          THE COURT:  All right.  So do you have any

9 disagreement with that?

10          MS. COWLES:  No, sir, I do not.

11          THE COURT:  Okay.  It's accurate?

12          MS. COWLES:  Yes, sir, it is.

13          THE COURT:  So and Mr. Eychaner, yes, let's administer

14 the oath for purposes of this.

15          (Defendant placed under oath.)

16          THE COURT:  So Mr. Eychaner, you've just heard the

17 government and your attorneys recite the various plea offers in

18 the case.  Do you agree that your attorneys discussed with you

19 these prior plea offers?

20          THE WITNESS:  Yes, I do, Your Honor.

21          THE COURT:  And the descriptions that we've had here

22 today are consistent with your memory of these plea offers?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  All right.  And so you wish to enter a not

25 guilty plea and proceed to trial today?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Okay.  Thank you.  You can have a seat.

3          So we're still no longer than four days, as I

4  understand it, Ms. Conner?  No longer than four days?

5          MS. CONNER:  Yes, Your Honor, that's correct.

6          MS. COWLES:  Yes, sir.

7          THE COURT:  Okay.  And I'm going to use one alternate.

8  I always like to use at least one alternate.  For that short a

9  trial that's what we'll do.

10          I've looked at the voir dire submitted by the

11  defendant and may use a couple of those things.  We'll see where

12  we go.  But it is duplicative of much of what I normally ask, so

13  that's why I say we'll see where that goes.

14          I have the witness list from Ms. Cowles and I have the

15  defendant's witness list.

16          MS. CONNER:  Your Honor, we still have not been

17  provided the witness list by the government.  I don't know

18  what -- we've asked a couple of times, but I have not received

19  it yet unless it's in a binder.

20          (Government's counsel conferred.)

21          THE COURT:  Ms. Cowles?

22          MS. COWLES:  Your Honor, I can provide that to

23  counsel.

24          THE COURT:  If you have a copy -- do you have an extra

25  copy, Madam Clerk?

```
 1              COURTROOM DEPUTY CLERK:  Yes, sir.

 2              THE COURT:  Will you pass that up, Officer Brown?

 3    Show it to Ms. Cowles.  Make sure it's the right one, and let

 4    her give it to Ms. Conner.

 5              MS. COWLES:  Yes, Your Honor.

 6              THE COURT:  Okay.  And you have the defense?

 7              COURTROOM DEPUTY CLERK:  Yes, sir.

 8              MS. COWLES:  Yes, Your Honor.

 9              THE COURT:  Okay.  So this is the way, Counsel, I will

10    describe to the jury what we're here for.  Today we have for

11    trial a criminal case expected to take approximately four days.

12    There's one defendant in this case, Elmer Emmanuel Eychaner,

13    III.  The defendant has been charged with attempted receipt of

14    obscene visual representations of the sexual abuse of children,

15    destruction of a tangible object to impede a federal

16    investigation, obstruction of justice, attempted evidence

17    tampering, and penalties for registered sex offender.  These

18    offenses are alleged to have occurred in the Eastern District of

19    Virginia on November 17, 2016.

20              Do you have all have stipulations you're going to be

21    offering?

22              MS. CONNER:  Your Honor, we discussed stipulating to

23    interstate commerce as well as venue, but we haven't...

24              MS. COWLES:  If we could he have a moment, Your Honor?

25              THE COURT:  You don't need to do it now, necessarily,
```

1  just when you do, let me know if you're going to read it or you

2  want me to read it and let me see it in advance so I can be

3  familiar with it.

4          Of course under Rule 32.2(b)(5) a defendant has the

5  right to -- I guess the government does too -- but a right to a

6  jury trial so that the jury at the conclusion of the evidence

7  can be retained to also, in a succeeding proceeding, determine

8  forfeitability of specific property if it returns a guilty

9  verdict.  Is that being requested by either party in the case?

10         MS. COWLES:  No, Your Honor.

11         I'm sorry, Your Honor.

12         (Government's counsel conferred.)

13         MS. McKEEL:  Your Honor, are you asking about the

14  forfeiture?

15         THE COURT:  Forfeitability under 32 --

16         MS. McKEEL:  Yes.  I think there's an agreement that

17  we're not going forward, but that they're going to sign the

18  document, the consent of forfeiture.

19         THE COURT:  Okay.

20         MS. CONNER:  That's correct, Your Honor.

21         THE COURT:  All right.  You all know I have

22  introductory instructions that I read while you all are in the

23  process of picking the jury.

24         We'll take a brief recess and then get started.  I've

25  been advised that one juror has college classes that start at

1    11:45 today and has asked to be excused, but could be a good

2    lesson, because there's no advance request for excuse for this

3    first day of class, so it could be an object lesson.  But we'll

4    address that when we get together, everybody.

5            Is there anything else you all want to address before

6    we take our short recess and then get started?

7            MS. CONNER:  One question, Your Honor, is how the

8    Court intends to deal with the count that's missing on the

9    indictment?  We would ask the Court to renumber them 1, 2 and 3

10   or somehow, maybe if not -- either that or not --

11           THE COURT:  I wasn't going to send the indictment back

12   in this case.  I pretty much decided that at the very beginning

13   when we had the unusual kind of indictment that we had.  I just

14   thought the way we were going to remedy it was with just using

15   the jury instructions, which some of the judges in our court do

16   anyway, they don't send the indictments back.

17           Let me get this out there too, just on that issue:

18   You know, I expect that if there's something that is in an

19   indictment that has been excluded from evidence -- when I do

20   admit them -- that's been excluded or that has not come in

21   evidence or is particularly prejudicial, that the parties are

22   going to tell me that and say we don't want the indictment to go

23   back.  But my general practice is to let indictments go back.

24   That's my nuanced way of dealing with it.  But in this case we

25   won't, we'll deal with it in jury instructions.

```
 1          MS. CONNER:  Thank you.  I just didn't know in your

 2   introductory remarks you refer to the count numbers in the

 3   indictment.  I don't know how your -- I don't remember how you

 4   do it normally.

 5          THE COURT:  Well, I guess that it could be that -- I

 6   don't think I mention the count number, I just say, Has been

 7   charged.  So I'll try to -- you know, it's going to be -- I

 8   think the way we deal with it is that when you all -- you all

 9   can submit an instruction to me that, some kind of language

10   about you should not concern yourself with the numbering of the

11   counts, that is an administrative matter left to the Court.  So

12   just come up with something for me on that.

13          MS. CONNER:  Okay.  Thank you.

14          THE COURT:  Anything else?  Okay.

15          MS. COWLES:  Nothing further from the government, Your

16   Honor.

17          THE COURT:  Madam Clerk, as soon as everybody's back,

18   let me know.

19          (Court and courtroom deputy conferred.)

20          THE COURT:  So how long will it take to get

21   Mr. Eychaner out and back, do you think?  Five minutes?

22          DEPUTY UNITED STATES MARSHAL:  Yes, sir.

23          THE COURT:  Okay.  So I think there's no issue with

24   starting to bring the jury up, assuming that in five minutes

25   we're going to start bringing them in.  Attorneys, you just need
```

1  to be careful to get back into the courtroom as soon as

2  possible, and any witnesses or anything.  But the defendant will

3  be coming in through a separate door, so that shouldn't be an

4  issue, I don't think.  But we'll just assemble the jurors out in

5  the hallway right away.

6           (Court and court security officer conferred.)

7           THE COURT:  All right.

8           (Recess taken from 10:58 a.m. to 11:01 a.m.)

9           THE COURT:  All right, Counsel, are we ready to bring

10 in the jury?

11          MS. COWLES:  Yes, Your Honor.

12          MS. CONNER:  Yes, Your Honor.

13          THE COURT:  And you all have seen the excuses, right?

14          MS. CONNER:  Yes.

15          MS. COWLES:  Yes, Your Honor.

16          THE COURT:  Oh, Mr. Grate, can you come to the podium

17 real quick?

18          JURY ADMINSTRATOR GRATE:  Most certainly, Your Honor.

19          THE COURT:  I understand that Juror No. 12 let you

20 know this morning that he or she is a full-time student and

21 today is their first day of class, but we didn't have any

22 request in advance; is that correct?

23          JURY ADMINSTRATOR GRATE:  That is correct, Your Honor.

24          THE COURT:  And where is the class, do you know?

25          JURY ADMINSTRATOR GRATE:  ODU.

1          THE COURT:  Okay.  And you've seen the class schedule

2    showing this?

3          JURY ADMINSTRATOR GRATE:  I have seen the schedule.

4    He has it with him as well.

5          THE COURT:  Okay.  That's the only person you're aware

6    of who has something pressing right this moment?

7          JURY ADMINSTRATOR GRATE:  Not right this moment, but

8    there's a gentleman who is also a full-time student who has not

9    made a request to be excused, and he does have a final exam

10   tomorrow.  I'm trying to remember his name.  Cobb.

11         THE COURT:  Didn't he tell you to ask to be excused?

12         JURY ADMINSTRATOR GRATE:  I have no clue, Your Honor.

13         THE COURT:  Maybe he didn't study.

14         THE COURT:  Okay.  Well, I'll ask my standard

15   questions and we'll see where we go with that.

16         JURY ADMINSTRATOR GRATE:  Very good, sir.

17         THE COURT:  Let's go ahead and bring the jurors in.

18         JURY ADMINSTRATOR GRATE:  Very good, Judge.

19         THE COURT:  Good afternoon to everyone, ladies and

20   gentlemen of the jury.  My name is Mark Davis, I'm one of the

21   judges in the court here.  And we're going to proceed with some

22   of the formalities and then we'll get down to some questions and

23   other things that we need to address.  Thank you for being here.

24         All right.  Madam Clerk, would you please call the

25   case and inquire if the parties are ready?

```
 1              COURTROOM DEPUTY CLERK:  In Case No 4:17cr76, United

 2   States of America v. Elmer Emmanuel Eychaner, III.

 3              Ms. Cowles, is the government ready to proceed?

 4              MS. COWLES:  The government is ready to proceed, Your

 5   Honor.

 6              THE COURT:  Good morning, Ms. Cowles.

 7              MS. COWLES:  Good morning.

 8              COURTROOM DEPUTY CLERK:  Ms. Conner, is the defendant

 9   ready to proceed?

10              MR. GRINDROD:  Defense is ready to proceed.  Good

11   morning, Your Honor.

12              THE COURT:  Good morning, Ms. Conner.

13              COURTROOM DEPUTY CLERK:  Now members of jury, when I

14   call your name, would you please stand and answer present, and

15   remain standing until the next name is called, and then be

16   seated?

17              (Jury was impaneled and sworn in untranscribed

18   proceedings.)

19              THE COURT:  All right.  Is there any motion to

20   separate the witnesses?

21              MS. CONNER:  Yes, Your Honor.

22              THE COURT:  All right.  The Court grants the motion to

23   separate the witnesses.  So any witnesses that are going to

24   testify other than those sitting at counsel table must step out

25   of the courtroom.
```

 1          All right.  Does the government have an opening

 2 statement?

 3          MS. COWLES:  Yes, Your Honor.

 4          THE COURT:  How long do you estimate it to last?

 5          MS. COWLES:  Your Honor, approximately 10 minutes.

 6          THE COURT:  All right.  Does the defense have an

 7 opening statement?

 8          MR. GRINDROD:  Yes, Your Honor.

 9          THE COURT:  Approximately how long?

10          MR. GRINDROD:  13 last time, Your Honor.

11          THE COURT:  Okay.  Very good.  You may proceed, Ms.

12 Cowles.

13          MS. COWLES:  Your Honor, Counsel, ladies and gentlemen

14 of the jury, the United States will prove to you beyond a

15 reasonable doubt that on November 17th, 2016, the defendant,

16 Elmer Emmanuel Eychaner, III, used a government-monitored

17 computer to go onto the Internet and attempt to receive obscene

18 cartoon images depicting the sexual abuse of minors.

19          The evidence will show that the defendant knew that

20 his computer was monitored by the government, and he still chose

21 to use his computer to access this obscene illegal material.

22          You will learn that the defendant's computer was being

23 monitored by the government because, in 2008, the defendant was

24 convicted in the Eastern District of Virginia in the Norfolk

25 Division in federal court for possession of child pornography.

1   Now, based on this criminal conviction, the defendant was placed

2   on a period of federal supervision.  You'll learn about what

3   federal supervision is in this case.  But the defendant was

4   being monitored by the Federal Probation Office for the Eastern

5   District of Virginia in Newport News.  And originally when the

6   defendant began his period of federal supervision in June, 2016,

7   he was not allowed to have a computer, but then in July, 2016,

8   the defendant told his probation officer, who at the time was

9   Probation Officer Powers, that he would like to get a computer

10  so he could look for a better job.  Now, the probation office

11  agreed that the defendant could have a computer to job search,

12  as long as the probation office could monitor what the defendant

13  was doing on that computer.

14          During this case, you will learn that the probation

15  office for the Eastern District of Virginia has an agreement

16  with a company called RemoteCOM, and RemoteCOM installed

17  monitoring software on computers of people that are being

18  monitored by the probation office, and that way the probation

19  office is able to keep track of what people who are being

20  monitored are doing on their computers.  You will learn that the

21  defendant agreed that his computer could be monitored, and he

22  agreed to a number of monitoring conditions.

23          Now, during this case you're going to learn about the

24  different ways that RemoteCOM monitors offender's computers, and

25  that one of those ways is called keystroke monitoring.

1  Basically, keystroke monitoring is tracking what an individual

2  is typing on a keyboard.  So when they hit certain keys, the

3  system logs that, and that way the probation office is able to

4  track what they're doing and what they're typing and what

5  they're looking for.  The defendant knew that this keystroke

6  monitoring was one of the ways that RemoteCOM was tracking his

7  activities on his computer.

8         You will hear that in August, 2016, the defendant's

9  probation officer received a report from RemoteCOM about the

10  activity the defendant was engaging in on his computer.  She

11  approached the defendant and spoke with him and he admitted that

12  he was searching for pictures of minors on his computer.  And he

13  also told her that he had found a hole in the system, and that

14  he was using something called voice recognition software, and

15  specifically a program called Cortana, to try to defeat the

16  monitoring from the federal probation office.

17        What you'll learn in this trial is that voice

18  recognition software works by, rather than typing on a computer

19  on a keyboard, a person will speak to the computer, give that

20  computer voice commands, and that way the person doesn't have to

21  enter anything on a keyboard and there's no keystrokes being

22  recorded.

23        Now, the probation officer listened to this confession

24  and this admission from the defendant in August of 2016, but she

25  was aware that RemoteCOM had another way of tracking what the

1  defendant was doing, and that was by taking screenshots or a

2  picture of what the defendant was doing on his computer.

3  RemoteCOM software, you'll learn, takes screenshots of a user's

4  activity periodically.  Different things can trigger the

5  screenshots to start being taken, and then they start being

6  taken every 10 seconds.  You'll learn about how that software

7  works in this trial.

8          So the probation officer knew that this Cortana

9  program was not a threat to the system.  However, the defendant

10  continued to use Cortana in the mistaken belief that it was a

11  way to evade the system and evade the tracking.  You will learn

12  that on the night of November 17th, 2016, the defendant used his

13  roommate's wifi, got on the Internet, and looked and obtained

14  obscene images of cartoons depicting the sexual abuse of minors.

15  You'll see some of the defendant's search history and you'll

16  hear about some of the search terms he used.  You'll also learn

17  that after the defendant was done conducting these searches, at

18  about 8:03 p.m. that night on November 17th, 2016, the defendant

19  deleted his search history.

20          Now, the very next day, on November 18th, 2016, in the

21  morning, the defendant called up his probation officer who he

22  had been transferred, so it was now Probation Officer Yost.  He

23  told Probation Officer Yost he wanted to return his computer to

24  the store because it was distracting and the monitoring software

25  cost too much money for him to have to pay for.  So he just

1   wanted to return the computer to the store.  You'll also hear

2   that less than an hour later the defendant called back Probation

3   Officer Yost and he told her that he had not been honest with

4   her, he had not told her the whole story.  And then, ladies and

5   gentlemen, the defendant confessed.  He told his probation

6   officer that the night before he had searched for and viewed

7   images of cartoon anime that depicted children engaged in a

8   variety of sex acts.

9           You'll learn that when Probation Officer Yost heard

10  the defendant's confession, she went to the probation officer

11  who was in charge of the computer monitoring program for the

12  probation office.  That's Probation Officer Mako.  She asked

13  Probation Officer Mako if he could go into Mr. Eychaner's

14  account and see if Mr. Eychaner had really engaged in this

15  activity the night before.  So Probation Officer Mako went into

16  the system, went into Mr. Eychaner's account, and he was able to

17  see the different images that Mr. Eychaner had viewed the day

18  before of children engaged in a variety of sex acts, cartoons

19  depicting all of these different sex acts involving minors.  And

20  Probation Officer Mako let Probation Officer Yost know what he

21  had found.

22          Now, after confirming the defendant's confession with

23  Probation Officer Mako, Probation Officer Yost called the

24  defendant back.  She told him that she needed to come collect

25  his computer from him.  The defendant told her that he was at

1  work, he'd be back later that evening.  And then he told her

2  that he had taken the hard drive out of his computer, damaged

3  the hard drive, and thrown it down a storm drain on the way to

4  work.  Probation Officer Yost told him that she needed to come

5  get the pieces of his computer.

6          You'll hear that later that evening, Probation Officer

7  Yost went with her supervisor, Probation Officer Powers, to the

8  defendant's residence on 35th Street in downtown Newport News.

9  They met with the defendant, went upstairs to his room, and he

10  gave them his computer mouse and the charge cord for it, and he

11  told them about the images that he had viewed the night before,

12  and he told them that he had viewed these cartoon images of

13  children engaged in a variety of sex acts.

14          The defendant then went downstairs, took them

15  downstairs, took them to the back of his residence to a trash

16  can where he pulled out the pieces of his laptop computer.  Both

17  probation officers noticed that the laptop computer was damaged.

18  The defendant repeated his admission from earlier that he had

19  taken that hard drive out of the computer and he had thrown it

20  down a storm drain on his way to work that day.

21          The probation officers collected the defendant's

22  computer and later turned it over to law enforcement to see if

23  it could be forensically examined.

24          During the course of this trial you'll learn about

25  what a forensic examination involves and you will hear that,

1  because the defendant had thrown away his hard drive, the

2  computer forensic analyst was not able to perform a forensic

3  examination on the defendant's computer.

4          During this trial you'll hear about the searches the

5  defendant conducted.  You'll hear about some of the search terms

6  that he used, which included Little Girls Pervert Paradise,

7  Toddlercon Sex Movies, and Lolita Sperm.  You'll see some of the

8  images that the defendant viewed on November 17th, 2016.

9          At the end of this trial, I'll have another chance to

10  come and speak with you.  That will be after you've heard

11  testimony of the probation officers who listened to the

12  defendant's confession, and after you've seen some of those

13  images of obscene cartoons of children being sexually abused,

14  and after you've heard all of the evidence, and at that time,

15  ladies and gentlemen, I will ask that you find the only just

16  verdict supported by all of the evidence:  A verdict of guilty

17  on all counts.

18          Thank you.

19          THE COURT:  Thank you, Ms. Cowles.

20          Mr. Grindrod?

21          MR. GRINDROD:  Anime cartoons.  This case is about

22  whether the U.S. government can send someone to prison for

23  looking at cartoons online.  The Constitution protects each of

24  us from being punished for exercising certain sacred rights.

25  The First Amendment.  Freedom of speech, freedom of expression

1   and of religion; the Second Amendment, right to bear arms; the

2   Fifth Amendment, the Ninth.  These amendments draw a hard line

3   where government power must yield to individual liberty.  And as

4   jurors in this case, you are the last line of defense for those

5   liberties.  During this trial, you may hear the prosecutors say

6   we represent the United States, and that's true, they represent

7   the U.S. Department of Justice.  But in a case about the First

8   Amendment, in a case about how far the government can go and

9   when government power must yield to individual liberty, I think

10  it's important for us to remember the Preamble of the

11  Constitution.  "We the People of the United States, in order to"

12  -- among other things -- "secure the blessings of liberty to

13  ourselves and our posterity, do ordain and establish this

14  Constitution."  In this case it's you, the people, who have to

15  decide whether our government can send someone to prison for

16  looking at cartoons.

17          Now let me pause for a moment if I can, to make a few

18  introductions.  My name is Andrew Grindrod, this is Amanda

19  Conner, and we are the lawyers representing Elmer Eychaner.

20  Susan Jones, seated at the far end of that table, is another

21  member of the defense team.  And this is Mr. Eychaner.  He's the

22  person charged in this case.  And the evidence will show that

23  Mr. Eychaner has some disturbing sexual interests.  When you

24  hear certain aspects of this case, you may feel sorry for him,

25  you may be horrified.  Maybe some mix of both.  It's only human

1  to have those feelings.  But the law says you can't base your

2  verdict on feelings.  Whether those are feelings of sympathy or

3  feeling of animus, you have to decide this case based on the

4  facts and the law.  That's important in every case, but it's

5  especially important in cases like this, where our

6  Constitutional rights are at stake.  Because our freedoms have

7  to be guarded most strongly when they're exercised by somebody

8  who is genuinely hated.  Our freedoms are based on principle,

9  not on popularity.

10            So let me take you back to the summer of 2016.  The

11  evidence will show that Mr. Eychaner was on federal supervised

12  release, which is basically like probation.  You will hear from

13  two probation officers, Ms. Powers and Ms. Yost, who were his

14  supervising probation officers at the time.  The evidence will

15  show that Mr. Eychaner was not perfect on supervision, but when

16  he made a mistake, he was generally up-front with it.  You'll

17  hear that Mr. Eychaner was working a temp job.  He was keeping

18  in touch with his probation officer, and you'll hear that at one

19  point he was allowed to get a computer so that he could look for

20  a permanent job.  And you'll hear, as Ms. Cowles said, that

21  Mr. Eychaner was not allowed to do certain things on that

22  computer.  He was not allowed to look at any kind of

23  pornography, even legal, mainstream stuff like Playboy, wasn't

24  allowed to use social media.  Lot of restrictions.  And in order

25  for the probation office to know whether he was complying with

1  those restrictions, there was a monitoring software, some

2  monitoring software installed on to his computer.

3          You'll hear that Mr. Eychaner's computer was monitored

4  by a company called RemoteCOM.  And the evidence will show that

5  this monitoring software was pretty incredible.  It captured a

6  lot of information:  Keyword strokes, keyword alerts, websites

7  visited, uploads, downloads, email logs.  It tracked basically

8  everything Mr. Eychaner was doing on his computer.  And every 10

9  seconds it took a screenshot, a screen grab of exactly what was

10 on his computer screen.  The evidence will show that everything

11 he did on his computer was captured, monitored, saved by

12 RemoteCOM.

13         Now, as I mentioned, the evidence will also show that

14 Mr. Eychaner has a serious problem.  He has perverted sexual

15 interests.  Nobody wants to be born that way.  Nobody would

16 choose it.  But the evidence will show that on November 17th,

17 2016, he had a break.  The evidence will show that for about

18 two hours he looked online for images that would satisfy his

19 sexual interests.  The evidence will show that he looked for

20 cartoons, for anime cartoons of children engaged in various

21 sexual acts.  That's what he's charged with here.

22         The evidence will show that that night, Mr. Eychaner

23 smashed his computer.  Punched the screen.  Took out the battery

24 and bent it.  He took out the hard drive, smashed the frame.

25 Evidence will show that he realized, for him, that computer

1   presented a high-risk situation that needed to be eliminated.

2   And so he smashed it.  He eliminated it.  The evidence will show

3   that the next morning he got rid of the hard drive.  Tossed it

4   down a sewer, just like you heard.  Threw the other pieces of

5   the computer away.  And the evidence will show that he called

6   his probation officer and he said I don't want a computer

7   anymore.  And the evidence will show that he didn't tell his

8   probation officer during that first conversation about what had

9   happened the night before, but the evidence will also show that

10  he called her back less than an hour later and told her exactly

11  what he had done.

12          And the evidence will show that later that day, when

13  there was the first time anybody mentioned trying to get ahold

14  of that computer for preserving it, Mr. Eychaner had already

15  smashed it, and he helped his probation officers gather what

16  could be gathered still as far as the pieces go, showed them

17  where it was in the trash, gave them the mouse, gave them the

18  cord.  That's what the evidence in this case will show.

19          Now I told you this case is about the First Amendment,

20  and that's true, but that's not all this case is about.  In

21  fact, the government has to prove a lot before you're even going

22  to get to the First Amendment question.  Let me start with the

23  burden of proof.

24          Mr. Eychaner is charged with four crimes.  First, he's

25  charged with knowing receipt of obscene anime cartoons.  That's

1   the one we've been talking about and focusing on.  Second, he's

2   charged with two counts of destroying evidence, basically the

3   judge will explain the details.  And then the fourth and final

4   charge is an enhanced penalty provision for certain crimes

5   involving a minor.  For each of those offenses, the government

6   has the burden of proof, they have to prove certain facts beyond

7   a reasonable doubt.  We call those facts that they have to prove

8   the elements of the offense.  Before you can find Mr. Eychaner

9   guilty, you have to all unanimously agree that every single

10  element has been proven beyond a reasonable doubt.  That's a

11  very high burden.  Unanimous agreement that every element has

12  been proven beyond a reasonable doubt.  That's the government's

13  burden in this case.

14          And Mr. Eychaner, he has no burden.  He is presumed

15  innocent.  Innocent is the default.

16          So the burden of proof is high, and it lies only with

17  the government.  How can the government meet its burden?  Only

18  through evidence.  The government cannot meet its burden by

19  speculation, by assumptions.  And they can't just get you

20  halfway there.  They have to eliminate all reasonable doubt from

21  your mind before you can vote to convict.

22          So let's talk about some of what the government has to

23  prove in this case.

24          The knowing receipt of obscene anime cartoons.  To

25  find Mr. Eychaner guilty, the government has to prove five

1   elements beyond a reasonable doubt.  First, that he actually

2   received the anime cartoon in question; second, that the cartoon

3   depicted minors engaged in sexually explicit conduct; third,

4   that his receipt of the cartoon was knowing, he knew he was

5   receiving it; fourth, that the cartoon was obscene under a

6   special three-part First Amendment test that the judge is going

7   to explain to you; and fifth, that the cartoon moved in

8   interstate commerce.

9           Now, I'm not going to stand up here and preview for

10  you all of the evidence on all of those elements, but let me

11  talk about two things.  First, keep an open mind.  You're going

12  to see shocking and disturbing cartoon images depicting sexual

13  acts with characters that look like kids.  Now, thankfully, as

14  disturbing as those images are going to be, they're not pictures

15  of real children.  And no real children -- they do not depict

16  real children being abused or exploited.  They are cartoons.

17  But I can tell you, you're going to have strong gut reactions.

18  That's okay.  But none of the elements in this case are going to

19  turn on whether you're disgusted.  I personally find neo-Nazi

20  propaganda pretty darn disgusting, but it's still protected

21  speech under the First Amendment.  So allow yourself to be

22  disgusted.  Feel what you feel, and then set those feelings

23  aside and apply the law.

24          On the obscenity element you're going to have to apply

25  a three-part test.  I just mentioned that.  But the third part

1   of that test requires the government to prove beyond a

2   reasonable doubt, for every image they've charged, that the work

3   as a whole lacks serious literary, artistic or political value.

4   And on that issue you're going to hear from a college professor.

5   Judge Davis mentioned her name when he was asking -- telling you

6   about the witnesses in this case -- Dr. Cather.  She's a

7   professor at University of Texas at Austin.  She's an expert on

8   Japanese anime.  Dr. Cather is not going to testify until the

9   very end of this trial, but her testimony is really important on

10  this obscenity issue.  So I'm asking you, please look at these

11  disturbing images, but keep an open mind.

12          Second thing I'll talk about on this count is to

13  please pay attention to the details.  I promise you, Ms. Conner

14  and I are not going to draw your attention -- we are not going

15  to waste your time drawing attention to stuff that doesn't

16  matter, but some of the details are going to prove to be really

17  important.  Ms. Conner will talk about those details in her

18  closing argument, but I'm telling you that the details are going

19  to be important now, so you can keep an eye out for them and

20  you'll know what she's talking about in her closing.  So on this

21  cartoon count, please keep an open mind and pay attention to the

22  details.

23          Turning briefly to the destruction of evidence

24  charges.  You're going to be asked whether Mr. Eychaner

25  destroyed his computer.  That's going to be easy.  But the

 1  government has to prove why.  The government has to prove that

 2  he smashed that computer for the specific purpose of impeding an

 3  investigation.  And if you're not convinced beyond a reasonable

 4  doubt, if there could have been some other reason in his mind,

 5  then you have to vote not guilty.

 6          So now we've talked about what this case is about, let

 7  me tell you two things it's not about.  First, it's not about

 8  whether Mr. Eychaner violated his conditions of probation.  That

 9  was all handled in a separate proceeding.  You're going to hear

10  about that today, but that's not what you're being asked to

11  decide.  The second thing is it's not about Mr. Eychaner's prior

12  conviction.  You just heard Ms. Cowles reference it.  Yes, there

13  is one.  But the judge will instruct you, you may not consider

14  that as evidence that Mr. Eychaner committed this crime.  It

15  would be a violation of your oath as jurors to do so.

16          In conclusion, this is not going to be an easy case.

17  You're going to see things that make you uncomfortable.  And

18  when you retire to deliberate, you're going to have to have

19  conversations that are going to be uncomfortable.  Conversations

20  about sex are uncomfortable enough, and we're asking you to have

21  a thoughtful conversation about cartoon images that depict

22  children -- child-like figures engaged in sexual acts.  During

23  deliberations, it may be scary to voice your opinion, because

24  you may not want to be seen as the guy who is standing up to say

25  I think this is okay.  But let me be clear:  We are not asking

1   you to, we will not ask you, at the end of this trial, to stand

2   up for child sex cartoons.  We won't ask you to stand up for

3   Mr. Eychaner, but we will ask you to stand on principle.  We

4   will ask you to stand up for the First Amendment, and we will

5   ask you to find Mr. Eychaner not guilty.

6            THE COURT:  Thank you, Mr. Grindrod.

7            Counsel, it's now about quarter to 5:00.  Probably

8   makes little sense for us to move on with evidence at this

9   point, so I think we ought to get back together at 9:30 in the

10   morning for your first witness.  And maybe we can discuss a few

11   matters to make things go more smoothly while the jury goes on

12   home.

13            So Officer Brown, ladies and gentlemen, he's going to

14   see you back to the jury room, show you everything you have

15   there, need there, and in the morning -- he's going to give you

16   a little few minutes of orientation about where you come in the

17   morning and we're going to make sure that they're not coming

18   down that hallway by themselves.  And he's going to show you the

19   door where you'll come in, and answer any questions you have

20   about what you should bring.  And in the morning, he'll offer

21   each of you a legal pad to take notes if you want to use it, as

22   I told you earlier.  That's totally up to you.

23            Remember, no research.  Don't say anything on FaceBook

24   about it.  Don't talk to anybody about the case.

25            All right.  I'll let you go, and see you in the

1    morning.  Thank you.

2         Everyone please stand.  Everyone in the courtroom

3    please stand up.

4         (Jury left the courtroom.)

5         THE COURT:  All right.  You can be seated.

6         So Mr. Grindrod, I want to hear from you on the

7    argument Ms. Cowles made about anime cartoons.  Let me

8    reconstruct if I can what I think she said.  She said that

9    lolicon is considered anime cartoons, I think.  And I think she

10   also said that CGI is considered anime cartoons.  Is that what I

11   understood you to say?  In other words, that when the Count 2

12   charges anime cartoons, your position, the government's position

13   is that that includes the lolicon and the CGI?

14        MS. COWLES:  Your Honor, the government would agree to

15   redact the top portion of 14a-14 and provide new copies to the

16   Court tomorrow morning.

17        THE COURT:  So those three images?

18        MS. COWLES:  To remove those three images.

19        THE COURT:  And then keep in the -- is it

20   something-com image on the bottom right of that page?

21        MS. COWLES:  We would keep that image in.

22        THE COURT:  And the search -- I don't know if they

23   were search terms, but the small words that you pointed to

24   earlier that are above the CGI images, those would stay?

25        MS. COWLES:  Yes, Your Honor.

1          THE COURT:  Okay.

2          MR. GRINDROD:  Yes, Your Honor.  And I just was

3   speaking with Ms. Cowles about this.  The government will also

4   be --

5          (Counsel conferred.)

6          MR. GRINDROD:  The government has agreed not to admit

7   14a-3 and is going to make a similar redaction to the one we

8   discussed a moment ago on 14a-17.

9          THE COURT:  Hold on.  So 14a-3 is coming out

10  completely.  14a-17 is going to be redacted so that what's in

11  that bottom right portion is coming out?  That thumbnail?  Is

12  that what's coming out?

13         MR. GRINDROD:  Yes, Your Honor.  Where it says "Top of

14  the Day," the image that's right below that will be redacted.

15         And if I can just confer with Ms. Cowles briefly?

16         THE COURT:  Hmm-hmm.

17         (Counsel conferred.)

18         MR. GRINDROD:  So those, yes, Your Honor, and just

19  after conferring with Ms. Cowles, so those will be removed here

20  from these exhibits and they also will no longer, obviously, be

21  charged images.  So we won't have to include those on the

22  special verdict form either.

23         THE COURT:  So that will reduce the 24 down to --

24         MR. GRINDROD:  And I'm sorry, Your Honor, and 14a-5

25  the government is going to pull entirely from the exhibit.

1          THE COURT:  So what's that leave, 15 or so?

2          (Counsel conferred.)

3          MR. GRINDROD:  Yes.  18 images is what we had.

4          THE COURT:  18 total?  Okay.  Very good.

5          So who do we start with tomorrow, Ms. Cowles?

6          MS. COWLES:  Your Honor, that will be Probation

7  Officer Stephanie Powers.

8          THE COURT:  Powers.  Okay.  And so now how long do you

9  think this case is going to last?  When do you think the

10  evidence will be completed?  Do you think your evidence will

11  just go tomorrow, Ms. Cowles, and be concluded by tomorrow?

12          (Government's counsel conferred.)

13          MS. COWLES:  Your Honor, I believe it will go through

14  tomorrow, finishing tomorrow, and if not, finishing tomorrow,

15  then first thing the next day, the next morning.

16          THE COURT:  Okay.  And then how long do you

17  anticipate, Mr. Grindrod, yours may last?  What's your best

18  estimate?

19          MR. GRINDROD:  Maybe a half day, Your Honor.

20          THE COURT:  Okay.  So maybe we could -- we'll see, but

21  maybe by Thursday afternoon we could let the jury go early, if

22  we finish in time, and talk about jury instructions and charge.

23          MR. GRINDROD:  Our --

24          THE COURT:  I want you all to get together on the jury

25  instructions and work out everything that you can on those.  You

1  probably have already done it, but that's something to think

2  about.

3          MR. GRINDROD:  Your Honor, our expert is arriving

4  today.  We're going to put her on as our first witness, but

5  we're hoping to get her out of this area by Thursday night.  So

6  if that, that's -- I don't know if that helps with your timing

7  planning, but that's our...

8          THE COURT:  It may help you with your planning and

9  timing.

10          MR. GRINDROD:  Well, I'm going to have problems if

11  we're not done by then, but...

12          Thank you, Your Honor.

13          THE COURT:  All right.  Good.  You all have a good

14  evening and I'll see you in the morning at 9:30.  Thank you.

15          (Whereupon, proceedings concluded at 4:53 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          *CERTIFICATION*

2

3          *I certify that the foregoing is a true and complete*

4     *excerpt of the transcript of proceedings held in the*

5     *above-entitled matter.*

6

7          _____

8                     Paul L. McManus, RMR, FCRR

9                          _____

10                              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25