UNITED STATES OF AMERICA,

v.                                    Criminal Case No. 4:17cr76

ELMER EMMANUEL EYCHANER, III,

    Defendant.

## OPINION AND ORDER

This matter is before the Court on a Renewed Motion for Judgment of Acquittal filed by Defendant Elmer Emmanuel Eychaner, III ("Defendant" or "Eychaner") pursuant to Federal Rule of Criminal Procedure 29(c)(1). ECF No. 90. For the reasons noted below, Defendant's Renewed Motion for Judgment of Acquittal is **DENIED** as to Counts Two, Three, and Four, but the Motion is **GRANTED** as to Count Five, and Defendant's conviction on Count Five is **VACATED**.

## I. Background

In August 2017, Defendant was charged with the following five counts: Access with Intent to View Visual Depictions of Minors Engaging in Sexually Explicit Conduct, in violation of 18 U.S.C. § 2252(a)(4)(B) (Count One); Attempted Receipt of Visual Depictions that Depict Minors Engaging in Sexually Explicit Conduct and are Obscene, in violation of 18 U.S.C. § 1466A(a)(1)

(Count Two)[1]; Destruction of a Tangible Object to Impede a Federal Investigation, in violation of 18 U.S.C. § 1519 (Count Three); Obstruction of Justice - Attempted Evidence Tampering, in violation of 18 U.S.C. § 1512(c)(1) (Count Four); and Penalties for Registered Sex Offender, in violation of 18 U.S.C. § 2260A (Count Five). Indictment, ECF No. 1.

In September 2017, Eychaner entered a plea of not guilty and a jury trial was scheduled. The trial date was later continued to May 15, 2018. ECF No. 25. On May 13, 2018, the Government moved to dismiss Count One of the Indictment. ECF No. 62. The Court granted the motion the next day. ECF No. 70. After a four-day jury trial, on May 18, 2018, the jury returned guilty verdicts on each of the remaining counts of the Indictment. ECF No. 86.

## A. The Evidence Presented at Trial

The evidence at trial revealed that in December 2007, Eychaner pled guilty to Possession of Material Containing Child Pornography. In March 2008, he was sentenced to 120 months imprisonment and a term of lifetime supervision. See Judgment, United States v. Eychaner, No. 2:07cr183 (E.D. Va. Mar. 13,

---

[1] The Court recognizes that 18 U.S.C. § 1466A and most opinions dealing with offenses under that section refer to such offenses with some variant of a title involving "obscene visual representations of the sexual abuse of children." Here, the parties agreed to refer to Count Two as "Attempted Receipt of Visual Depictions that Depict Minors Engaging in Sexually Explicit Conduct and are Obscene," which mirrors the language in Count Two of the Indictment. See Ind. 2, ECF No. 1.

2008), ECF No. 30. As special conditions of supervised release, Defendant was prohibited from (1) possessing or using a computer to access any online computer services at any location without the prior approval of the probation officer and (2) from possessing or accessing pornographic material or any pictures of juveniles. Id. at 4.

In June 2016, Defendant began his term of supervised release. Shortly thereafter, Eychaner spoke to Probation Officer Stephanie Powers, who was supervising him at the time, and told her that he wanted to obtain a computer to conduct job searches. Eychaner agreed in writing that his computer would be monitored, and he signed forms advising him that the Probation Office would monitor his computer in a variety of ways through software provided by RemoteCOM, a third-party vendor. See Waiver of Hearing to Modify Conditions of Supervised Release, United States v. Eychaner, No. 2:07cr183 (E.D. Va. July 15, 2016), ECF No. 40. He was also specifically advised that the monitoring software could "restrict and/or record any an[d] all activity on the computer, including keystrokes and Internet use history." Id. On August 8, 2016, RemoteCOM's monitoring software was installed onto Defendant's computer.

Later that August, Probation Officer Stephanie Powers received information from RemoteCOM about Defendant's suspicious computer activities. After being confronted about this

3

information, Eychaner admitted to having performed an Internet search for images of clothed minors. At that time, he also told his probation officer that he had used a voice recognition program called Cortana[2] to circumvent RemoteCOM's keystroke monitoring. Probation Officer Powers then instructed Eychaner to use his computer only to search for jobs, but she allowed him to keep his computer.

On November 17, 2016, utilizing his own computer, Defendant used his roommate's Wi-Fi to access the Internet in order to perform searches on Bing.com using the Cortana voice recognition program. Eychaner used many sexually explicit search terms[3] that generated a large number of anime images depicting children engaged in sexual activity.[4] In addition to his Bing.com

---

[2] The testimony at trial established that Cortona is a voice recognition program available on Windows 10 computers that is similar to Alexa, Google, or Siri. Trial Tr. 106:11-15, ECF No. 96. The trial transcript is available on the Court's docket at ECF Nos. 95-98, where each docket entry corresponds to the transcript for one day of the four-day trial. Hereinafter, the Court will only refer to the trial transcript without including the corresponding docket entry.

[3] For example, Eychaner used search terms such as "Uncensored Toddlercon Sex Comic," "Toddlercon Sex Movies," "show images of lolita sperm," "show images of cg Lolita," "Little girls Pervert Paradise," "3D Dad Daughter Little Girl," "VIP Zona 3d Hentai," "Lolicon 3D images," and "Animated Toddlercon Sex."

[4] An example of the typical image shown to the jury was from Eychaner's search for "Vip Zona 3d Hentai," which resulted in a thumbnail image for a video from XXXBunker.com titled "My Little Sister Can't Be this Easily Corrupted." Gov.'s Ex. 14a-7b. This image shows a small, childlike female character with her legs spread as she is penetrated by an adult male character. Id. Another example is Eychaner's search for "Shotacon 3D Little Girl," which returned a result of a thumbnail image of a video from xhamster.com titled "3d cute loli fucked hard." Gov.'s Ex. 14a-8. This image shows a female character who is identifiably prepubescent being penetrated by an adult male.

4

searches, Defendant also went to the websites "premiumhentai.site" and "premiumhentai.biz" to find additional anime images. Defendant's online activities that evening lasted from 6:34 p.m. to 7:38 p.m., during which time RemoteCOM's monitoring software captured still screenshot images from Defendant's computer screen every ten seconds.

On the morning of November 18, 2016, Defendant called Probation Officer Candace Yost, who was then supervising him, and told her that he wanted to return his computer because the monitoring software was too expensive. Less than an hour later, he called back and stated that he had not been honest with her. He then confessed that he had accessed inappropriate images on his computer the night before, which he described as "anime child pornography." Defendant also related that he had been able to access these images using the Cortona voice recognition program and that he believed that he had found a hole in the monitoring system.

After hearing Eychaner's confession, Probation Officer Yost then went to Probation Officer Mako, who was in charge of computer monitoring for the United States Probation Office for the Eastern District of Virginia. Probation Officer Mako examined Eychaner's computer activity and confirmed that, while there was no unusual activity in the keystroke monitoring section from the previous night, RemoteCOM had captured

hundreds of screenshots showing that Eychaner had viewed explicit images.

Probation Officer Yost then called Eychaner back and told him she needed to collect his computer. Eychaner replied that he was at work at the moment, but that he would be home later that day. He also told her that he had already taken his hard drive out of his laptop and thrown it down a storm drain on the way to work that day. Eychaner stated that he had done this because he was angry at his computer, which he described as "the danger zone." Probation Officer Yost then told him that she would need him to collect all the remaining pieces of his laptop for her to retrieve later that day.

In the early evening of November 18, 2016, Probation Officers Yost and Powers went to Eychaner's residence to collect his computer. At that time, Eychaner again confessed to having viewed images he described as "anime child pornography" the night before. He then gave the probation officers his computer mouse and power cord, and led them outside the residence to a trash can where he removed the remaining pieces of his broken laptop computer and his laptop's battery. The computer was missing its hard drive, and the hard drive was never recovered.

Probation Officer Yost later took the pieces of Defendant's computer and gave them to FBI Task Force Officer Call, who then turned them over to Computer Forensic Analyst ("CFA") Jones for

analysis.   CFA Jones testified at trial that he could not
conduct a forensic examination of the computer because of the
missing hard drive.   Officer Call and CFA Jones also testified
about the steps that would have been taken in the investigation
if there had been a hard drive to forensically analyze.

At trial, the Government published thirteen images to the
jury from the complete screenshots captured from Defendant's
Bing.com image searches.[5]   In their unredacted form, the
screenshots show around 20 images from the results returned from
Eychaner's Bing.com searches.   The thirteen images published to

---

[5] Prior to trial, the Court limited the number of images the Government could
show the jury in order to prevent prejudice to Defendant.  At the time,
Defendant agreed that the images should be so limited.  At trial, the parties
disagreed about the scope of the underlying "works" that should be analyzed
for purposes of the obscenity element under 18 U.S.C. § 1466A.  The Court
instructed the parties that, because the individual thumbnail images from the
Bing.com searches came from video clips and images that were removed from the
original "work as a whole" and placed in isolation on a website, the "work as
a whole" for these images was the material that they linked to on the
underlying websites.   See Trial Tr. 327:2-330:16; see also United States v.
Extreme Assocs., Inc., No. CRIM 03-0203, 2009 WL 113767, at *1-3 (W.D. Pa.
Jan. 15, 2009) (noting that individual digital video clips constituted the
"work as a whole" when they were posted on a website without any notice to
the viewer that they were scenes from longer films); Kahm v. United States,
300 F.2d 78, 83 (5th Cir. 1962) (finding that, where a person removes
passages from other works and combines them into a new, free-standing
compilation, that compilation becomes the new work "as a whole."). This same
standard also applied to the images hosted on premiumhentai.site and
premiumhentai.biz.

During trial, Defendant's key expert witness, Dr. Cather, gave
testimony which the Government claimed raised a question in the jury's minds
about whether the other images in the Bing.com screenshots would show that
the admitted thumbnail images had a context that gave them serious artistic,
literary, or political value.  Trial Tr. 335:14-337:2.  As a result, the
Government requested that they be able to admit several full screenshots in
order to dispel any misconceptions the jury might have about what the
redacted images would show.  See id.  The Court granted the Government's
request, but only allowed them to publish three full screenshots of the
Bing.com image results, for the limited purpose of rebutting the implication
raised by Dr. Cather's testimony, rather than for all screenshots from which
unredacted images had been shown. See Gov.'s Exs. 14b-1, 14c-2, 14d-2.

the jury each show one image from a particular screenshot, with the remaining images all redacted. See Gov.'s Exs. 14a-1a, 14a-1b, 14a-1c, 14a-2, 14a-6a, 14a-6b, 14a-7a, 14a-7b, 14a-8, 14a-9, 14a-10, 14a-11, and 14a-12;[6] see also Special Jury Verdict Form, ECF No. 86 (listing image numbers).

In addition to the thirteen images from the Bing.com searches, the Government also published five screenshot images from premiumhentai.site and premiumhentai.biz.[7] See Gov.'s Exs. 14a-4, 14a-13, 14a-14, 14a-15, 14a-16; see also Special Jury Verdict Form, ECF No. 86 (listing image numbers). One of these screenshots features the following description of a set of images available on premiumhentai.site:

> The newest lolicon 3d image set by Vinput in perfect picture quality. Horny little loli girls posing naked and taking huge cocks inside their tight wet little pussies. This set contains 25 seconds of bonus animation video with cute naked dancing little girl, enjoy! Also, don't miss the others [sic] volumes!

Gov.'s Ex. 14a-14 (listing 19 images and one video in the set). Two of the other images include information on the page listing the type of images in the "set," the number of images in that set, and the username of the set's "author." See, e.g., Gov.'s

---

[6] As for these individual thumbnail images, the Government did not take the additional step of showing the jury the contents of the webpage that the thumbnail images linked to, but both sides agreed that the images were from mainstream pornography websites such as xhamster.com, youporn.com, and xxxbunker.com.

[7] Two of the images come from the site premiumhentai.biz, Gov.'s Exs. 14a-4, 14a-16, while three are from premiumhentai.site, Gov.'s Exs. 14a-13, 14a-14, 14a-15. The Court refers to these images collectively as coming from premiumhentai.site.

Ex. 14a-15 ("Type: lolicon images | Author: Pororin | 27 pics"). In addition, two of these images also feature a large "DOWNLOAD" button on the screen. See Gov.'s Exs. 14a-14, 14a-15.

Among the Government's exhibits submitted at trial were several screenshots showing that, at the moment the screenshot was taken, the images had been enlarged either by hovering over the image or by clicking on it. See Gov.'s Exs. 14a-4, 14a-16. The Government also submitted screenshots taken just after 8:00 p.m. on November 17 that show that Eychaner deleted his Bing.com search history. See Gov.'s Ex. 12 at 80 (featuring a browser tab for "Bing-Search History" with a box stating "Clear your history" and "You're about to delete your entire search history. Are you sure you want to continue?" where the button for "Yes" appears to have been selected.).

The Defendant's evidence at trial consisted solely of the testimony of his expert, Dr. Kirsten Cather Fischer ("Dr. Cather"). Dr. Cather was offered by the defense as an expert in modern Japanese literature, culture, manga, and anime. See Trial Tr. 283:6-291:16. Dr. Cather's testimony first covered the definitions of many of the key Japanese terms used throughout the trial, such as manga,[8] anime,[9] hentai,[10] lolicon,[11]

---

[8] Dr. Cather described manga as a Japanese style of print cartoon. She noted that manga cartoons are typically two-dimensional, hand-drawn images shown in discrete panels, and that they are frequently linked into a series of panels to make a larger story. Trial Tr. 287:8-12. She also explained that within the broader genre of manga cartoons, there are various subgenres, with the

shotacon,[12] and toddlercon.[13]  Dr. Cather also generally described

manga's history, the stylization of characters featured in

manga, and the literary and artistic value that manga can have

in its many subgenres, including, in Dr. Cather's opinion, the

serious value of works of lolicon, shotacon, and toddlercon.

See generally id. at 291:21-318:8.  She concluded that, while

she could not opine as to whether the images in question had

serious artistic, literary, or political value based on the

isolated portions of the works presented by the Government, the

images at issue might have such serious value when viewed in the

broadest distinction being between manga intended for adult audiences (seijin manga), and manga intended for children (seinen manga).  Id. at 293:22-24.

[9] Dr. Cather defined anime as a film version of manga cartoons.  Id. at 287:14-15.  For purposes of this Opinion, the Court refers to images from anime or manga collectively as "manga" images.

[10] Dr. Cather described "hentai" as literally meaning "twisting of form," and that it referred to paraphilia or abnormal sexual desires.  Id. at 301:16-20.  She noted that hentai can refer to sexual themes involving children, but that it can also depict adults engaged in paraphilic sexual conduct.  Id at 302:4-6.

[11] Dr. Cather described the term "lolicon" as describing a subgenre of manga that usually refers to the sexual desire of an older male for a young girl.  Id. at 305:21-22.  "Lolicon" is derived from the term "Lolita complex," referring to the 1955 novel Lolita in which an older male character becomes sexually involved with a 12-year-old girl.  Id. at 303:15-304:2.  On cross-examination, Dr. Cather agreed that the term "lolicon" describes the sexual portrayals of young girls.  Id. at 347:3-5.

[12] Dr. Cather described "shotacon" as the corollary to lolicon except involving young boys.  Id. at 306:14-18.  On cross-examination, she agreed that the term refers to depictions involving sexually suggestive themes of young boys.  Id. at 347:9-13.

[13] Dr. Cather defined toddlercon as being a type of "lolicon" or "shotacon" but featuring toddler-age characters who are the objects of the sexual desire of older men.  Id. at 307:1-7, 347:15-19.  On cross-examination, Dr. Cather stated that the ages of the characters depicted in toddlercon would usually fall within the ages of two to four, with some characters in toddlercon perhaps being as old as six or seven.  Id. at 347:22-25.

context of the original manga works.  Id. at 318:6-8.  While the Government largely accepted Dr. Cather's definitions of the key Japanese terms, it strongly challenged Dr. Cather's contention that manga storylines involving lolicon, shotacon, and toddlercon could have serious literary or artistic value.  See generally id. at 346:21-371:13.

## B. The Acquittal Motions and the Jury Verdict

At the close of the Government's case-in-chief, Defendant moved for a judgment of acquittal on all counts, and provided briefs to the Court about certain issues.  See ECF Nos. 74 & 75; Trial Tr. 254:20-259:20.  The Court granted Defendant's Rule 29 motion for a judgment of acquittal for the "actual receipt" portion of Count Two, but denied the motion for all other counts.  ECF No. 81; Trial Tr. 270:20-272:13; Id. at 384:25-390:22; see also Indictment 2, ECF No. 1 (including language in Count Two stating that Eychaner "knowingly received and attempted to receive" the images in question).  Defendant later renewed his motion for judgment of acquittal at the conclusion of his presentation of evidence, Trial Tr. 380:23-381:2, which the Court also denied.  Id. at 384:25-390:22.

The jury found Defendant guilty on all the remaining counts of the Indictment.  ECF No. 86.  As to Count Two, at Defendant's request, the Court instructed the jury to use a special verdict form that listed the jury's verdict for each of the eighteen

11

explicit images published to them. Id. The jury found Eychaner guilty as to each of the eighteen images. Id.

On June 1, 2018, Defendant filed the instant Renewed Motion for Judgment of Acquittal. ECF No. 90. Two weeks later, the Government responded in opposition, ECF No. 91, and Defendant filed his reply brief in late June, ECF No. 92. Having been fully briefed, the matter is ripe for disposition.

## II. Legal Standard

Rule 29(c)(1) of the Federal Rules of Criminal Procedure provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." If the jury returned a guilty verdict, the court can "set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2).

A court considering a motion for judgment of acquittal must determine "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." United States v. MacCloskey, 682 F.2d 468, 473 (4th Cir. 1982). If "after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt," the jury's verdict must

12

stand.  United States v. United Med. & Surgical Supply Corp.,
989 F.2d 1390, 1402 (4th Cir. 1993).

### III. Analysis

**A. There is Sufficient Evidence to Sustain Eychaner's Conviction on Count Two - Attempted Receipt of Visual Depictions that Depict Minors Engaging in Sexually Explicit Conduct and are Obscene**

Eychaner first challenges the sufficiency of the evidence supporting his conviction on Count Two - Attempted Receipt of Visual Depictions that Depict Minors Engaging in Sexually Explicit Conduct and are Obscene.  Def.'s Acquittal Br. for Count Two, ECF No. 74.  To convict Eychaner on this count, the Government had to prove beyond a reasonable doubt that (1) Eychaner specifically intended to commit the underlying offense of Receipt of Visual Depictions that Depict Minors Engaging in Sexually Explicit Conduct and are Obscene, and (2) he took a substantial step towards the commission of that crime that strongly corroborates that intent.  See United States v. Engle, 676 F.3d 405, 419-20 (4th Cir. 2012).  Here, the underlying offense has the following elements: (1) that the defendant knowingly received a visual depiction; (2) that the visual depiction depicts a minor engaged in sexually explicit conduct; (3) that the visual depiction is obscene; (4) that the defendant knew, at the time of such receipt, the sexually oriented nature of the visual depiction; (5) that the defendant knew at the time

13

of such receipt that the visual depiction depicted a minor; and (6) that the visual depiction had been shipped or transported in interstate or foreign commerce. See 18 U.S.C. § 1466A(a)(1); Pattern Crim. Jury Instr. 5th Cir. § 2.60 (2015) (modified); Trial Tr. 466:17-468:2.

Eychaner specifically challenges whether the Government produced sufficient evidence to show (1) that he specifically intended to commit the underlying offense; (2) that he took a substantial step towards the commission of the underlying offense; (3) that certain of the images published to the jury (a) depict minors as opposed to youthful-looking characters, and (b) that the minors depicted are engaged in sexually explicit conduct; and (4) that the visual depictions were obscene. The Court addresses each element challenged in turn.

## 1. There is Sufficient Evidence to Find that Eychaner Specifically Intended to Commit the Underlying Offense

Eychaner first challenges whether the evidence is sufficient to show that he acted with the specific intent to receive[14] the images in question. At trial, this issue was

---

[14] The Court instructed the jury that:

> To receive a visual depiction means to take possession of it. Receiving includes the downloading or saving of a visual depiction by means of the Internet. A person has possession of something if the person knows of its presence and has physical control of it or has the power and intention to control it. Merely viewing [] visual depictions on the Internet does not constitute the substantive crime of the receipt of such visual depictions.

clearly and squarely presented to the jury, as Eychaner's main argument as to Count Two was that the evidence only showed a specific intent to view, as opposed to intent to receive, the images. See Trial Tr. 503:3-508:6. While at times inartfully distinguishing between evidence that established the specific intent to commit the underlying offense versus the evidence showing a substantial step towards the commission of the underlying offense, the Government presented evidence that was sufficient for the jury to conclude Eychaner had the requisite specific intent. See Trial Tr. 487:2-491:7, 526:3-528:4, 531:5-532:4; see also Gov.'s Opp'n Br. 5, 10 (noting the evidence showing that Eychaner took a substantial step to commit the underlying offense, but failing to explain the basis for the jury's finding for specific intent). Despite the Government's failure to distinguish clearly between the specific intent and substantial step elements in its response to the motion for acquittal during trial and in its post-trial response to the renewed motion for acquittal, the Court addressed this distinction at trial with the parties, noting the basis for its ruling as to each element in its denial of Eychaner's Rule 29 motion on Count Two. See Trial Tr. 383:13-386:7.

The Court notes at the outset the striking similarities between the facts here and those presented in United States v.

Trial Tr. 471:7-14.

_Groenendal_, No. 14-1143/1148, 2015 U.S. App. Lexis 23381 (6th Cir. Apr. 27, 2015) (unpublished order), in which the Sixth Circuit affirmed a conviction for attempted receipt of child pornography and attempted access with intent to view child pornography. _Id._ at *1-2. Like Eychaner, Groenendal was on supervision from a prior conviction for possession of child pornography. _Id._ While on supervision, he persuaded his probation officer to allow him to have a computer on the condition that he would agree to computer monitoring. _Id._ at *5. Groenendal later conducted image searches on Bing.com for child pornography, the evidence of which was logged by the monitoring software in the form of screenshots. _Id._ Groenendal's probation officer eventually received a report about his activities from the monitoring service, after which the defendant was prosecuted for the above-mentioned offenses. _Id._ at *5-6.

At trial and on appeal, Groenendal argued that the evidence was insufficient to show that he specifically _intended_ to commit either of the charged offenses. _Id._ at *3. The district court denied the defendant's Rule 29 motion at trial, and the Sixth Circuit affirmed the conviction. _Id._ at *9-10. On plain error review, the Sixth Circuit found that the following evidence was sufficient to show the defendant's specific intent to receive the images: (1) evidence of numerous pages of search terms that

16

Groenendal entered into the Bing.com search engine which yielded images of child pornography; (2) evidence showing that Groenendal had scrolled through multiple pages of results and moved his mouse over certain images to enlarge them; (3) evidence that the defendant had used suggested search results from Bing.com to find further images of child pornography; (4) evidence that images had been stored in the defendant's temporary cache files; (5) Groenendal's admission to having conducted the searches; (6) and Groenendal's prior conviction for possession of child pornography. Id.

The only meaningful difference between the above facts and those here is that Eychaner removed his hard drive and prevented any forensic analysis to determine whether his Internet cache file contained the images in question or whether he had actually affirmatively downloaded or saved the images.[15] But because both this case and Groenendal involve the attempted receipt as opposed to actual receipt of these images, the Internet cache evidence is unnecessary to show that an attempted receipt of the images occurred. A review of the evidence here shows that every other category of evidence relied on by the Groenendal court for its finding of specific intent is present.

---

[15] Of course, Groenendal did not involve the actual downloading of the files in question, whereas Eychaner destroyed the evidence in this case that would show whether he downloaded any of the materials at issue.

The starting point for the jury's consideration was Eychaner's admission that the evidence "certainly demonstrates that he had the specific intent to look at images on his screen." Def.'s Count Two Acquittal Br. 6, ECF No. 74. The jury thus only had to find that Eychaner's intent went beyond simply desiring to view the images to that of seeking to receive them.

Here, the jury had many pieces of evidence before them establishing Eychaner's specific intent to receive the images in question. First, the jury could infer Eychaner's specific intent from the evidence of the search terms he used on Bing.com. See Groenendal, 2015 U.S. App. Lexis 23381, at *9 (noting the defendant's search terms among the items that reflected his specific intent to receive the images); see also United States v. Heiberg, No. NMCCA 201000668, 2011 WL 5855535, at *4 (N-M. Ct. Crim. App. Nov. 22, 2011) (noting that an "intentional search for child pornography" can show a specific intent to receive such images). Examples of the terms he used include "Lolicon 3D images," "Shotacon 3d Little Girl," and "Toddlercon Sex," all of which returned explicit anime images. Second, the jury could find that the evidence, that Eychaner had used some of the suggested search terms generated by Bing.com to pursue more images, suggested his intent to receive such images. See Groenendal, 2015 U.S. App. Lexis 23381, at *9 (noting that

18

Groenendal used Bing.com's suggested search terms). Third, the jury could infer Eychaner's specific intent from his admission to having searched for and viewed "anime child pornography" on his computer. See id. (noting Groenendal's admission to having conducted the searches among the evidence that showed his specific intent to receive the images). Fourth, the Government produced evidence showing that Eychaner's activities went beyond passive viewing. As noted above, several screenshots published to the jury showed that Eychaner had clicked on and enlarged the images. See Gov. Exs. 14a-4, 14a-16. While enlarging an image would not have been enough to show the receipt of such image, it does suggest that Eychaner's intent to interact with and control the images went beyond passive viewing. Cf. Groenendal, 2015 U.S. App. Lexis 23381, at *10; Heiberg, 2011 WL 5855535, at *4 (noting that the defendant had clicked on and enlarged images and that this supported a finding of his intent to receive such images).

Fifth, the jury could infer an intent to receive the images based on Eychaner's prior conviction for possession of child pornography. See Groenendal, 2015 U.S. App. Lexis 23381, at *10 (noting that Groenendal's prior conviction for possession of child pornography supported an inference that he intended to receive the images in question). Because of this conviction, the jury could infer that Eychaner was a person who was not

19

content to merely passively view explicit images of children on the Internet. Instead, they knew that his viewing activities had been accompanied in the past by the receiving and possessing of such images, and that he had a history of collecting sexually explicit images of children. Cf. United States v. Vosburgh, 602 F.3d 512, 528 (3d Cir. 2010) (noting in the context of a challenge to a search warrant that "persons with an interest in child pornography tend to hoard their materials and retain them for a long time . . . Child pornography is illegal, and therefore difficult and risky to obtain. Presumably, once a child pornography collector gets his hands on such material he will not be quick to discard it."). As a result, the jury could infer that, when Eychaner viewed the images in question here, he had that same intention to receive or collect these images that he had displayed in the past.

Sixth, the combination of Eychaner's repeated confessions to viewing the images at issue and the removal of his hard drive supports an inference that his activities did, in fact, go beyond mere viewing. If Eychaner truly only viewed the images, the question remains of what his purpose was in destroying the laptop and removing the hard drive. While Eychaner claimed that his actions simply reflected his anger at having failed at his attempt at abstinence once again, the jury could instead infer that whatever evidence was on the laptop revealed something

worse than the viewing to which he confessed. To the extent the jury was persuaded that Eychaner was attempting to cover up the actual receipt of the images in question, they could surely find that he had specifically intended to receive such images and that all steps necessary for the completion of the crime had taken place.

Seventh, the circumstances of the crime suggest a motive to download as opposed to merely view the images online. Eychaner was viewing images on a <u>monitored</u> system. While he could not know for certain how RemoteCOM's software worked, he reasonably could have concluded that he risked detection each time he used an explicit search term on Bing.com or went to a site like premiumhentai.site. Given the easily understood risk associated with each search, the jury could conclude that Eychaner thought he might as well download the materials rather than have to revisit them later.

Finally, the length of time that Eychaner lingered at the websites suggests more than mere viewing. As noted above, Eychaner was online conducting searches on Bing.com and visiting premiumhentai.site for over an hour. During that time, he scrolled through hundreds of images, at the very least stopping to hover over and enlarge many of them. The jury could thus infer that Eychaner's viewing activities were consistent with an attempt to seek out a mass of images in order to receive a

collection (either through caching or downloading) rather than merely to view the images.

Based on the above and viewing the evidence in the light most favorable to the prosecution, a reasonable juror could have found beyond a reasonable doubt that Eychaner acted with the specific intent of committing the underlying offense of receipt of visual depictions that depict minors engaging in sexually explicit conduct and are obscene.

## 2. There is Sufficient Evidence to Find that Eychaner Took a Substantial Step to Commit the Underlying Offense

In addition to proving Eychaner's specific intent to commit the underlying offense, the Government had the burden of proving that Eychaner took a substantial step toward the receipt of the images at issue. A substantial step is a "direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose." Engle, 676 F.3d at 423. It is also "more than mere preparation but less . . . than completion of the crime." Id.

At trial, the Government first produced evidence showing that Eychaner convinced his probation officer to allow him to have a computer in July 2016. In August 2016, Eychaner then tested the limits of the RemoteCOM software by using Cortana. These first two actions are best understood as potentially being the preparatory stage for his later crimes. The Government also

22

produced evidence showing that on November 17, 2016, Eychaner: (1) logged onto his roommate's Wi-Fi; (2) navigated to Bing.com using Cortona voice recognition commands; (3) input dozens of explicit search terms on that site such as "Little Girls Pervert Paradise" and "Animated Toddlercon Sex"; (4) scrolled through the search results and enlarged several images; (5) then navigated to premiumhentai.site; and (6) searched through numerous pages on that site, including multiple pages with a button that would allow him to download a complete set of explicit images and videos. In addition to the direct evidence of Eychaner's online activity, the jury knew that Eychaner had removed his hard drive and confessed to viewing illicit images. As mentioned above, the jury could infer from this evidence that Eychaner's activities had gone beyond mere viewing. Based on the above, there was sufficient evidence for the jury to conclude that Eychaner took multiple substantial steps towards receipt of visual depictions that depict minors engaging in sexually explicit conduct and are obscene.

### 3. There is Sufficient Evidence to Find that the Images Depicted Minors Engaged in Sexually Explicit Conduct

Defendant next challenges whether certain of the images published to the jury actually depict minors engaged in sexually explicit conduct. In particular, Defendant argues that Government's exhibits 14a-2, 14a-4, and 14a-10 do not depict

23

minors as opposed to youthful-looking characters, and that the minor depicted in Government's exhibit 14a-14 is not engaged in sexually explicit conduct.

There is little dispute that most of the images at issue depict minors. Many of the characters are identifiably minors based on their obviously prepubescent features. See Gov.'s Exs. 14a-1a, 14a-b, 14a-2, 14a-c, 14a-6a, 14a-6b, 14a-7b, 14a-8, 14a-11, 14a-13, 14a-14, 14a-15. Others can be identified as minors because of their sizes relative to the adults with whom they are engaged in sexual activity. See Gov.'s Exs. 14a-7a, 14a-7b, 14a-8, 14a-9, 14a-10, 14a-11, 14a-12, 14a-16. The details in the images, such as clothing or hairstyle, also suggest that several of the characters are minors. See Gov.'s Exs. 14a-1a, 14a-1b, 14a-6a, 14a-6b, 14a-7b, 14a-8, 14a-11, 14a-14, 14a-15.

Turning first to Government's exhibit 14a-2, this image shows a youthful-looking female character with her legs spread in a lascivious display. While Defendant claims that her appearance is "highly stylized"[16] and that the image is ambiguous

---

[16] The Defense's expert, Dr. Cather, claimed that, as a general matter, determining the ages of the characters portrayed in manga is difficult because manga artists portray their characters with highly-stylized features, such as large eyes, small facial features, a lack of pubic hair, and soft lines to the body. Trial Tr. 287:18-23, 292:17-24. Her testimony assumes, however, that the artist's subjective intentions regarding the age of the characters portrayed controls for purposes of determining whether the characters depicted are minors. Defendant has cited no caselaw in support of that proposition, nor is the Court aware of any court holding that the artist's possible subjective intentions, about which there was certainly no evidence presented here, trump a reasonable juror's conclusion of what an image actually portrays.

24

as to whether she is a minor, the character's breasts and genitals appear to show that she is prepubescent. The jury thus could have concluded beyond a reasonable doubt that this image depicted a minor.

As to Government's exhibit 14a-4, this image depicts a youthful-looking female character who is performing oral sex on a male. The female character is not identifiably a minor based on any visible prepubescent characteristics because only her shoulders and face are visible. The most identifiably childlike aspect of the character is that her hair is styled in pigtails. The male character is mostly out of view, but the female character's mouth is very small in comparison with his penis. Defendant contends that this image is ambiguous as to the age of the female character depicted because the character's pigtails alone do not give a sufficient indication of her age. While this may be true, a reasonable juror could have concluded beyond a reasonable doubt that the character was a minor based on the combination of the character's youthful looks, her hairstyle, and the relative size of the female character's mouth in relation to the male's penis.

As to Government's exhibit 14a-10, this image, titled "denis the menace fucks his mom," depicts exactly what its title suggests. The Dennis the Menace character appears to be roughly the same size as his mother, and no other characteristic is

visible to show that he is a minor. But the context of the picture, which depicts a famous character who is below the age of eighteen, would suggest to a reasonable viewer that the character depicted is a minor. Given the additional details known to the jury about Dennis the Menace, the jury had sufficient evidence to conclude beyond a reasonable doubt that the character depicted in Government's exhibit 14a-10 was a minor.

Next, Defendant challenges whether Government's exhibit 14a-14, which consists of an image of a very young, nude male with his legs spread while lying on his back, actually constitutes a depiction of sexually explicit conduct. The Government contends that this image meets § 1466A's requirement that the visual depiction depict "sexually explicit conduct" because it constitutes a lascivious exhibition of the genitals under 18 U.S.C. § 2256(2)(A)(v). See 18 U.S.C. § 1466A(f)(2) (incorporating the definition of "sexually explicit conduct" from 18 § 2256(2)(A), which is defined as including the "lascivious exhibition of the genitals or pubic area of any person"). To determine whether an image constitutes a lascivious exhibition of the genitals, courts in this district consider the six relevant but non-exclusive factors set forth in United States v. Dost:

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
4) whether the child is fully or partially clothed, or nude;
5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

636 F. Supp. 828, 832 (S.D. Cal. 1986), aff'd sub nom. United States v. Wiegand, 812 F.2d 1239 (9th Cir. 1987); see also United States v. Whorley, 400 F. Supp. 2d 880, 883 (E.D. Va. 2005), aff'd, 550 F.3d 326 (4th Cir. 2008) (citing the Dost factors). Under the Dost standard, "a visual depiction need not involve all of these factors to be a lascivious exhibition of the genitals or pubic area." Whorley, 400 F. Supp. 2d at 883 (quoting Dost, 636 F. Supp. at 832) (internal quotation marks and citation omitted).

The depiction in Government's exhibit 14a-14 contains almost all of the elements noted in Dost. First, the minor's genitals are the image's focal point. Second, the child is fully nude, with the only item of clothing visible being his underwear, which is dangling from his ankle. The impression given by the latter detail is that the character seems to have recently removed his underwear, apparently in anticipation of

sexual activity. Third, the child is in an unnatural position. As noted above, the child is on his back with his legs spread, and he appears to be using his hands to pull on his legs in order to fully expose himself for sexual contact. Fourth, the character's pose appears to be highly sexually suggestive, as he seems to be offering himself for sex. Fifth, the character's depiction strongly suggests the minor's willingness to engage in sexual activity.

In addition to the five _Dost_ factors mentioned above, one other notable detail about this image is that it is a part of an advertisement for another site, as it has a banner at the top stating "Only Best Shotacon" and a banner at the bottom stating "Click Here to Visit." If this image did not, in fact, constitute a lascivious display of the genitals, it is hard to see how it could achieve its purpose of luring viewers to the advertised site. Given the above, the jury had sufficient evidence before it to conclude that Government's exhibit 14a-14 depicted a minor engaged in sexually explicit conduct because the minor depicted was making a lascivious exhibition of the genitals.

### 4. There is Sufficient Evidence to Find that the Images Were Obscene

Defendant's final challenge to his conviction on Count Two is whether the jury had sufficient evidence to conclude that the

images are obscene. Whether a work is obscene is judged under the three-part test articulated in <u>Miller v. California</u>, 413 U.S. 15, 24-25 (1973). Under <u>Miller</u> and its progeny, a work is obscene if: (1) the average person, applying contemporary community standards, would find that the material, taken as a whole, appeals to the prurient interest; (2) the average person, applying contemporary community standards, would find that the material depicts or describes sexual conduct in a patently offensive way; and (3) a reasonable person would find, taking the material as a whole, that it lacks serious literary, artistic, political or scientific value. <u>Id.</u> at 24. At oral argument during trial on his motion for judgment of acquittal and his renewed motion for judgment of acquittal, Defendant challenged whether the images were obscene. Trial Tr. 258:23-259:16, 380:23-381:2. Defendant has not raised any new arguments or cited any new law in his post-trial Renewed Motion for Judgment of Acquittal.

As noted above, there was a disagreement at trial between the parties about what the proper scope of the "work as a whole" should be for the images published to the jury. The Government appeared to take the view that the "work as a whole" with respect to the Bing.com thumbnail images was either the individual thumbnail images or the full screenshot of the image search results. <u>See</u> Trial Tr. 326:16-327:1 (arguing that the

jury needed to see full screenshots of the Bing.com images in order to appreciate exactly what Eychaner viewed); Trial Tr. 530:4, ECF No. 98 (stating that, when the jury looked at the individual thumbnail images, they were looking at the "work as a whole."). With respect to the images from premiumhentai.site, the Government seemed to believe that the individual images hosted on that site each constituted a "work as a whole."

Defendant took a dramatically different view, arguing first that if an image looks as if it might have come from a larger manga work, then the Government, in order to meet its burden of proof, has the duty to diligently search for the original work and present it in its entirety to the jury. See Trial Tr. 513:13-23 (noting that because the defense's expert believed the images looked as if they originally were part of a larger manga work, that the "work as a whole" should be the original manga work); see also Trial Tr. 539:1-20, 540:14-16 (stating defendant's position that the "work as a whole" for the Bing.com images was the original manga work). If the Government cannot find the original work, then, according to Defendant, no prosecution can occur for an image extracted from the original work. Defendant also appeared to offer another view under which, even if the original manga work was not the "work as a whole," the Government had a duty to present the materials from the underlying websites from which the Bing.com image results

came. _See_ _id._ at 513:24-514:18. Because the Government failed

to produce evidence of the full context of the underlying

websites for the Bing.com images, Defendant argued that the jury

could not judge whether such images came from works that were,

on the whole, obscene. _Id._ Notably, while Defendant offered

much argument applicable to the thirteen images from the

Bing.com searches, Defendant never explained why the

Government's evidence regarding the five premiumhentai.site

images was insufficient to show their obscenity.

At trial, the Court concluded that both the Government's[17]

and the Defendant's[18] views were incorrect for the "work as a

---

[17] In the Court's view, adopting the Government's theory with respect to the Bing.com images would expand the reach of obscenity laws beyond what Congress intended by potentially exposing persons to prosecution based on receiving a single thumbnail image that was captured at random by a search engine from a work that is, on the whole, not obscene. To illustrate why, consider the following example: Imagine that a director films a modern rendition of Romeo and Juliet that a reasonable person would find, on the whole, has serious literary and artistic value. Also assume that the director believes it is important to include a scene in which the lovers, who are played by young teenagers, actually have sex on screen. Under the _Miller_ test, this sex scene would not render the whole film obscene because the work as a whole has serious artistic and literary value. If, however, this film were placed on a website, and the Bing.com search engine captured a thumbnail image from the sex scene, then that single image, standing in isolation, might be obscene. Under the Government's theory, it would potentially be proper to prosecute someone for attempting to receive that image if they view it in a Bing.com image search, even though the search result would clearly indicate to the viewer that the image comes from another larger work and that underlying work itself is not obscene.

Adopting the Government's view would contravene the Supreme Court's repeated instructions that individual scenes from a work should not be viewed in isolation if those scenes are presented in connection with the larger work. _See_ _Ashcroft v. Free Speech Coalition_, 535 U.S. 234, 248 (2002) (stating that "[w]here the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive"); _Roth v. United States_, 354 U.S. 476, 488-89 (1957) (rejecting the proposition that obscenity could be judged on the basis of an isolated excerpt of a larger work). As the evidence showed a trial, image results from Bing.com are presented in connection with the underlying

whole" element.   As   noted   above,   the   Court   instructed   the

parties that, when a person takes isolated portions of otherwise

non-obscene   works   and   places   those   portions   on   a   website   in   a

manner   that   does   not   indicate   to   a   viewer   that   they   come   from   a

larger   work,   the   isolated   portions   become   the   new   "work   as   a

whole" to be analyzed.[19]   See Extreme Assocs., 2009 WL 113767, at

---

websites because they include a link in the images that informs the viewer
that the image comes from the underlying website.  Thus, because each image
result on Bing.com is presented in connection with the "work as a whole"
hosted on the underlying website, the obscenity of the image result should be
judged in relation to the work presented on the underlying website.

[18] Defendant's theory — that the Government must always find and present the
full original manga work in order to have a prosecution for any image related
to the original work, even if an isolated portion is intentionally removed
and placed on a website — is unsupported by caselaw and would effectively
immunize defendants from prosecution for receiving and possessing certain
obscene images.   To illustrate the latter issue, consider the following
examples: An artist creates an obscene manga work and uploads a few isolated
images from that work to the Internet.   The artist then locks the original
work in a vault, never to be seen again.   According to Defendant, no
prosecution could ever occur for an offense related to those images because
the Government would never be able to present the "work as a whole" to the
jury.   Thus, defendants would always be able to enjoy these obscene images
free from worry of prosecution.
      Or consider a second scenario: an artist draws a single obscene image
that superficially looks as if it might have come from a larger work.
According to Defendant's theory, because the image looks as if it might come
from a larger work, the Government could only prosecute someone for receiving
this obscene image if they found the underlying work, which does not exist.
Thus, under this second scenario, Defendant's theory would once again set an
impossible burden for proving that the "work as a whole" is obscene, and it
would allow defendants to thwart Congress's clear intent to criminalize the
receipt or possession of such obscene images.

[19] For example, assume that there is an original, non-obscene anime work that
is two hours long, of which three minutes consists of an explicit sex scene
involving children.   If one were to take the three-minute sex scene and place
it on a website in a manner that does not indicate to the viewer that the
scene comes from a larger work, then that isolated scene would become the new
"work as a whole" to be analyzed.   If a search engine, say Bing.com, then
captures an individual thumbnail image from that three-minute scene that
later appears in a defendant's image search, then the correct "work as a
whole" for that Bing.com image is still the three-minute video on the
underlying website.   This is because the thumbnail image includes a link and
other information that will show the viewer that the image is presented in
connection with the underlying website.

*1-3; <u>Kahm</u>, 300 F.2d 78, 83. Thus, the Court concluded that the images or videos hosted on premiumhentai.site and the other pornography websites constitute the works as a whole to be analyzed for purposes of the <u>Miller</u> test.

There is no reasonable doubt that images depicting children engaged in sexually explicit conduct, like those at issue here, are obscene under the <u>Miller</u> test if they are viewed in isolation. <u>See</u> <u>United States v. Koegel</u>, 777 F. Supp. 2d 1014, 1024 (E.D. Va. 2011) ("Courts in this district have found Japanese anime cartoons to be obscene when the cartoons depict the sexual abuse of children.") (citing <u>United States v. Whorley</u>, 550 F.3d 326, 330 (E.D. Va. 2008)). The relevant question now is whether the Government presented enough information, in addition to the images themselves, for the jury to have determined beyond a reasonable doubt that each "work as a whole," when judged under the standard articulated above, was obscene.

In order to convict Defendant on Count Two, the jury needed only to unanimously find that at least one of the visual depictions Eychaner attempted to receive was obscene. <u>See</u> 18 U.S.C. § 1466A(a)(1) (criminalizing, in relevant part, the attempted receipt of "<u>a visual depiction of any kind</u>, including a drawing, cartoon, sculpture, or painting, that . . . depicts a minor engaging in sexually explicit conduct . . . and is

33

obscene") (emphasis added); cf. Koegel, 777 F. Supp. 2d at 1024
(noting that the defendant was guilty under § 1466A because he
possessed obscene anime cartoon images of the sexual abuse of
children, but declining to state the number of images that
qualified as obscene under the statute). Thus, because the jury
was instructed that they had to unanimously find whether each
image listed on the Special Jury Verdict Form was obscene, see
Trial Tr. 472:22-473:1, and they did find that each of the
images was obscene, see Special Jury Verdict Form, ECF No. 86,
Eychaner must show that the Government has failed to carry its
burden with respect to each of the images in order to be
acquitted on Count Two. To sustain the conviction, however, the
Government need only show that at least one of the images was
obscene.

Here, based on the full range of information known to the
jury about the relevant "works as a whole," the jury clearly had
a sufficient basis to conclude beyond a reasonable doubt that at
least the three images from premiumhentai.site (Gov.'s Exs. 14a-
13, 14a-14, 14a-15) were obscene. With respect to the other
fifteen images, there is also sufficient evidence to support the
jury's finding as to those images' obscenity, but the Court will
only address these other images at a summary level rather than
on an image-by-image basis. This is because the Court has
already ruled at trial that a reasonable juror could have found

34

these images to be obscene, and Defendant has offered no new arguments with respect to either the premiumhentai.site images or any of the other fifteen images that warrants a more in-depth response.[20] Cf. Koegel, 777 F. Supp. 2d at 1024 (noting in its analysis of the evidence supporting the defendant's § 1466A conviction that the defendant possessed some images that were obscene, but only analyzing the images on a summary basis rather than image by image).

Turning to the three images from premiumhentai.site (Gov.'s Exs. 14a-13, 14a-14, 14a-15), the jury had five pieces of evidence before them that, when viewed together with the graphic images themselves, demonstrated that the images came from works that were, on the whole, obscene. First, the jury was aware that these images came from a pornographic website that catered to viewers interested in sexual manga depictions of children. See Gov.'s Exs. 14a-13, 14a-14, 14a-15; see also Trial Tr. 198:7-9, 202:9-11 (explaining that premiumhentai.site offers

---

[20] Also, as noted by the parties on the record at trial, the total number of images that the jury found to be obscene has no bearing upon the Guideline calculation. See Trial Tr. 546:8-547:11 (noting that both sides agreed that the number of images for which the Defendant was convicted would have no impact upon his Guidelines calculation); see also U.S.S.G. § 2G2.2(b)(7) & App. n. 6 (noting that the enhancement for the number of images involved in the offense is calculated by the number of images that constitute child pornography, as defined by 18 U.S.C. § 2256(8)). Obscene cartoon images do not qualify as images of "child pornography" for purposes of the Guidelines calculation. See 18 U.S.C. § 2556(8) (defining "child pornography" as involving a visual depiction (1) involving the use of a minor engaging in sexually explicit conduct; or (2) a computer-generated image that is indistinguishable from a minor; or (3) an image modified to appear as if an identifiable minor is engaging in sexually explicit conduct).

downloads for "shotacon" and "lolicon" sets of images, and that it includes categories such as "lolicon," "lolicon 3d," "lolicon images," "lolicon video," "shotacon," "shotacon 3d," "shotacon video," "straight shotacon" and "uncensored hentai"). As noted earlier, the jury was aware that "lolicon" refers to sexual portrayals of young girls and that "shotacon" refers to sexual portrayals of young boys. Thus, based on their knowledge of the nature of the website "premiumhentai.site," the jury could infer that the contents of particular images or sets of images found on that site were likely to be obscene.

Second, the jury was aware that two of these images (Gov.'s Exs. 14a-13, 14a-15) were each a part of a "set" of images and videos available on that site. The description of one set that was included in a screenshot gives a glimpse of the contents of the "sets" available on premiumhentai.site:

> The newest lolicon 3d image set by Vinput in perfect picture quality. Horny little loll girls posing naked and taking huge cocks inside their tight wet little pussies. This set contains 25 seconds of bonus animation video with cute naked dancing little girl, enjoy! Also, don't miss the others [sic] volumes!

Gov.'s Ex. 14a-14 (listing 19 images and one video in the set). The two images also include information about the type of images that are included in the set, the name of the set's "author," and the number of images in the set. See Gov.'s Ex. 14a-13 ("Type: lolicon images | Author: Pororin | 27 pics); Gov.'s Ex.

14a-15 ("Type: lolicon 3D images | Author: Wayfarer | 41 pics").
The jury could thus conclude that, at most, the "work as a whole" for these images consisted of either 27 or 41 images, and that these images were of "lolicon."

Third, in two of the screenshots the jury could see the various "tags" listed in the screenshot that apparently describe each set. See Gov.'s Ex. 14a-13 ("Tags: anal, CG set, cum, cum in mouth, cute girls, full color, group, hard, hardcore, lolicon, nude, posing, rape, sex toys, slutty, sperm, underwear"); Gov.'s Ex. 14a-15 ("Tags: loli, black, cute girls, hard, hardcore, licking, lolicon, nude, posing, rape, slutty, sucking, very cute"). While these tags speak to the obscene nature of those particular sets, the very fact that premiumhentai.site includes such tags at all speaks to the types of content found on that site. A reasonable juror could have concluded that these tags are a clear indication that the contents available on premiumhentai.site are geared towards pedophiles who are interested in manga images depicting minors engaged in sexual activity, and that the sets available at that site do not contain full manga works of serious artistic, literary, or political value.

Fourth, the jury also knew of the obscene titles for one image and one of the sets. See Gov.'s Ex. 14a-13 (listing the title of the image as "cum-in-mouth"); Gov.'s Ex. 14a-14

37

(listing the title of the set as "Vinput Lolicon 3D Pack"). They could thus infer that these titles give some indication of the nature of the complete set of images, and that the full set was likely to contain further obscene sexual depictions of children.

Finally, the jury also knew that an image appeared on a particular page within premiumhentai.site that advertised another site offering "Only Best Shotacon." See Gov.'s Ex. 14a-14. As noted above, the minor in the advertisement is a young male making a lascivious display of the genitals. Based on this advertisement, the jury could make two inferences. First, they could infer that, within the context of the "works" being offered on premiumhentai.site, terms like "shotacon" refer to graphically sexual images done in the "shotacon" style, and not to full manga works that potentially have serious artistic or literary value. Second, the jury could infer that, because the party who placed the advertisement on premiumhentai.site appeared to believe that persons visiting that site would also want to visit another site displaying pornographic images of "shotacon," the contents available on premiumhentai.site must be similar in kind.

Based on all of the above, the evidence submitted by the Government was sufficient to support the jury's verdict with respect to the three images from premiumhentai.site. For the

two such images that were part of sets of images available on premiumhentai.site (Gov.'s Exs. 14a-13, 14a-15), the jury could reasonably have concluded that those images were part of obscene works based on the graphic nature of the images themselves, the nature of premiumhentai.site, the nature of the sets available at premiumhentai.site, and the tags used to describe the sets. See Gov.'s Exs. 14a-13, 14a-15. Second, the third such image — the visual depiction in Government's exhibit 14a-14 that is an advertisement featuring the young boy mentioned above — does not appear to have been part of a set or any other larger "work as a whole," and thus the jury had a sufficient basis for concluding that that image was obscene as well based on the image itself.[21]

After the Government met its burden of producing enough evidence for the jury to find that the three images mentioned above were part of works that were obscene, the Defendant had the opportunity to rebut the Government's case by showing that some part of each "work as a whole" gave it serious literary, artistic, or political value. Defendant elected not to produce any part of the "works as a whole" for the jury to analyze. Defendant relied solely on Dr. Cather's testimony that these images might have had serious artistic or literary value when

---

[21] To the extent that Defendant still maintains that the Government should have shown the full extent of any of the underlying works, such argument does not apply to the image at issue in Government's exhibit 14a-14 because there is no indicia that this image was part of a set or that there was any larger "work as a whole" pertaining to that image.

viewed as a part of the original manga work. The jury heard and considered Dr. Cather's testimony on this issue, and apparently they rejected her conclusion that works that graphically depict sexual relations with children could have serious artistic, literary, or political value under the Miller test. As noted above, outside of generally claiming that all the images should be judged in relation to the original manga works they come from, Defendant has never specifically addressed why the Government's evidence is insufficient to show that the images from premiumhentai.site are obscene. Given these circumstances, the Court concludes that a reasonable juror could have found beyond a reasonable doubt that the images from premiumhentai.site were obscene.

With respect to the other fifteen images that the jury found to be obscene, these images similarly include indicia of the nature of each "work as a whole" from which the jury could infer each work's obscenity. This evidence consists of (1) the obscene nature of the images presented to the jury that depict graphic sexual activity with children, which gives some indication that each "work as a whole" is similarly obscene, see, e.g., Gov.'s Ex. 14a-1a (showing a female toddler, whose hands are bound, being penetrated by an adult male); (2) the nature of the websites that hosted the underlying videos or images, which were all largely pornographic, see, e.g., Gov.'s

Ex. 14a-7a (noting that video was hosted on "xHamster.com," which the parties agreed was a pornographic website); (3) the titles of the underlying videos or images, see, e.g., Gov.'s Ex. 14a-8 (listing the title of the video as "3d cute loli fucked hard"); (4) the brief duration of some of the underlying videos (which suggests that these videos did not contain the types of deep storylines of serious literary value described by Dr. Cather), see, e.g., Gov.'s Ex. 14a-10 (listing the length of the video titled "denis the menace fucks his mom" at three minutes); (5) and the search terms that were used to return the image results on Bing.com, see, e.g., Gov.'s Ex. 14a-2 (listing the search term as "show images of Lolita sperm"). Based on these indicia, the jury could have found that the other images came from works that were, on the whole, obscene.

In view of the above, Defendant's Renewed Motion for Judgment of Acquittal on the ground that there was insufficient evidence to support the jury's verdict with respect to Count Two is **DENIED**. ECF No. 90.

### B. There is Sufficient Evidence to Sustain Eychaner's Conviction on Count Three – Destruction of a Tangible Object to Impede a Federal Investigation

Next, Eychaner challenges his conviction on Count Three – Destruction of a Tangible Object to Impede a Federal Investigation. To convict Eychaner on this count, the Government had to prove: (1) that Eychaner destroyed or

mutilated a tangible object, specifically a computer hard drive; (2) that he acted knowingly; and (3) that he acted with the intent to impede, obstruct, or influence an investigation within the jurisdiction of a department or agency of the United States Government. See 18 U.S.C. § 1519; United States v. Powell, 680 F.3d 350, 356 (4th Cir. 2012) (stating the elements of an offense under 18 U.S.C. § 1519); Modern Federal Jury Instructions - Criminal § 46.13 (2017); Trial Tr. 475:12-476:20.

Here, the evidence produced at trial established that Eychaner's actions satisfied the first two elements when he knowingly removed his computer's hard drive and threw it down a storm drain. While Defendant contends that he acted for a purpose other than seeking to impede the investigation of his crimes by the United States Probation Office for the Eastern District of Virginia, the circumstances suggest that he reasonably should have anticipated that an investigation would occur. Defendant claims to have thrown away the hard drive while he was on the way to work on November 18, 2016, which was before he confessed to viewing "anime child pornography." At that time, though he could not know for sure that his activities had been detected, he knew that he had been engaging in prohibited activities on a monitored computer. He thus could reasonably surmise that there was a risk that there would ultimately be an official investigation. Having already been

42

subject to a forensic analysis of his laptop during his prior prosecution for possession of child pornography in 2008, Eychaner would have known how critical his laptop's hard drive would be to proving the full extent of his criminal activities. Based on the above circumstances, a reasonable juror could have found beyond a reasonable doubt that when Eychaner removed and threw away his laptop's hard drive, he acted with the specific intent of impeding an investigation of his activities by the United States Probation Office.

Therefore, Defendant's Renewed Motion for Judgment of Acquittal for Count Three is **DENIED**. ECF No. 90.

## C. There is Sufficient Evidence to Sustain Eychaner's Conviction on Count Four - Obstruction of Justice - Attempted Evidence Tampering

Defendant also challenges his conviction on Count Four - Obstruction of Justice - Attempted Evidence Tampering. To convict Eychaner on this count, the Government had to prove: (1) that Eychaner altered, destroyed, mutilated, or concealed any record, document, or tangible object, specifically a computer, computer battery, and computer hard drive; (2) that he acted with the intent to impair the object's integrity or availability in an official proceeding, specifically in a federal grand jury investigation; and (3) that Eychaner acted corruptly.[22]   See 18

---

[22] The Court instructed the jury that:

43

U.S.C. § 1512(c)(1); <u>United States v. Sterling</u>, 860 F.3d 233, 245-46 (4th Cir. 2017) (explaining the essential elements of an offense under 18 U.S.C. § 1512(c)(1)); <u>Modern Federal Jury Instructions - Criminal</u> § 46.10 (2017); Trial Tr. 476:21-479:5.

Here, the evidence showed that Eychaner had badly damaged his laptop and his laptop battery, and that he threw away his hard drive. The Government also established that a forensic examination of Eychaner's laptop was not completed because of the missing hard drive. CFA Jones explained to the jury the types of information and evidence that ordinarily would be contained on a computer hard drive. Officer Call outlined the procedure that she would have followed if CFA Jones had been able to conduct a forensic analysis of Eychaner's laptop computer. The jury was also aware of Defendant's prior conviction for possession of child pornography, and they could infer that Eychaner knew that his laptop and hard drive would ultimately become subject to forensic analysis. Thus, the jury had sufficient evidence before them to determine that Eychaner had destroyed, mutilated, or concealed the laptop, the laptop's

---

To act corruptly means to act knowing[ly] and dishonestly with the specific intent to undermine the integrity of the official proceeding. It is not necessary to show that the defendant was successful in achieving the forbidden objective, only that the defendant corruptly tried to achieve it in a manner which he knew was likely to influence or obstruct or impede the due administration of justice due to the natural and probable [e]ffect of the defendant's actions.

Trial Tr. 478:15-23.

battery, and the hard drive to impair each object's availability at an official proceeding, and that he acted with a corrupt intent.

Therefore, Defendant's Renewed Motion for Judgment of Acquittal for Count Four is **DENIED**. ECF No. 90.

### D. Defendant Must be Acquitted of his Conviction on Count Five Because the Predicate Offense Did Not "Involve a Minor"

Finally, Defendant has renewed his motion for acquittal of his conviction on Count Five - Penalties for Registered Sex Offender. In Count Five, Eychaner was charged with a violation of 18 U.S.C. § 2260A, which provides:

> Whoever, being required by Federal or other law to register as a sex offender, commits a felony offense involving a minor under section 1201, 1466A, 1470, 1591, 2241, 2242, 2243, 2244, 2245, 2251, 2251A, 2260, 2421, 2422, 2423, or 2425, shall be sentenced to a term of imprisonment of 10 years in addition to the imprisonment imposed for the offense under that provision. The sentence imposed under this section shall be consecutive to any sentence imposed for the offense under that provision.

Id. (emphasis added). At trial, Defendant moved for acquittal on Count Five on the ground that the term "involving a minor" requires the participation of an actual person who is under the age of eighteen, and that there was no evidence supporting a finding that such element was satisfied here. Def.'s Count Five Acq. Br., ECF No. 75. Defendant's motion, presented for the first time in the midst of trial, raised an issue of statutory interpretation to be analyzed at the conclusion of the

45

Government's case-in-chief and again before submission of the case to the jury, and without the benefit of time for further reflection. The Court ultimately denied the motion based on the information presented by the parties at that time, but stated that, should Defendant renew his motion after trial, the Court would give it careful consideration.

The Court later instructed the jury that there are two elements to this offense: (1) that Eychaner committed a specified felony offense involving a minor, specifically a violation of 18 U.S.C. § 1466A(a)(1); and (2) that at the time he committed the specified felony offense, Eychaner was required by Federal or other law to register as a sex offender. Trial Tr. 479:6-481:16. The Court further instructed the jury that the first element was satisfied by proof that Eychaner committed the crime of the attempted receipt of one or more visual depictions that depict a minor engaging in sexually explicit conduct and are obscene, in violation of 18 U.S.C. § 1466A(a)(1). Trial Tr. 481:1-8.

The jury ultimately found Eychaner guilty on Count Two of an offense under 18 U.S.C. § 1466A(a)(1) because Eychaner had knowingly attempted to receive "obscene anime cartoons" depicting minors engaging in sexually explicit conduct, and thus they also found him guilty on Count Five. See Jury Verdict, ECF No. 86; Indictment 2, ECF No. 1 (stating for Count Two that

Eychaner had attempted to receive "obscene anime cartoons"). No evidence was presented at trial suggesting that the cartoons were produced using actual minors.

The issue to be resolved now is whether the "involving a minor" element of § 2260A was satisfied when Eychaner attempted to receive cartoon depictions of imaginary minors. The Court is unaware of any jurisdiction that has directly addressed this issue.[23] In answering this question, the Court must begin with the text of § 2260A. See Chris v. Tenet, 221 F.3d 648, 651 (4th Cir. 2000). The Court's sole aim is to "enforce [the statute] according to its terms." Id. at 652 (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)). In establishing the meaning of a statutory term, the Court must first determine "whether the language at issue has a plain and unambiguous meaning." Id. at 651 (quoting Robinson v. Shell Oil Co., 519

---

[23] In United States v. Slaughter, 708 F.3d 1208 (11th Cir. 2013) and United States v. Dahl, 81 F. Supp. 3d 405 (E.D. Pa. 2015), each court addressed a similar issue: whether the "involving a minor" element of § 2260A was satisfied when the defendant believed a person was a minor, but the person involved was actually an adult. Slaughter interpreted "minor" broadly as including a person who was an adult but who was believed by the defendant to be under the age of eighteen. See Slaughter, 708 F.3d at 1214-16. Dahl applied a narrower meaning, finding that the term "minor" was only satisfied when the person involved was actually under the age of eighteen. See Dahl, 81 F. Supp. 3d at 406-07.

These cases are largely inapposite here. It does not necessarily follow from Slaughter that the term "involving a minor" also encompasses conduct involving a depiction of a fictitious character that was not perceived by the defendant as an actual minor. Likewise, it does not necessarily follow from Dahl that a defendant does not violate § 2260A if the "minor" involved was actually a fictitious depiction of a person under the age of eighteen years. The references to "actual minors" in Slaughter and Dahl relate to actual age. Here, "actual minor" is used to distinguish actual persons from imaginary persons.

47

U.S. 337, 340 (1997)). This inquiry should be guided "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 652 (quoting Robinson, 519 U.S. at 341).

**1. Plain Meaning of the Term "Minor" in 18 U.S.C. § 2260A**

Here, the key word at issue, "minor," is not ambiguous. Section 2256(1) of Title 18 provides the relevant definitions for offenses involving the term "minor" under Chapter 110, including § 2260A. A "minor" is defined as "any person under the age of eighteen years." 18 U.S.C. § 2256(1) (emphasis added). Conceivably, the word "person" could be read both narrowly, as referring to an actual, flesh-and-blood individual, and broadly, as referring both to actual individuals and imaginary individuals conceived by artists. Determining whether to apply a narrow or a broad meaning to the definition's use of "person" is critical here because it affects whether the defined term "minor" should likewise be read broadly or narrowly.

Because § 2256 does not define "person" and because the word lacks a specialized meaning affecting this case,[24] the Court will consider dictionary definitions. See Fed. Deposit Ins.

---

[24] The issue here differs from the issue faced by the Eleventh Circuit when it acknowledged that "[t]he definitions of 'person' contained in standard general-purpose dictionaries reflect ambiguity in the common usage of that term." United States v. Zuniga-Arteaga, 681 F.3d 1220, 1223 (11th Cir. 2012). This statement by the Eleventh Circuit related to whether "person" referred to only a living person or also a deceased person. Id.

48

Corp. v. Meyer, 510 U.S. 471, 476 (1994) (asserting that, absent a statutory definition, courts "construe a statutory term in accordance with its ordinary or natural meaning"); Blakely v. Wards, 738 F.3d 607, 611 (4th Cir. 2013) (explaining that dictionary definitions may be consulted as aids for determining whether the meaning of a word is plain).

Dictionaries define the word "person" in a way that connotes a narrow meaning.[25] The Oxford English Dictionary provides several definitions for "person," almost all of which relate to actual individuals. See Person, The Compact Oxford English Dictionary, (2d ed. 1991) (defining "person" as "an individual human being; a man, woman, or child," "a man or woman of distinction or importance," "a self-conscious or rational being," "a human being (*natural person*) or body corporate or corporation (*artificial person*), having rights and duties recognized by the law," and "the living body of a human being"). Black's Law Dictionary similarly defines person as "[i]n general usage, a human being[.]" Person, Black's Law Dictionary (6th ed. 1990). Webster's Third New International Dictionary likewise defines "person" as primarily connoting an actual human being. See Person, Webster's Third New International Dictionary Unabridged (1993) (defining "person" as "an individual human

---

[25] Because the relevant definition of "minor" in 18 U.S.C. § 2256(1) was adopted in 1996 and has not been amended since that time, the Court will consider definitions from dictionaries that were current in 1996.

being," "a human being as distinguished from an animal or thing," "the individual personality of a human being: self," "a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties").

The above definitions each favor a narrow reading of "person." Because the term "minor" under § 2256(1) requires a "person," and because the term "minor" in § 2260A is not qualified by the words "virtual," "imaginary," or another modifier, the dictionary definitions of "person" apply to the term "minor" in § 2260A. As a result, "person" is ordinarily or naturally understood to mean "an individual human being" or "an individual with legal status." Hence, because "minor" is defined as a "person", and a "person" is an individual human being with legal status, the Court concludes that the word "minor" unambiguously means an actual person who is, or who is at least believed to be,[26] under the age of eighteen.

The Government has failed to explain how a fictional character can qualify as a "person" under the definition of "minor" in § 2256(1). The Government asserts that § 2256(1)'s definition of minor "simply imposes an age cutoff in defining the term 'minor,' and that cutoff is satisfied here." Gov.'s

---

[26] Because the issue presented in <u>Slaughter</u> and <u>Dahl</u> is not properly before this Court, the Court need not decide whether a <u>person</u> who is an adult but who is believed to be a minor satisfies the "involving a minor" element of § 2260A.

Opp'n Br. 13, ECF No. 91. While it is true that § 2256(1)'s
definition does impose an age cutoff, it also requires that the
age cutoff be applied to a "person." The Government simply
ignores the word "person" in the definition of "minor," as that
term is used in the statutory offense (§ 2260A), and then moves
on to analyze the particular predicate offense under § 1466A.
The Government points out that, because § 1466A criminalizes
obscene <u>depictions</u> of minors regardless of whether the minors
depicted actually exist, somehow this means that the term
"minor" in § 2260A must be equally broad. Gov.'s Opp'n Br. 13.
At the risk of stating the obvious, the term "depiction of a
minor" is different from the term "minor," standing alone. A
depiction inherently carries with it the possibility that the
subject of the depiction might not exist in the real world. The
term "minor" has, as mentioned above, a default meaning
referring to a person in the real world. If § 2260A used a
phrase such as "involving a depiction of a minor under Section
1466A" instead of "involving a minor," then the Government's
point would be well taken. However, § 2260A, as written,
requires the involvement of a minor, which, as defined, requires
the participation of a "person." That requirement is not met by
the involvement of a cartoon character.

## 2. The Plain Meaning of the Term "Involving a Minor" in 18 U.S.C. § 2260A

Next, the Court notes that the specific context for the word "minor" in § 2260A is the clause "[w]hoever . . . commits a felony offense <u>involving</u> a minor[.]" 18 U.S.C. § 2260A (emphasis added). Dictionaries provide various definitions for the word "involve," but the term primarily means to include or contain as a necessary element.[27] Webster's Third New International Dictionary defines "involve" as "to have within or as a part of itself" or "to draw in as a participant." <u>Involve</u>, <u>Webster's Third New International Dictionary of the English Language Unabridged</u> (2003). The Oxford English Dictionary defines "involve" as "to include; to contain, imply." <u>Involve</u>, <u>The Compact Oxford English Dictionary</u>, (2d ed. 1991). Utilizing these definitions, the Court concludes that the phrase "commits a felony offense involving a minor" should simply be read as "commits a felony offense that includes a minor as a part of the offense."

Read this way, there is no ambiguity to the phrase "involving a minor." When this element of § 2260A is applied to an offense under § 1466A, a minor is "involved" in the offense when the minor is the subject of the visual depiction, such as when the visual depiction is a photograph of an actual child

---

[27] Because 18 U.S.C. § 2260A was adopted in 2006, the Court will consider dictionaries that were current or near current as of that time.

engaged in sexually explicit conduct. A minor might conceivably also be "involved" in the offense if the minor serves as an inspiration for a particular visual depiction. For example, if a defendant draws a sexually explicit picture of a minor with whom he had a sexual encounter in the past, one might argue that the minor is "involved" as the subject of the offense. A minor is not "involved" in the offense, however, when the depiction in question involves a fictional cartoon character with no relation to any actual person in the real world.

### 3. Broader Context of 18 U.S.C. § 2260A as a Whole

Having considered the plain meaning of the phrase "involving a minor" and found it to be unambiguous, the Court now turns to the broader context of 18 U.S.C. § 2260A as a whole. In addition to § 1466A, § 2260A lists fifteen other predicate offenses that can potentially "involve a minor" for purposes of that section. All the other predicate offenses necessarily require the involvement of an actual person besides the defendant in order to commit the offense. Of the other predicate offenses, six always require the involvement of a minor as an element of the offense,[28] while nine can be committed

---

[28] See 18 U.S.C. § 1470 (transfer of obscene material to minors); 18 U.S.C. § 2423 (transportation of minors); 18 U.S.C. § 2425 (use of interstate facilities to transmit information about a minor); 18 U.S.C. § 2260 (production of sexually explicit depictions of a minor for importation into the United States); 18 U.S.C. § 2251A (selling or buying of children); 18 U.S.C. § 2251 (sexual exploitation of children).

with a minor.[29] For all of these offenses, however, a minor can only conceivably be "involved" as either the actual or the intended victim of the crime. Thus, because Congress specifically chose other predicate offenses for § 2260A where the term "involving a minor" captures those offenses in which a minor either is or is intended to be the victim, one might infer that Congress intended that phrase to have the same application when § 1466A serves as the predicate offense. Because no minor is victimized when a defendant commits an offense under § 1466A involving a fictional cartoon character, this raises an inference that an offense under § 1466A involving a fictional cartoon character does not satisfy the "involving a minor" element of § 2260A.

Also a part of the broader context of § 2260A is the specific predicate offense at issue, 18 U.S.C. § 1466A. In relevant part, § 1466A criminalizes the attempted receipt of "a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that . . . depicts a minor engaging in sexually explicit conduct . . . [and] is obscene." 18 U.S.C. § 1466A(a)(1). The Fourth Circuit has held that the "depicts a

---

[29] See 18 U.S.C. § 1201 (kidnapping); 18 U.S.C. § 1591 (sex trafficking of children or by force, fraud, or coercion); 18 U.S.C. § 2241 (aggravated sexual abuse); 18 U.S.C. § 2242 (sexual abuse); 18 U.S.C. § 2243 (sexual abuse of a minor or ward); 18 U.S.C. § 2244 (abusive sexual contact); 18 U.S.C. § 2245 (offenses resulting in death); 18 U.S.C. § 2421 (transportation generally); 18 U.S.C. § 2422 (coercion or enticement).

minor" element of the statute can be satisfied either by a depiction of an actual minor or by a cartoon representation of a minor. See United States v. Whorley, 550 F.3d 326, 336 (4th Cir. 2008). A cartoon representation qualifies under the statute because § 1466A states that "[i]t is not a required element of any offense under this section that the minor depicted actually exist." 18 U.S.C. § 1466A(c) (emphasis added). The inclusion of this latter provision also leads to two inferences relevant to the Court's understanding of § 2260A. First, the very fact that Congress felt the need to include a statement in § 1466A clarifying that a minor need not exist to satisfy the requirement that the depiction "depicts a minor" suggests that the term "minor," standing alone, would naturally refer to a minor that actually exists. Second, because Congress stated that the minor depicted need not exist for any offense "under this section," Congress clearly indicated that § 1466A(c) should only apply to offenses under § 1466A. As 18 U.S.C. § 2260A is not an offense under § 1466A, the Court finds no reason to believe that Congress intended that the term "minor" in § 2260A should be defined by § 1466A(c) to include "minors" who do not exist.

In view of the above, the broader context of § 2260A as a whole does not establish that the phrase "involving a minor" in § 2260A is ambiguous. Because the language at issue in § 2260A,

the specific context of that language, and the broader context of that language as a whole all lean toward the narrow reading of the word "minor" in § 2260A, the phrase "involving a minor" is not susceptible to two reasonable interpretations, see Lee v. Norfolk S. Ry. Co., 802 F.3d 626, 631 (4th Cir. 2015), and it is therefore not ambiguous.

## 4. The Court Finds No Reason to Apply the Principle of *In Pari Materia* to 18 U.S.C. § 2260A

The Government's primary remaining argument for finding that § 2260A's "involving a minor" requirement is satisfied here is based on a comparison of § 2260A with another criminal statute that uses the term "actual minor." See Gov.'s Opp'n Br. 14 (citing 18 U.S.C. § 2252A(a)(3)(B)). According to the Government, because Congress has proven able to use the term "actual minor" in other criminal statutes, then the failure to include a similar modifier like "actual" before the term "minor" in § 2260A suggests that Congress intended the term minor to include both actual and non-actual minors. Id.

Because the Government asks this Court to construe § 2260A in light of a separate statute to reach an understanding that is different from the plain meaning of § 2260A, it appears that the Government is asking this Court to apply the rule of *in pari materia* to § 2260A. The Fourth Circuit has explained that *in pari materia* refers to the principle that "'adjacent statutory

56

subsections that refer to the same subject matter' should be read harmoniously." New Cingular Wireless PCS, LLC v. Finley, 674 F.3d 225, 249 (4th Cir. 2012) (quoting United States v. Broncheau, 645 F.3d 676, 685 (4th Cir. 2011)). In other words, when applying this principle to resolve statutory ambiguities, "statutes addressing the same subject matter generally should, be read 'as if they were one law.'" Finley, 674 F.3d at 249 (quoting Wachovia Bank v. Schmidt, 546 U.S. 303, 316 (2006)); see, e.g., United States v. Morison, 844 F.2d 1057, 1064 (4th Cir. 1988) (construing §§ 793(d) and 794 of the Espionage Act *in pari materia* because they were "intended to and did cover separate and distinct offenses, with separate and distinct punishment" and "[i]t is important ... to ascertain the essential element in each section which made it separate and distinct from the other"). If the Court were to apply this principle here, it would construe § 2260A *in pari materia* with other criminal statutes that serve a similar purpose to § 2260A.

The Fourth Circuit has cautioned, however, that the principle of *in pari materia* should only be applied to texts that are actually ambiguous. See Finley, 674 F.3d at 249 ("If language is ambiguous . . . we then turn to other evidence to interpret the meaning of the provision, such as the rule of *in pari materia* and the legislative history"); Broncheau, 645 F.3d at 685 ("The principle of *in pari materia* is applicable . . .

only 'where the meaning of a statute is ambiguous or doubtful.'") (citation omitted). Other circuits similarly discourage *in pari materia* constructions absent clear textual ambiguity. See United States v. Warren, 820 F.3d 406, 408 (11th Cir. 2016) ("[C]ourts generally apply *in pari materia* only when a legal text is ambiguous"); Martin v. United States, 389 F.2d 895, 897 n.5 (5th Cir. 1968) (stating that when the statute was "neither patently nor latently ambiguous . . . there is no need to resort to in pari materia constructions"). Because the Court has found that § 2260A is unambiguous, it declines the Government's invitation to depart from the plain meaning of § 2260A through an *in pari materia* construction.[30]

---

[30] The Court previously ruled, based on the arguments presented for the first time in the midst of trial, that because Congress had used the term "actual minor" in § 2252A(a)(3)(B)(ii) when it wanted an actual minor to be involved, Congress's failure to include similar language in § 2260A, which was enacted after § 2252A(a)(3)(B), showed its intent that offenses involving non-actual minors should also be subject to § 2260A's additional ten-year sentence. The Court engaged in this *in pari materia* construction primarily because the Court believed that the Eleventh Circuit had engaged in a similar construction in Slaughter. See Slaughter, 708 F.3d at 1215-16 (engaging in an alternative *in pari materia* analysis, though not labeling it as such). While the Court has already held that an *in pari materia* construction of § 2260A is not warranted here based on its review of Fourth Circuit precedent, the Court notes now that, having had time to reflect on the matter, it would in any case reach a different conclusion about what inference could be drawn from a direct comparison between § 2260A and § 2252A(a)(3)(B). Section § 2252A(a)(3)(B) criminalizes various activities for materials that are or contain:

> (i) an obscene visual depiction of a minor engaging in sexually explicit conduct; or
> (ii) a visual depiction of an actual minor engaging in sexually explicit conduct.

Id. (emphasis added). In the context of the statute, the inclusion of the phrase "of an actual minor" in § 2252A(a)(3)(B)(ii) makes sense when set off against the phrase "of a minor" in § 2252A(a)(3)(B)(i). When the two phrases are read together, it is clear that Congress intended the term "minor" to be

Given the above, the Court holds that, because a fictional cartoon character is not a "person," § 2260A's "involving a minor" element was not met when Eychaner attempted to receive obscene cartoon images. The Court thus concludes that Defendant's Motion for Judgment of Acquittal must be **GRANTED** on Count Five, and his conviction on Count Five must be **VACATED**. ECF No. 90.

## IV. CONCLUSION

For the reasons noted above, Defendant's Renewed Motion for Judgment of Acquittal on Counts Two, Three, and Four is **DENIED**.

Because the "involving a minor" element of 18 U.S.C. § 2260A was not satisfied by the facts of this case, Defendant's Renewed Motion for Judgment of Acquittal is **GRANTED** for Count Five, and Defendant's conviction on Count Five is **VACATED**. ECF No. 90.

---

broader than the term "actual minor." The only clear inference to be drawn from this statute, then, is that when Congress explicitly uses the terms "actual minor" and "minor" in the same statute, then Congress intends the term minor to potentially include non-actual minors. If § 2260A had a similar structure, with phrasing such as "involving a minor under Section 1466A, or involving an actual minor" under the other predicate offenses, then the phrase "involving a minor" would be similarly broad. However, Congress did not write § 2260A with that phrasing, and thus the comparison to § 2252A is inapposite.

The Court also notes that the Government has failed to point to any statute in which Congress has used the term "minor," standing alone, to unambiguously refer to minors who do not exist. Given this context, the Court finds the Government's argument that the term "minor" in § 2260A includes fictional minors to be unpersuasive.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to counsel for Defendant and to the United States Attorney's Office in Newport News, Virginia.

**IT IS SO ORDERED.**

/s/

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 15, 2018