IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF VIRGINIA
*Newport News Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 4:17cr76 |
| v. | ) | |
| | ) | |
| ELMER EMMANUEL EYCHANER, III | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT

The defendant, Elmer Emmanuel Eychaner III, by counsel and in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.2 of the *Sentencing Guidelines and Policy Statements*, and this Court's sentencing procedures order, hereby states several unresolved objections to the Presentence Investigation Report ("PSR").[1]

**1. Mr. Eychaner should not receive a two-level enhancement under § 2G2.2(b)(7)(A) because the offense does not involve at least 10 images of "child pornography."**

The number-of-images enhancement in PSR ¶ 30 should not apply for three independent reasons.

*First*, the government has not proven—even by a preponderance—that Mr. Eychaner committed a crime involving child pornography. Because the government did not secure a conviction based on Mr. Eychaner having knowingly received, possessed, or accessed with the intent to view child pornography, this enhancement cannot apply unless the government first proves at sentencing that the images in question were involved in an "offense." Even assuming

---

[1] The defense originally objected to the application of a four-level enhancement under § 2G2.2(b)(4)(A) for an offense involving sadistic or masochistic material or other depictions of violence. *See* PSR ¶ 27. That objection is withdrawn.

*arguendo* that the images in question constitute child pornography, the government must also prove that Mr. Eychaner committed an *offense* involving those images. The verdict itself does not support such a finding because the jury made no findings as to these specific images or to images allegedly involving actual children more generally. Absent such a showing, the enhancement cannot apply.

The same holes in the government's proof at trial that led this Court to grant a Rule 29 motion as to the charge alleging actual receipt of cartoons demonstrate that the government cannot prove actual receipt or possession of the images in question here. *See United States v. Johnson*, 523 F. App'x 219, 222 (4th Cir. 2013) (holding that simply viewing images online is insufficient to prove knowing receipt). Thus, the government has to prove that Mr. Eychaner acted with the specific intent to access or save images of child pornography. *See United States v. Russo*, No. 3:09cr191, 2009 WL 3839299, at *5 (E.D. Va. Nov. 16, 2009) (observing that "it is possible to knowingly receive child pornography without attempting to have done so, because an attempt crime requires 'specific intent' to commit the underlying crime, as opposed to the lesser mens rea, 'knowingly,' that 18 U.S.C. § 2252A requires") (emphasis in original), *aff'd,* 408 F. App'x 753 (4th Cir. 2011). Whether Mr. Eychaner intended to access pornographic images of real children was not a question the jury was asked to decide. And most of the search terms Mr. Eychaner used for the short period in question explicitly related to cartoon images. Dr. Cather testified that the terms hentai, lolicon, shotacon, and toddlercon—which appeared in many of Mr. Eychaner's searches—related to *cartoon* images rather than images of actual children. Trial Tr. 303-307. Other searches included the term "CG," which stands for computer-generated. *See, e.g.*, Trial Tr. 147:13 (discussing use of search term "Show images of CG loli"). Computer generated images are not images of child pornography. The same is true for searches involving

the terms "Animated" or "3D." Trial Tr. 185:9-18. These searches demonstrated an intent to view cartoon or computer-generated images. Indeed, the government argued in closing that Mr. Eychaner "started doing searches that were going to yield *cartoon* images of minors engaged in sexually explicit conduct." Trial Tr. 489:8-10 (emphasis added). By contrast, these search terms do not demonstrate a specific intent to view, possess, or download images of actual child pornography.

Because the jury did not find (and the government has not otherwise proven) that Mr. Eychaner committed any offense involving images of child pornography, the enhancement under § 2G2.2(b)(7)(A) cannot apply.

***Second***, the enhancement under § 2G2.2(b)(7) applies only if "the offense involved" child pornography images. So even if the government establishes that Mr. Eychaner committed *an* offense involving child pornography, the government must then establish that "*the* offense" involved such images. To do so, the government must establish that conduct from this other offense (the supposed child pornography offense of which Mr. Eychaner was not convicted) constitutes relevant conduct as to the offenses of conviction. *See* § 1B1.1, App. Note 1(H) (defining "offense" by reference to relevant conduct); § 1B1.3 (defining relevant conduct); *see also United States v. Teuschler*, 689 F.3d 397 (5th Cir. 2012) (vacating sentence because district court applied number of images enhancement when government did not show that possession of additional images was relevant conduct). The government's relevant conduct theory is not readily apparent. Without one, the enhancement cannot apply.

***Third***, if the government clears those hurdles, it still bears the burden of proving by a preponderance of the evidence that at least ten of the images identified in Paragraph 14 of the PSR meet the definition of "child pornography" under 18 U.S.C. § 2256(8). *See* § 2G2.2, App.

Note 6 (providing that the term "image" within the meaning of this enhancement refers to an image "that constitutes child pornography, as defined in 18 U.S.C. § 2256(8)"). On this question, the parties agree that cartoon images do not trigger the enhancement.

Based on conversations with the attorney for the government, the defense understands that the government intends to rely *solely* on this Court's lay opinion as to the age of the people depicted in these images to support a finding that the images meet the definition of child pornography. Even without countervailing evidence, this minimalist approach to proving essential elements of an enhancement is underwhelming. But here the government has affirmative reason to doubt that the images it presents are child pornography. The government's failure to provide the Court with any evidence to support its claims is particularly striking in this context.

As an initial matter, the government acknowledges that the National Center for Missing and Exploited Children (NCMEC) provided a report stating that the images and videos in question are not from any known series of child pornography. PSR ¶ 15. NCMEC's Child Victim Identification Program (CVIP) "serves as the central repository in the U.S. for information relating to child victims depicted in sexually exploitative images and videos."[2] "CVIP was launched in 2002 after NCMEC analysts repeatedly saw images of the same child victims in their reviews and began tracking which victims had been previously identified by law enforcement." *Id*. CVIP's "victim identification lab" allows "law enforcement, prosecutors, and social service workers [to] access redacted and sanitized child sexual abuse images in an effort to help identify and rescue unknown child victims." *Id*. Obviously, that none of the images depict

---

[2] Nat'l. Center for Missing & Exploited Children, Child Victim Identification Program, *available at* http://www.missingkids.com/theissues/onlineexploitation/cvip (last accessed Aug. 13, 2018)

known victims is not conclusive proof that the images do not depict child pornography. But it should have prompted further investigation by the government.

The defense is not permitted access to NCMEC's database. Nor does the defense benefit from having ready access to the government's binders of allegedly illicit material. Or to the vast investigative resources of the FBI. But a defense investigation revealed that several of the images that the government says depict minors actually depict adults.

Once—after extended delays and protracted litigation—the government finally identified the basis for Count One, the defense uncovered evidence that cast serious doubt on one of the alleged images. In the face of this evidence, the government decided to dismiss the child pornography charge. Now the government's allegations as to child pornography have resurfaced. And, again, the government asserts that even the image for which the defense previously provided § 2257 verification documents constitutes child pornography. And apparently it plans to present no evidence in support other than the image itself.

At the sentencing hearing, the defense plans to introduce documentary evidence from its investigation to establish that at least some of the images in question actually depict adults. The defense's documentary evidence will include § 2257 compliance documents for images alleged by the government to constitute child pornography and § 2257 compliance statements from and/or descriptions of websites distributing images alleged by the government to constitute child pornography. The defense may also put on testimony from a defense investigator respecting the defense's investigation of the age of the women depicted in these images. The defense may also introduce a declaration and/or testimony from Susan A. Brown, a medical doctor specializing in pediatrics and adolescent medicine. Dr. Brown may offer opinions about the ages of individuals depicted based on her career in pediatric medicine and extensive study of child and adolescent

growth and development. Because the government will fail to prove that *any* image constitutes child pornography, Mr. Eychaner should not receive the two-point enhancement for committing an offense that involved at least ten images of child pornography.

If, however, the Court finds that some of the images in question constitute child pornography, the Court may need to resolve whether duplicate photos should count more than once toward the number of images under § 2G2.2(b)(7)(A). Application Note 6(B)(i) states that "for purposes of determining the number of images under subsection (b)(7): Each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered to be one image." The Application Note goes on to define an "image" as "any visual depiction ... that constitutes child pornography."

As this Court knows from trial testimony, Mr. Eychaner's computer was monitored by RemoteCom and screenshots were taken approximately every 10 seconds. Accordingly, when the same screen displayed for longer than 10 seconds, the remote monitoring software captured another screenshot. In such circumstances, the same "image" was captured twice by RemoteCom. The same phenomenon occurred when Mr. Eychaner scrolled down a page, but did not scroll far enough in ten seconds to bring an entirely new group of images onto the screen.

In these circumstances, the same images being "screenshot" more than once by RemoteCom should not result in that image counting more than once against Mr. Eychaner. The image in question only existed once and Mr. Eychaner did not copy or save it in any way. Imagine if RemoteCom's software took a screenshot every second. Would that mean Mr. Eychaner attempted to receive ten times the number of images? Certainly not. But the government's argument unavoidably leads to that conclusion.

The Fourth Circuit has held that the same image can count more than once for purposes of this enhancement if the same image is emailed to more than one person. *United States v. Price*, 711 F.3d 455 (4th Cir. 2013). The *Price* court explained that by emailing the same image to multiple people, it increased the number of images of child pornography that existed in the world:

> Price reproduced images of child pornography when he emailed a limited number of images of child pornography to a large number of people. That Price reproduced the pornographic images with the click of a "send" button as opposed to the use of a photocopier does not sway the outcome; his conduct still had the effect of increasing the number of images of child pornography. *See generally United States v. Sullivan,* 451 F.3d 884, 890 (D.C. Cir. 2006) ("the prohibition against possessing child pornography transported ... by computer is one important aspect of a comprehensive legislative scheme aimed at eliminating traffic of child pornography."). Each time Price sent an email with images of child pornography attached he gave fodder to potential abusers who may now have access to the images. Price's mass proliferation of child pornography via email makes it almost impossible to know who will come into possession of the images and that much harder for law enforcement to eradicate the images' existence.

*Id*. at. 459-60.

Mr. Eychaner's case is patently different. Mr. Eychaner did not reproduce the images at all. Rather, solely because of RemoteCom's arbitrary ten-second protocol for taking screen shots, Mr. Eychaner is being tagged with viewing *multiple* images when he really only viewed the *same* image for more than ten seconds. That rule makes no sense. And nothing about the Fourth Circuit's analysis in *Price* dictates such a result.

By the defense's count, approximately 22 images are double-counted due to this phenomenon under the PSR's number-of-images calculation. So depending on whether the Court finds that some of the alleged images actually constitute child pornography (and, if so,

how many and which) the Court may have to determine whether images that appear in multiple screenshots should count each time they appear or once.

The government bears the burden of proving whether the § 2G2.2(b)(7)(A) enhancement applies. The government has not proven 1) that Mr. Eychaner committed an offense involving these images, 2) that the images were involved in "the offense" for which Mr. Eychaner is being sentenced, or 3) that at least ten of the images in question meet the definition of child pornography. Without proving each of those items the enhancement cannot apply.

### 2. Section 2G2.2(b)(2)'s enhancement for material involving a prepubescent minor should not apply.

The PSR applied a two point enhancement under § 2G2.2(b)(2). PSR ¶ 26. Section 2G2.2(b)(2) provides, "If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by 2 levels." This enhancement should not apply for two reasons. First, for the reasons stated above, this offense does not involve any actual minors. None of the pornographic[3] photos depict individuals under 18 years old, much less under 12.

---

[3] The defense acknowledges that at least one identified image depicts minors, but not all photos of nude minors are illegal. *United States v. Doyle*, 650 F.3d 460, 473 (4th Cir. 2011) (holding that the "mere presence of nudity in a photograph, even child nudity, does not constitute child pornography"). The particular image, which appears to be from a nudist beach, does not meet the definition of child pornography. *See United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986) (listing factors typically used to determine whether visual depiction of a minor constitutes a "lascivious exhibition of the genitals or public area," including 1) whether the focal point is the child's genitalia or pubic area; 2) whether the setting is sexually suggestive, *i.e.,* in a place or pose generally associated with sexual activity; 3) whether the child is in an unnatural pose, or in inappropriate attire; 4) whether the child is fully or partially clothed, or nude; 5) whether the depiction suggests sexual coyness or a willingness to engage in sexual activity; and 6) whether the depiction is intended or designed to elicit a sexual response in the viewer). Images that are not illegal—meeting neither *Miller*'s obscenity test nor the statutory definition of child pornography—cannot count toward the prepubescent minor enhancement. Not only would that contravene the plain language of the guideline (which contemplates images being involved in an *offense*), it would also violate the First Amendment. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 256 (2002) (explaining that restrictions that cover materials beyond the categories recognized in *Ferber* and *Miller* violate the First Amendment).

Second, insofar as the government relies on cartoons to support this enhancement, its legal position is incorrect. This enhancement is triggered not by the involvement of any cartoon, but rather only by the involvement of another actual person who is prepubescent or under age 12. Under the guideline's definition, a minor is an "individual," meaning a person or human being. A cartoon is not an "individual." Ergo, a cartoon is not a "minor."

The guideline's text provides that the enhancement applies only if the "material involved a prepubescent **minor** or a **minor** who had not attained the age of 12 years." § 2G2.2(b)(2) (emphasis added). The relevant application note defines the term "minor" as follows:

> **"Minor" means** (A) **an individual** who had not attained the age of 18 years; (B) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years, and (ii) could be provided for the purposes of engaging in sexually explicit conduct; or (C) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

§ 2G2.2(b)(2), App. Note 1 (emphasis added).

The Fourth Circuit has held that courts should "interpret the Sentencing Guidelines according to the ordinary rules of statutory construction." *United States v. Ashford*, 718 F.3d 377, 382 (4th Cir. 2013) (quoting *United States v. Strieper*, 666 F.3d 288, 293-94 (4th Cir. 2012)). As always, that inquiry begins with the text. *Id.*

When used as a noun, the term "individual" refers to a person or a human being. It does not refer to a cartoon. This ordinary meaning is confirmed by a number of dictionary definitions. For example, the Oxford English Dictionary provides the following relevant definition for "Individual": "In contexts where a group is not specified or implied: a human being, a person." *See Individual*, *OED Online, Oxford University Press* (Web. June 2018) *available at* www.oed.com/view/Entry/94633 (last accessed Aug. 15, 2018). In an admittedly unrelated context, the Supreme Court cited several dictionary definitions and *unanimously* held that the

word "individual" ordinarily refers to "a human being, a person." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012) (citing dictionary definitions and observing that "[e]videncing that common usage, this Court routinely uses 'individual' to denote a natural person").

This Court recently held that the term "person" is ordinarily understood to refer to a human being and not to a cartoon. *See* ECF No. 103, at 49. If anything, the word "individual" is less amenable than the word "person" to being extended to encompass cartoons. The Dictionary Act, which generally defines terms used in the United States Code, refers to "individuals" as a subset of the collection of legal entities and natural persons referred to by using the word "person." It provides that the word "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, ***as well as individuals***." 1 U.S.C. § 1. Congress's usage here is consistent with the ordinary meaning of "individual"—it refers to a human being or natural person. Neither "person" nor "individual" is broad enough to encompass cartoons. And this Court has already held that the term "person" does not include cartoons. If anything, "individual" has a narrower meaning.

Other courts interpreting the word "minor" in § 2G2.2 have employed definitions that would exclude cartoons. In *United States v. Vasquez*, the Fifth Circuit was asked to consider whether a fictitious minor of the defendant's own creation qualified as a "minor" under this definition. 839 F.3d 409, 413 (5th Cir. 2016). The Fifth Circuit cited favorably the Eleventh Circuit's analysis of § 2G2.2's definition of minor:

> The only part of the definition of "minor" in the commentary to U.S.S.G. § 2G2.2 that does not include the involvement of a law enforcement officer is "an individual who had not attained the age of 18 years." *See* § 2G2.2 cmt. n.1(A). In other words, where the defendant is not dealing with a law enforcement officer, *the enhancement applies only where the "minor" actually is a true, real live, sure enough minor.*

*Id.* at 412-13 (quoting *United States v. Fulford*, 662 F.3d 1174, 1181 (11th Cir. 2011) (emphasis in *Vasquez*). The Fifth Circuit adopted the Eleventh Circuit's analysis. It held that, although Vasquez's offense involved "a fictitious minor, invented by the defendant, under twelve years of age," it was ***not*** true that "the offense involved a minor who had not attained the age of 12 years." *Id.* There was no dispute in *Vasquez* that the character was under age 12. *Id.* But a fictional character is not a "real live" human being. So the court properly held that the enhancement did not apply.

Because the plain text of the guideline is unambiguous, the Court need not go any further. But if the Court were inclined to examine the legislative history surrounding § 2G2.2's definition of "minor," the Court should reach the same conclusion.

Before 2004, § 2G2.2 provided simply that "'[m]inor' means an individual who had not attained the age of 18 years." § 2G2.2 App. Note 1 (2003). In November 2004, however, the Sentencing Commission amended the definition to add parts (B) and (C). *U.S. Sentencing Guidelines Manual* app. C, vol. III amend. 664, at 49 (Nov. 1, 2004) (Amendment 664). The Commission explained that, "[i]n response to the increase in the use of undercover officers in child pornography investigations, the amendment expands the definition of 'minor.'" *Id.* at 60.

In the same November 2004 amendments, the Commission made various changes to the child pornography guidelines in response to the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, (the "PROTECT Act"), Pub. L. 108-21. *See generally U.S. Sentencing Guidelines Manual* app. C, vol. III amend. 664, at 58 (Nov. 1, 2004) (Amendment 664). When Congress created a new offense via the PROTECT Act, the Commission adjusted the guidelines to ensure that the statutory scheme and the guideline scheme made sense together. *See id.* at 62 (discussing changes to guidelines intended to account for

Congress's addition of a new crime: Misleading Domain Names on the Internet in violation of 18 U.S.C. § 2252B).

Finally, Congress's actions in the PROTECT Act also prompted the Commission to revise definitions in the application notes. The PROTECT Act created an enhancement based on the number of images. *Id.* at 59. The Commission recognized that, against the existing backdrop, Congress's actions created an ambiguity in the guidelines as to how images would be counted. *Id.* (observing that "the congressional amendment did not provide a definition of 'image,' which raised questions regarding how to apply the specific offense characteristic"). In response, the Commission provided a definition of the term "image" that meshed with Congress's intent.

Critically, § 1466A—the offense charged under Count Two of the instant indictment, which proscribes receiving cartoon depictions of minors engaged in sexually explicit—was enacted in the 2003 PROTECT Act. *See* Pub. L. 108-21, title V, § 504(a) (Apr. 30, 2003) (adding § 1466A). In the November 2004 amendments to the guidelines, the Commission demonstrated that it knew how to 1) expand the definition of minor, 2) change guideline provisions in response to new crimes created by the PROTECT Act, and 3) change definitions in the application notes to resolve ambiguities created by the PROTECT Act. Clearly, the Commission could have expanded the definition of "minor" to include cartoons, rather than limiting it to *individuals*. But the Commission did not do so.

As this Court has held, a cartoon is not a "person." ECF No. 103, at 59. Likewise, a cartoon is not "an individual." Accordingly, § 2G2.2(b)(2)'s enhancement for material involving a prepubescent minor should not apply.

**3. The five-level enhancement under § 2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor should not apply.**

Paragraph 28 of the PSR applies a five-level enhancement based on the conclusion that Mr. Eychaner "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." § 2G2.2(b)(5). This enhancement should not apply.

The guidelines define "pattern of activity involving the sexual abuse or exploitation of a minor" as "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." § 2G2.2. App. Note 1. The guidelines further define "sexual abuse or exploitation":

> "Sexual abuse or exploitation" means any of the following: (A) conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)-(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2241, § 2422, or § 2423; (B) an offense under state law, that would have been an offense under any section if the offense had occurred within the special maritime or territorial jurisdiction of the United States; or (C) an attempt or conspiracy to commit any of the offenses under subsection (A) or (B). "Sexual abuse or exploitation" does not include possession, accessing with intent to view, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor.

*Id.*

The previous presentence report—which was completed for Mr. Eychaner's 2007 possession of child pornography case—originally applied this enhancement. But it was later removed because only one of Mr. Eychaner's prior offenses qualified as a predicate. *See* PSR in *United States v. Eychaner*, Case No. 2:07cr183. At Page A-1 of the addendum, the pattern enhancement was removed and the probation officer wrote as follows:

> The enhancement for engaging in a pattern of activity involving the sexual abuse or exploitation on a minor was removed because the

defendant's conduct which resulted in his December 11, 1992, conviction does not meet the definition of "sexual abuse or exploitation of a minor", as defined in the guidelines.

The analysis has not changed since the preparation of the 2007 PSR.

4. **The PSR's discussion of statements allegedly made by Mr. Eychaner during treatment should be limited to assessing his performance in treatment and discerning any relevant diagnoses.**

The defense objects to the PSR's inclusion of specific, allegedly self-reported information about Mr. Eychaner's sexual history obtained during sex offender therapy or evaluations for sex offender therapy.[4] All of this information was obtained through repeated assurances to Mr. Eychaner by treatment providers that as long as he gave generalized descriptions, none of that information would be used against him. Mr. Eychaner was repeatedly told that this information was being sought for purposes of treatment. Using this self-reported information to enhance Mr. Eychaner's sentence would not only contravene the assurances of his counselors and evaluators, it would undermine the BOP's sex offender treatment system at large.

In addition to the assurances made to Mr. Eychaner, the Bureau of Prisons own manuals stress the importance of honesty and self-disclosure as an important part of treatment—not as a vehicle to punish someone in the future. The BOP Program Statement on the Sex Offender Treatment Program (SOTP) emphasizes the importance of self-disclosure as a treatment objective, noting that the non-residential SOTP "is intended to better prepare the inmate for intensive treatment in the [residential SOTP] by enhancing motivation, ***promoting honest self-disclosure of prior sexual behavior***, learning and practicing group participation skills, etc." BOP Program Stat. 5324.10, at 3.4.2(b) (Feb. 15, 2013) (emphasis added). Self-disclosure of past sexual behavior is an explicit expectation of the program. *See id.* at 3.3.2(b) (noting that "participants are expected to … [p]articipate in a Process Group, demonstrating an appropriate

---

[4] This information is found in Paragraphs 62-64, 76-78, 81, 82, 84, 86, and 91 of the PSR.

level of self-disclosure"). Indeed, such disclosure is required to successfully complete the treatment program. *See id.* at 3.3.4(a) ("Participants have completed treatment when the SOMP Coordinator determines they have … [d]emonstrated an appropriate degree of self-disclosure). And the BOP makes clear that "disclosure of previously undocumented sexual offenses" is important for treatment staff to adjust the intensity of treatment. *See id.* at 3.5.4.

Placing limits on the confidentiality of statements made to treatment providers while a offender is on supervised release or housed in the BOP can be justified by the need for the BOP or Probation to discern the best way to promote the offender's rehabilitative needs through appropriate treatment. This Court has noted this rationale when requiring such waivers in the past. *See, e.g.*, Sent. Hrg. Tr. 22:6-23:4, 26:1-27:2 (June 8, 2016) in *United States v. McLean*, No. 4:16cr34 (E.D. Va. June 8, 2016) (Davis, J.). But it would be patently unfair, contrary to this Court's rationale, and in conflict with BOP's stated treatment goals and repeated assurances to Mr. Eychaner if every soul-crushing admission Mr. Eychaner made with an eye towards getting better through active participation in treatment was used to enhance his sentence by even one day. Moreover, if disclosures made by Mr. Eychaner in BOP treatment are used to significantly increase his sentence, word of how statements in treatment are being used will spread like wildfire within the BOP. Whatever the merits of general deterrence as a sentencing strategy, using statements from BOP treatment to drastically increase a defendant's sentence will have a serious "general deterrence" effect. It will undoubtedly cause offenders to curb self-disclosure and honesty in treatment.

### 5. The enhancement for obstruction of justice under § 3C1.1 should not apply.

"To satisfy the requirements of this enhancement, the defendant's obstructive conduct must have been willful, meaning that he must have consciously acted with the purpose of obstructing justice." *United States v. Thorson*, 633 F.3d 312, 320 (4th Cir. 2011) (internal

quotations and brackets omitted).  The defense acknowledges that Mr. Eychaner smashed his computer, but the evidence does not support a finding that he did so with the requisite intent.  Accordingly, the enhancement should not apply.

### 6.  Contrary to PSR ¶¶ 16 and 116, restitution is not authorized.

The PSR asserts that restitution is authorized under the Mandatory Victims Restitution Act (MVRA) or the Mandatory Restitution for Sexual Exploitation of Child Act (MRSECA).  At this time, the government does not appear to be seeking restitution.  Thus, the question of legal authority may be moot.  But the defense objects to the assertion that this Court has authority to order restitution to any person and seeks leave to further brief the matter if the government asserts that any person is entitled to restitution.[5]

### 7.  Results of a polygraph examination at PSR ¶ 92 should be stricken.

Paragraph 92 of the PSR includes two sentences containing the alleged results of polygraph examinations conducted in July and September 2016.  The two sentences in that paragraph begin with the phrase, "The defendant showed deception."  Those sentences should be stricken from the PSR based on their inherent unreliability.

The Fourth Circuit held in 1997 that polygraph evidence is *categorically* inadmissible at trial.  *United States v. Sanchez*, 118 F.3d 192 (4th Cir. 1997) (holding that polygraph evidence had "no significant relevance to any material issue going to [the defendant's] guilt.").  The next year, the Supreme Court has held that such *per se* bans on the use of polygraph evidence are

---

[5] In sum, the MVRA and the MRSECA provide for restitution that compensates only for the specific conduct that is the basis for the offense of conviction.  *See United States v. Freeman*, 741 F.3d 426, 434 (4th Cir. 2014) (holding that, under MVRA, "awards of restitution…must compensate only for the loss caused by the specific conduct that is the basis of the offense of conviction" (internal quotation marks omitted)); *United States v. Sanders*, 52 F. Supp. 3d 1329, 1337 (N.D. Ga. 2014) (holding same under MRSECA).  Because Mr. Eychaner's offense of conviction charged only the attempted receipt of anime cartoons, the specific conduct forming the basis for the offense of conviction caused no loss.  Accordingly, no person is entitled to restitution.

reasonable and constitutional. *United States v. Scheffer*, 523 U.S. 303, 312 (1998) (noting that "there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate"). Both the Fourth Circuit and the Supreme Court rested their holdings on the observation that polygraph evidence is inherently and categorically unreliable. When the Fourth Circuit reconsidered the viability of polygraph evidence in 2003 (after the Supreme Court's decision in *Daubert*), it decided to retain its *per se* ban on polygraph evidence based on its unreliability. *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003) (holding that "to the extent that *Daubert*'s alteration of the legal landscape threw into doubt the viability of our *per se* rule against polygraph evidence, *Ruhe* and *Sanchez* effectively resolved those doubts in favor of the rule").

Although the cases above address the inadmissibility of polygraph evidence at trial, the Fourth Circuit has also affirmed the rejection of polygraph results at sentencing. In *United States v. Chin*, the district court refused to consider polygraph evidence at sentencing because the Fourth Circuit "has generally found polygraph evidence to be inadmissible," and because the "specific polygraph evidence [was] particularly unreliable because there had been no opportunity for joint observation by the prosecution." 181 F.3d 92 (4th Cir. 1999). The Fourth Circuit affirmed.[6] *Id.* Other courts have reached similar conclusions.[7]

---

[6] Both of the problems present in *Chin* apply here: polygraphs are generally unreliable, and the defense was not able to observe the examination.

[7] In *United States v. Dacre*, a district court had refused to consider polygraph results at sentencing because of "the uncertainties surrounding the reliability of polygraph examinations, which the Supreme Court and [the Eighth Circuit] have recognized." 187 F. App'x 674, 675 (8th Cir. 2006). The Eighth Circuit affirmed. Likewise, in *United States v. Messina*, a defendant attempted to offer favorable polygraph evidence at sentencing, but the district court would not accept it stating, "I still don't believe—let me put it this way, I believe that the rule of law which excludes polygraphs is the right one." 131 F.3d 36, 42 (2d Cir. 1997) (quoting the court below). The Second Circuit affirmed. *Id.* Other Courts of Appeals have reached the same conclusion. *See, e.g.*, *United States v. Thomas*, 167 F.3d 299, 307-08 (6th Cir. 1996) (affirming exclusion of

The Fourth Circuit also affirmed a district court's refusal to consider evidence of polygraph examination results in the context of a supervised release hearing. *See United States v. Mitchell*, 429 F. App'x 271, 275 (4th Cir. 2011). In *Mitchell*, the Fourth Circuit held:

> In accordance with our authorities construing the Federal Rules of Evidence, which, as we have noted, do not govern revocation hearings, "[p]olygraph results are generally inadmissible." *United States v. Blake,* 571 F.3d 331, 346 (4th Cir. 2009) (citation omitted). Unlike hearsay statements, as to which we made allowance for appropriate use in hearings like Mitchell's, *see United States v. McCallum,* 677 F.2d 1024 (4th Cir.1982), there is no similar precedent permitting the admission of polygraph results as substantive evidence in any proceeding. The lack of enabling authority is hardly surprising. The Supreme Court has commented that "there is simply no consensus that polygraph evidence is reliable," *United States v. Scheffer,* 523 U.S. 303, 309, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), a state of affairs that would seem to preclude such evidence meeting the *McCallum* test of "demonstrable reliability."

*Id.* at 275-76.

Relying on *Mitchell*, this Court has stricken polygraph results from presentence investigation reports in the past under similar circumstances. *See* ECF No. 35 in *United States v. Cross*, No. 2:16cr102 (E.D. Va. Aug. 2, 2017) (Davis, J.). Even if the inherent unreliability of polygraph evidence does not justify categorical exclusion of polygraph evidence from sentencing proceedings, such evidence should not be considered at sentencing (or included in a PSR) when there has been no specific showing as to its reliability. These polygraph results should be stricken.

---

defendant's polygraph evidence in support of role reduction); *see also United States v. Stein*, 127 F.3d 777, 781 (9th Cir. 1997) (affirming district court because polygraph report offered at sentencing was "too conclusory to be probative"). In *Ortega v. United States*, the Eighth Circuit vacated and remanded for resentencing when the district court relied on a polygraph examination as a basis for a sentencing enhancement. 270 F.3d 540, 547 (8th Cir. 2001). The Eighth Circuit "remind[ed] the government that although at sentencing a district court may consider information that would be inadmissible at trial, the information must have 'sufficient indicia of reliability to support its probable accuracy.'" *Id.* at 548 (quoting U.S.S.G. § 6A1.3(a)).

**8. Paragraph 84 incorrectly suggests that Mr. Eychaner portrayed himself as a victim during treatment to minimize his responsibility**

Although Mr. Eychaner did express concerns to treatment staff the BOP's sex offender treatment program was not sufficiently addressing his extensive abuse as a child, Mr. Eychaner did not express those concerns in an effort to "minimize his responsibility." He was simply trying to get help.

**9. Paragraph 93 incorrectly states that Mr. Eychaner "minimized his behavior"**

Paragraph 93 of the PSR states that Mr. Eychaner "minimized his behavior" when he said he only looked at anime child pornography. If the Court finds that none of the images viewed by Mr. Eychaner constitute actual child pornography, then the assertion in Paragraph 93 should be stricken.

Respectfully submitted,

ELMER EYCHANER

By:_____/s/_____

Amanda C. Conner
VSB # 88317
Assistant Federal Public Defender
Attorney for Elmer Eychaner
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
Email: amanda_conner@fd.org

Andrew W. Grindrod
VSB No. 83943
Assistant Federal Public Defender
Attorney for Elmer Eychaner
Office of the Federal Public Defender
150 Boush Street, Suite 403

Norfolk, Virginia 23510
Telephone:  757-457-0800
Telefax:  757-457-0880
Email: andrew_grindrod@fd.org

**CERTIFICATE OF SERVICE**

I certify that on the 16th day of August, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Lisa R. McKeel
Assistant United States Attorney
Office of the United States Attorney
Fountain Plaza Three
Norfolk, VA 23510
Phone: 757-591-4000
Fax: 757-591-0866
lisa.mckeel@usdoj.gov

Megan Cowles
Assistant United States Attorney
Office of the United States Attorney
Fountain Plaza Three
Norfolk, VA 23510
Phone: 757-591-4000
Fax: 757-591-0866
megan.cowles@usdoj.gov

I also certify that I have sent a copy of this filing by electronic mail to the following non-ECF user:

Karen Franklin
Senior United States Probation Officer
827 Diligence Drive, Suite 210
Newport News, Virginia
(757) 223-4673

By:_____/s/_____

Amanda C. Conner
VSB # 88317
Assistant Federal Public Defender
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0800
(757) 457-0880 (telefax)
amanda_conner@fd.org